## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Jane A. Restani, Judge**

|  |  |  |
|---|---|---|
| **TOYO KOHAN CO. LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | **Court No. 24-00261** |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **THOMAS STEEL STRIP CORPORATION,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.2, Toyo Kohan Co. Ltd. ("Plaintiff") respectfully moves for judgment upon the agency record in this court action. Plaintiff seeks judicial review of the U.S. Department of Commerce's ("Commerce") final results of the anti-dumping duty administrative review of diffusion-annealed nickel-plated flat-rolled steel products ("DANP") from Japan, covering the period May 1, 2022, to April 30, 2023. *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024) ("Final Results").

For reasons set forth in the accompanying brief of Plaintiff in support of their motion for judgment on the agency record, which is hereby incorporated into this motion by reference, Commerce's final determination is not supported by substantial evidence on the record and is otherwise not in accordance with law.

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(1) holding unlawful the affirmative antidumping determination for the Plaintiff and

(2) remanding the final determination with instructions for Commerce to render a new determination consistent with the court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
William Chandler

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th Street, N.W. Washington, D.C. 20036
202-663-8000

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Jane A. Restani, Judge**

| | |
|---|---|
| **TOYO KOHAN CO. LTD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | **Court No. 24-00261** |
| ) | |
| **Defendant,** ) | |
| ) | |
| **THOMAS STEEL STRIP CORPORATION,** ) | |
| ) | |
| **Defendant-Intervenor.** ) | |
| ) | |
| ) | |

## PLAINTIFF TOYO KOHAN'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
Will Chandler


**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co. Ltd.*

**May 2, 2025**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

PLAINTIFF'S STATEMENTS PURSUANT TO RULE 56.2 ........................................... 5

    A.    Administrative Determination Under Appeal ................................................. 5

    B.    Issues of Law Presented .................................................................................. 5

    C.    Statement of Reasons for Remanding Commerce's Determination ............. 5

STATEMENT OF FACTS ................................................................................................ 6

ARGUMENT .................................................................................................................. 19

I.    COMMERCE'S DATE OF SALE CONCLUSION IS NOT SUPPORTED BY
SUBSTANTIAL EVIDENCE AND IS OTHERWISE NOT IN ACCORDANCE
WITH LAW ......................................................................................................... 19

    A.    Commerce Has a Well-Settled Legal Framework and Practice for
Determining the Date of Sale ....................................................................... 19

    B.    Commerce Ignored Its Regulation and Its Well-Settled Practice and
Determined the Date of Sale in This Proceeding Without Any
Support in Substantial Evidence .................................................................. 25

II.    COMMERCE UNLAWFULLY APPLIED DIFFERENTIAL PRICING TO
AVOID USING THE AVERAGE-TO-AVERAGE COMPARISON
METHODOLOGY ............................................................................................... 35

    A.    The Exhaustion Doctrine Does Not Apply ................................................. 36

    B.    Commerce's Application of Its Cohen's d Approach Is Unlawful ............. 38

CONCLUSION AND PRAYER FOR RELIEF ............................................................. 43

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Allied Tube & Conduit Corp. v. United States*,
  24 C.I.T. 1357 (2000)........................................................................ 21

*Garg Tube Export LLP v. United States*,
  698 F. Supp. 3d 1230 (Ct. Int'l Trade 2024) ..................................... 36, 37

*Hormel v. Helvering*,
  312 U.S. 552 (1941)....................................................................... 36, 37, 38

*Marmen Inc. v. United States*,
  Slip Op. 23-1877 (Apr. 22, 2025) ............................... 3, 5, 35, 37, 38, 39, 40

*Nucor Corp. v. United States*,
  612 F.Supp.2d 1264 (Ct Int'l Trade 2009) ......................................... 29

*Papierfabrik Aug. Koehler AG v. United States*,
  36 CIT 1632 (2012)......................................................................... 36

*Polaris Indus. v. Arctic Cat, Inc.*,
  724 F. App'x 948 (Fed. Cir. 2018) ................................................... 36

*Siemens Gamesa Renewable Energy v. United States*,
  621 F. Supp. 3d 1337 (Ct. Int'l Trade 2023) .................................... 36

*Stupp Corp. v. United States*,
  619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) .................................... 37

*Stupp Corp. v. United States*,
  Slip Op. 23-1663 ........................................................................... 3

*Stupp Corporation v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ....................................................... 37, 39

*Ticaret A.Ş. v. United States*,
  426 F.Supp.3d 1395 (Ct. Int'l Trade 2020) .................................... 20, 29

*Ticaret A.S. v. United States*,
  693 F.Supp.3d 1368 (Ct Int'l Trade 2024) ..................................... 21, 25

*Ticaret A.S. v. United States*,
  756 F.Supp.3d 1312 (Ct. Int'l Trade 2025) .............................................................. 20

Administrative Proceedings

*2022–2023 Antidumping Duty Administrative Review of Diffusion-Annealed,
  Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Decision
  Memorandum* (Dep't Commerce, May 16, 2024) ...................................................... 15

*2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed,
  Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results Analysis
  Memorandum for Toyo Kohan Co., Ltd.* (Dep't Commerce, Nov. 25, 2024) at
  Attachment III ........................................................................................ 18, 35, 39, 40

*2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed,
  Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results Analysis
  Memorandum for Toyo Kohan Co., Ltd.* (Dep't Commerce, Nov. 25, 2024) at
  Page 11 ......................................................................................................................... 18

*2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed,
  Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results
  Analysis Memorandum for Toyo Kohan Co., Ltd.*, at 2 (Dep't Commerce, May
  16, 2024) *Prelim Analysis Memo* (P.R. 86) ............................................................... 30

*2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed,
  Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results
  Analysis Memorandum for Toyo Kohan Co., Ltd.* (Dep't Commerce, May 16,
  2024) (P.R. 86) ............................................................................................................. 16

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final
  Results of the Antidumping Duty Administrative Review and Final
  Determination of No Shipments*; 2017-2018, 84 Fed. Reg. 64,042 (Nov. 20,
  2019) ............................................................................................................................... 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final
  Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 30,816 (May 29,
  2014) ................................................................................................................................ 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final
  Results of Antidumping Duty Administrative Review; 2013–2015*, 81 Fed. Reg.
  91,116 (Dec. 16, 2016) .................................................................................................... 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final
  Results of Antidumping Duty Administrative Review; 2015–2016*, 82 Fed. Reg.
  57,715 (Dec. 7, 2017) ...................................................................................................... 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 64,327 (Dec. 14, 2018) ................................................................... 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2018–2019*, 86 Fed. Reg. 15,462 (Mar. 23, 2021) ...................................................... 6

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2019–2020*, 87 Fed. Reg. 4,842 (Jan. 31, 2022) .................................................... 6, 23

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 57,455 (Sept. 20, 2022) .................................................. 6, 24

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85,590 (Dec. 8, 2023) ....................................................... 6, 24

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024)........................................... 5, 6, 15, 16, 24, 29, 33, 43

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024)...................................................... 5

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 45,638 (Dep't of Commerce, May 23, 2024) ..................................................... 13, 14

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results of the Antidumping Duty Administrative Review; 2018–2019*, 85 Fed. Reg. 44,041 (July 21, 2020).................................. 23

*Issues and Decision Memorandum for the Final Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan* (Dep't of Commerce, November 25, 2024) ........................................................ 3

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 810 (1994), reprinted in 1994 U.S.C.C.A.N. 4040................ 20

<u>Statutes and Codes</u>

28 U.S.C. § 2637(d) ........................................................................................... 38

<u>Rules and Regulations</u>

19 C.F.R. § 351.401(i) ............................................................ 1, 5, 20, 21, 22, 34

62 Fed. Reg. 27,296, 27,348-49 (Dep't Commerce, May 19, 1997) ................................ 22

<u>Other Authorities</u>

Agreement on the Implementation of Article VI of the General Agreements on
 Tariffs and Trade 1994, Article 2.4.1, fn. 8 ................................................. 20

*Verification of the Sales Response of Toyo Kohan Co., Ltd. in the Antidumping
 Duty Administrative Review of Diffusion-Annealed Nickel-Plated Flat-Rolled
 Steel Products from Japan* (May 26, 2023) (Public Version) ........................................ 9

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case involves two issues – (1) the proper determination of the "date of sale" for U.S. sales in the challenged antidumping determination, and (2) the proper application of the statutory rule for comparing average prices to average prices. The Department of Commerce's ("Commerce") conclusion regarding the appropriate date of sale here was flawed and completely contrary to the record evidence. And Commerce's use of its differential pricing test here to avoid the statutory rule of average-to-average price comparisons is directly contrary to a recent Federal Circuit decision declaring the differential pricing test to be unlawful.

Regarding the first issue, the underlying legal framework for the date of sale is straightforward. Commerce determines the date of sale to be the date when the material terms of the sale, especially the price, have been fixed. Commerce has a specific regulation (*i.e.*, 19 C.F.R. § 351.401(i)) that creates a rebuttable presumption in favor of using the "invoice date" as the date of sale. This regulation reflects Commerce's view that, typically, the invoice sets the final terms of the sale. Commerce sometimes departs from this presumption, but only when there is satisfactory record evidence showing that another date better reflects the point when all the material terms of the sale have been settled. Commerce has other practices related to date of sale, but they are all grounded in this same basic legal framework—a presumption to use the invoice date, unless the material terms of sale were fixed at some other point in time. So, given that Commerce utilized the price set forth in Toyo Kohan's invoice to its U.S. customer for its dumping

margin calculations, the question is which date best reflects when this invoice price was finally established.

Commerce did not use the invoice date as the date of sale in this case, even though the record evidence overwhelmingly established that the price of the sale was not finalized until the date of the invoice. Commerce instead used the shipment date, which was earlier in time. The record evidence, however, shows conclusively that Toyo Kohan continues to negotiate the price after shipment up until the time of the invoice. The narrative responses submitted to Commerce explained this key point. The detailed databases submitted to Commerce also showed these frequent price changes up to the time of the invoice. Indeed, in this case, the record shows that more than half of the U.S. sales had changes to the price after shipment. That is why, for several of the most recent AD administrative reviews of Toyo Kohan, Commerce has consistently used the invoice date as the U.S. date of sale.

Yet Commerce did not discuss any of these key facts about the U.S. sales here, or when the price was finally set. Instead, Commerce made inconsistent statements about the date of sale in the preliminary determination, refused to correct the repetition in the 9th review of what Commerce acknowledged was a clerical error in the 8th review, and claimed this case was somehow different. Commerce's claim that the facts in this review are different, however, rests entirely on a single fact – that one of the U.S. sales used as an example in the initial Section A Response showed no price change between shipment and invoice. Yet Commerce never discussed the record evidence about all the other U.S. sales, and the record shows that more than half of the U.S. sales had price changes after

shipment.  In fact, the single example (*i.e.*, Exhibit A-10A) that Commerce actually cited in the *9th Review Final I&D Memo* to justify its date of sale determination contradicts its own claim, as it shows a price change between shipment and invoice, which demonstrates that the price was not finalized at the shipment date as Commerce had assumed.[1]

In short, Commerce utilized a particular date of sale (*i.e.*, the shipment date) even though the record evidence demonstrated that for more than half of Toyo Kohan's U.S. sales, the final invoice price differed from the applicable price at the date of shipment.  Accordingly, since Commerce's date of sale determination is not supported by substantial evidence, this Court should remand this case back to Commerce to revisit the date of sale issue and recognize that the date of sale here should be the invoice date.

Regarding the second issue, there has been a significant change in the relevant law on price comparisons.  The Federal Circuit very recently ruled in two cases – *Marmen Inc. v. United States*, Slip Op. 23-1877 (Fed. Cir. Apr. 22, 2025) ("*Marmen*") and *Stupp Corp. v. United States*, Slip Op. 23-1663 (Fed. Cir. Apr. 23, 2025) ("*Stupp II*") – that Commerce cannot use its current differential pricing test to invoke an exception to the statutory requirement to compare average prices to average prices when calculating the dumping margin.  Commerce used that same differential pricing test here, without making any effort to show that the underlying assumptions required for the test to be

---

[1] *Issues and Decision Memorandum for the Final Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan* ("*9th Review Final I&D Memo*") (Dep't of Commerce, November 25, 2024) at 4, (P.R. 108).

valid had been met.  In fact, those assumptions are not met here, and the differential pricing test is unlawful.

Although this second issue is new, and Toyo Kohan did not raise this issue below before Commerce, this significant change in the law provides the basis for a well-recognized exception to the exhaustion requirement that would otherwise apply. Accordingly, this Court should reach this issue, and remand to Commerce to correct this second error in its dumping margin calculation.

## PLAINTIFF'S STATEMENTS PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Appeal

Toyo Kohan seeks review of Commerce's final results in its ninth administrative review of the antidumping ("AD") duty order on diffusion-annealed nickel-plated flat-rolled steel products ("DANP") from Japan.

The challenged decision is set forth in *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024), and the accompanying *9th Review Final I&D Memo*.

### B.    Issues of Law Presented

Whether Commerce's departure from its regulatory presumption under 19 C.F.R. § 351.401(i) (*i.e.*, the date of sale should be the date of invoice) was supported by substantial evidence and otherwise in accordance with law.

### C.    Statement of Reasons for Remanding Commerce's Determination

Commerce's final results must be remanded because its conclusion as to the appropriate "date of sale" is not supported by substantial evidence.  Commerce ignored overwhelming evidence, in this AD review, that the material terms of sale were not fixed until the invoice date for the majority of U.S. sales transactions.  Commerce's final results also must be remanded for Commerce to recalculate the dumping margin in light of the recent Federal Circuit decisions in *Marmen* and *Stupp II*.  These legal deficiencies require remand.

## STATEMENT OF FACTS

This court appeal challenges Commerce's antidumping administrative review final results concerning *Diffusion-Annealed Nickel-Plated Steel (DANP) from Japan* for the May 1, 2022 – April 30, 2023, time period.[2]  The May 1, 2022 – April 30, 2023, time period is referred to as "AR9" or "POR9" because it is the ninth administrative review time period following the original investigation.  Given that Toyo Kohan was a mandatory respondent in the original investigation and has been a mandatory respondent in each of the previous AD reviews, the challenged determination in this appeal represents the tenth time that the Commerce Department has analyzed Toyo Kohan's U.S. sales for the DANP case.[3]

---

[2] *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024) ("Final Results").

[3] *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 30,816 (May 29, 2014); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2013–2015*, 81 Fed. Reg. 91,116 (Dec. 16, 2016); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2015–2016*, 82 Fed. Reg. 57,715 (Dec. 7, 2017); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 64,327 (Dec. 14, 2018); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2017–2018, 84 Fed. Reg. 64,042 (Nov. 20, 2019); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2018–2019*, 86 Fed. Reg. 15,462 (Mar. 23, 2021); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2019–2020*, 87 Fed. Reg. 4,842 (Jan. 31, 2022); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 57,455 (Sept. 20, 2022); *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85,590 (Dec. 8, 2023).

Toyo Kohan's Complaint sets forth the procedural progression of the underlying POR9 AD review.  There are also several key facts from the administrative record about Toyo Kohan's particular sales process for undertaking its U.S. sales, the way the U.S. selling price was established, that are critical to understanding the errors in Commerce's date of sale determination.

**Toyo Kohan's Section A Response Informed Commerce of Toyo Kohan's Distinctive Manner of Selling DANP To U.S. Customers and How the Selling Price Was Determined**

Section A of Commerce's AD questionnaire requested that Toyo Kohan provide detailed information about the process by which Toyo Kohan undertook its U.S. sales of DANP.  This language is standard in all Commerce questionnaires.  In response, Toyo Kohan provided a detailed explanation of its sales process.[4]

Toyo Kohan first explained generally the structure of its U.S. sales during the period of review ("POR").  After initially noting the sale process was largely the same as that of what was being used during the original investigation and subsequent eight administrative reviews, Toyo Kohan explained that (1) all the U.S. sales were made to the same unaffiliated customer, who resold to different U.S. end users; and (2) although it knows the intended end-user, Toyo Kohan does not know the prices its customer charges those end users.[5]

---

[4] *Toyo Kohan's Section A Response* (Sept. 15, 2023) ("*Toyo Kohan's AQR*") at 15-18 (P.R. 22; C.R. 3).

[5] *Id.* at 15.

Toyo Kohan then explained the sale negotiation process in detail. In particular, Toyo Kohan explained the following:[6]

- Sales terms are discussed quarterly, and for each period, there is a tentative price based on a temporarily agreed pricing formula;

- Based on these discussions, the customer issues a purchase order and Toyo Kohan "generates an electronic order confirmation that contains the estimated price, quantity, identifies the specifications of the product to be produced, and shipment terms;"

- Toyo Kohan then produces the merchandise and ships the merchandise from its factory at Kudamatsu to the customer;

- At this point, Toyo Kohan's sales system issues a "summary bill" to the customer, based on the shipment date from Kudamatsu, with the tentative price currently in the system;

- After shipment, Toyo Kohan then prepares a payment invoice for each shipment of subject merchandise sent to the customer;

- The invoice charges the finally agreed-upon sales price, that reflects any changes to raw material prices, exchange rates, or other factors; and

- After manual preparation of the invoice, the Sales Department will reverse the original summary bill prepared at the time of shipment and rebook to accounting to reflect the updated and final selling price.

Thus, Toyo Kohan's initial explanation in the Section A Response made clear that the price at shipment was only a tentative price, and that the commercial invoice reflected the finally agreed-upon price.[7]

---

[6] *Id.* at 16-18.

[7] It is noteworthy that Commerce itself confirmed this Tokyo Kohan process for deriving the final selling price during its an onsite verification of the Toyo Kohan during its previous AD administrative review (for POR8). And indeed, Commerce issued its "Verification Report" in May 2023, just several months before the time that Toyo Kohan was submitting is questionnaire responses for the POR9 AD review. In its Verification Report, Commerce noted the following about Toyo Kohan's process for establishing the final selling price:

**Toyo Kohan's Section C Response Informed Commerce of Why Toyo Kohan Had Adopted Invoice Date as Date of Sale <u>and</u> Provided Evidence of Price Changes After Shipment**

The essence of Section C of Commerce's AD questionnaire is to require a U.S. sales database from the foreign producer-exporter containing all of the data needed for the AD margin calculation.  As part of this requirement, Section C of the Department's AD questionnaire asked about the date Toyo Kohan had adopted for the "date of sale" field in its U.S. sales database.  In its response, Toyo Kohan explained that it had adopted invoice date as the appropriate "date of sale" (*i.e.*, reported in field "SALINDTU3") "because this is the date at which the price and quantity are set."[8]

Importantly, Toyo Kohan's Section C Response also provided the underlying evidence confirming that the invoice date was the first date at which the final selling price was established.  This can be seen in Toyo Kohan's discussion of "billing

---

Company officials stated that, at the time of shipment there are instances where the negotiating process is still ongoing, resulting in documents that include "non-finalized" prices. Company officials explained that in these instances they rely on a formula to adjust price, which includes the market price of raw materials. During the U.S. sales trace exercise, we examined the corresponding U.S. sales documentation for purposes of determining when price and quantity information are established . .. For the two sales listed above, we noted that the prices reflected at the date of shipment from the Kudamatsu factory were not finalized until the issuance of the commercial invoice date for both sales.

*Verification of the Sales Response of Toyo Kohan Co., Ltd. in the Antidumping Duty Administrative Review of Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan* (May 26, 2023), at 7 – 8 (Public Version) ("POR8 Verification Report") (which is a publicly available document on access.trade.gov at Barcode Number 4384076-01 in Case Number A-588-869.

[8] *Toyo Kohan's Section C Response* (Oct. 10, 2023) ("*Toyo Kohan's CQR*") at 16 (P.R. 39; C.R. 48).

adjustments."  Building on the general explanation provided earlier in its Section A

Response, Toyo Kohan explained:

> Specifically, Toyo Kohan's sales system requires it to generate upon shipment from Kudamatsu a summary billing document.  This date has been used to report the field SHIPDATU1. This billing document is issued at the price in Toyo Kohan's system at the time of shipment. <u>However, this price can change up to the date of invoicing to the U.S. customer</u> as noted in Toyo Kohan's Section A response (i.e., the date of the invoice to the U.S. customer has been reported in field SALINDTU3).  Therefore, to allow for Toyo Kohan's internal reconciliation of sales records to accounting records, <u>when a change in price occurs after shipment (e.g., if the price on the commercial invoice to the U.S. customer is not the same as the price on the summary billing document at the date of shipment from the factory), Toyo Kohan reverses the original billing document and issues a new bill at the final price</u>. Because accounting does not book U.S. sales until the product enters the United States (which occurs at the time title transfers to the U.S. customers), this change is not a "billing adjustment" but simply an internal difference between the most recent order confirmation price and the actual sales price (as from an accounting perspective there is not a "sale" until transfer of title after issuance of the commercial invoice).[9]

Here, Toyo Kohan explained to Commerce for the second time that the price frequently

changes after shipment, and that the invoice reflects the final agreed upon price.

Toyo Kohan also explained the different prices and confirmed the final price – the

invoice price that reflected any post shipment adjustments – that should be used for the

dumping margin calculation:

> However, in the interest of providing the Department with a full record, Toyo Kohan has also reported as a reference (i.e.,

---

[9] *Id.* at 24-25 (emphasis added).

not to be used in the Department's margin calculation) the price at the time of the original billing document as field GRSUPRU_ORIG and the difference between the price invoiced to the U.S. customer and the original price in field VAL_ADJU. We note that GRSUPRU_ORIG appears in Toyo Kohan's records as the price as of the date reported in field SHIPDATU1 and SALINDTU1, and the date at which the adjustment is made to arrive at VAL_ADJU is the date of the commercial invoice reported as INVOICE2 issued at date SALINDTU3. We note that these fields are provided purely for reference and should not be used in Department's margin calculation in conjunction with the reported GRSUPRU (e.g., Department could use GRSUPRU_ORIG + VAL_ADJU, or GRSUPRU, but should not utilize both as they are equivalent).[10]

Toyo Kohan specifically directed Commerce to a convenient additional field provided to show precisely which of the U.S. sales transactions had price changes between the time of shipment and the time of invoice.

This additional field documented extensive price changes between the date of shipment and the date of invoice. As discussed in the Section C Response, the U.S. sales database that was submitted as part of Toyo Kohan's Section C Response contained a specific field -- "VAL_ADJU" -- indicating whether there was a price adjustment after shipment from the factory (but before the final invoice was sent to the customer). *See* Exhibit SC-1 to Toyo Kohan's Supplemental Section C Response, dated April 24, 2024.

---

[10] *Id.* at 25. Because in past AD reviews, the issue of the appropriate date of sale had been a contested issue, Toyo Kohan also informed Commerce that its U.S. sales database also provided an alternative date of sale (reported in field "SALEDATU") equal to the earlier of the shipment date or the invoice date. Because the invoice date was virtually always after the shipment date, this means that the alternative date of sale equaled the shipment date.

The Toyo Kohan U.S. sales database confirmed that there were multiple U.S. sales transactions that had price changes *after* the subject merchandise left the factory (*i.e.*, after the date of shipment). Specifically, the full electronic data set submitted to Commerce showed that 83 out of 135 U.S. transactions, or 61 percent of those transactions, had price changes after shipment reported in the VAL_ADJU field. In other words, a substantial majority of the transactions had price changes after shipment.

We note that Toyo Kohan's U.S. sales database *also* provided the price set forth in Toyo Kohan's sales order confirmation that is issued to the customer (*i.e.*, at the time the customer orders the individual shipment). And so, it is also possible to compare the price set forth in the sales order confirmation with the final price set forth in the invoice.

**None of the Above Facts Were Disputed During the Underlying AD Review**

Again, all of the above facts were provided to Commerce as part of Toyo Kohan's initial AD questionnaire responses. And during the entire AD review (until the briefing phase), Commerce never sought to challenge any of the above fact, and never sought to clarify any of the above facts.

Specifically, on March 22, 2024, Commerce issued its supplemental questionnaire for Section A, and Toyo Kohan responded on April 3, 2024. None of the questions raised the issue of the date of sale.[11] On April 8, 2024, Commerce issued its supplemental questionnaire for Section B, and Toyo Kohan responded on April 22, 2024. Although

---

[11] *Toyo Kohan's Supplemental Section A Response* (April 3, 2024) (C.R. 114; P.R. 57).

Commerce did have one question on date of sale, this was related to sales of overruns, and did not involve the U.S. sales price at all.[12]

On April 12, 2024, Commerce issued its supplemental questionnaire for Section C, and Toyo Kohan submitted its response on April 22, 2024.  Although Commerce did have one question on the date of sale, this question related to correcting the import entry date.[13]  On April 18, 2024, Commerce issued its supplemental questionnaire for Section D, and Toyo Kohan responded on April 30, 2024. None of the questions raised the issue of the date of sale.[14]

And on April 30, 2024, Commerce issued its second supplemental questionnaire for Sections A through C, and Toyo Kohan responded on May 3, 2024.[15] Again, this supplement did not raise any questions about the U.S. date of sale.

**Commerce's Preliminary Determination for POR9 Contained The Same Type of SAS Coding Mistakes As Had Been Done In Commerce's Preliminary Determination for POR8**

On May 23, 2024, Commerce published its preliminary AD determination in the Federal Register.  That notice showed a calculated dumping margin of 12.69 percent for Toyo Kohan.[16]

---

[12] *Toyo Kohan's Supplemental Section B Response* (April 22, 2024) (C.R. 123; P.R. 68).

[13] *Toyo Kohan's Supplemental Section C Response* (April 24, 2024) (C.R. 132; P.R. 73).

[14] *Toyo Kohan's Supplemental Section D Response* (April 30, 2024) (C.R. 1142; P.R. 76).

[15] *Toyo Kohan's Supplemental Sections A-C Response* (May 3, 2024) (C.R. 164; P.R. 79).

[16] *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 45,638 (Dep't of Commerce, May 23, 2024) ("*Preliminary Results*") (P.R. 88).

Just five days later, on May 28, 2024, Toyo Kohan submitted a request for correction of ministerial errors.[17]  Toyo Kohan noted that the Department had made two SAS coding errors. Toyo Kohan explained Commerce had made:

> … the same inadvertent SAS coding mistakes identified above were made in the Department's POR8 AD preliminary AD review determination. And in that AD review, the Department fully agreed to correct these inadvertent coding mistakes for the Department's POR8 final AD review determination.[18]

Commerce corrected the second of the two programming errors noted above, so that error is not at issue here.  But Commerce did not correct the first error, which is the mistake related to the date of sale at issue here.  The first mistake identified by Toyo Kohan was as follows:

> The *first* mistake was to use a different "date of sale" (for U.S. sales) from what the Department explicitly intended. Page 3 of the Department's Decision Memorandum states clearly: "For the preliminary results, we based the date of sale for home market sales on the invoice date and <u>for U.S. sales on the commercial invoice date</u>.  Such Department date of sales conclusion is the same that the Department has made in all recent past AD review, pursuant to the Petitioner's specific request.
>
> Toyo Kohan's Section C responses make clear that Toyo Kohan's "commercial invoice date" for its U.S. sales was reported in field "SALINDTU3." And so, pursuant to the Department's explicit intention, SALINDTU3 should have been utilized for date of sale for Toyo Kohan's U.S. sales. However, because of an unintentional mistake, a different date was used for the date of sale for Toyo Kohan's U.S.

---

[17] *Letter from Curtis, Mallet-Prevost, Colt & Mosle LLP to the U.S. Department of Commerce Regarding Ministerial Error Correction* (May 28, 2024) (P.R. 89).

[18] *Id.*

*Id.* at 2-3 (emphasis added).  In other words, after the preliminary results and well before the final results, Toyo Kohan put Commerce on notice that (1) Commerce had departed from its own recent practice of using invoice date as the date of sale, and (2) the Section C Response had explained explicitly why the invoice date should be used for U.S. sales.

Commerce did not correct what Toyo Kohan had argued was a clerical error in the date of sale determination.  Instead, Commerce waited for the parties to submit their case briefs.  In its case brief, Toyo Kohan then renewed this request to correct the error in the date of sale for U.S. sales.   As it had in its earlier clerical error submission, Toyo Kohan explained that Commerce's computer coding identified the wrong "date of sale" field.  Although Commerce said in its *9th Review Preliminary I&D Memo* that it intended to use the "commercial invoice date" for U.S. sales,[19] it instead used a different date of sale for its calculation. *Toyo Kohan's Case Brief* (June 21, 2024) at 2-3 (P.R. 92).

Somewhat to Toyo Kohan's surprise, Petitioner then disagreed in its rebuttal brief.  Petitioner's rebuttal brief argued that Commerce's change in date of sale to shipment date was actually correct and should be maintained.  Petitioner asserted that the record confirms that the material terms of sale with Toyo Kohan's U.S. customer were established by the date subject merchandise was shipped from Toyo Kohan's factory. *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Petitioner's Rebuttal Brief* (June 28, 2024) at 2 (P.R. 95).

---

[19] *2022–2023 Antidumping Duty Administrative Review of Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Decision Memorandum*, at 4 (Dep't Commerce, May 16, 2024) ("*9th Review Prelim I&D Memo*") (P.R. 85).

In its final results, Commerce refused to correct the date of sale, as it had in the POR8 proceeding.  Instead of correcting the date of sale, Commerce accepted Petitioner's argument – and factually incorrect statement -- that the material terms were set on the shipment date.  Commerce's entire discussion of the date of sale issue can be found in the following two short paragraphs.  Commerce initially explained:

> In the Preliminary Results, we used the variable SALEDATU, which is the earlier of shipment date or commercial invoice date, as the date of sale for Toyo Kohan's U.S. sales.  Specifically, we stated that we based Toyo Kohan's date of sale on the earlier of the commercial invoice date or the shipment date (i.e., SALEDATU).  In its questionnaire response Toyo Kohan stated that, to be consistent with Commerce's policy, it has reported SALEDATU as the earlier of the invoice date (SALINDTU3) or the shipment date to the U.S. customer (SHIPDATU1).  Commerce's long-standing practice is to use the earlier of shipment date or invoice date as the date of sale.[20]

Here, Commerce quoted from its Preliminary Analysis Memo[21] and ignored the contrary statement in its *9th Review Prelim I&D Memo* stating an intention to use the invoice date as the date of sale, as Toyo Kohan has noted in its clerical error submission[22] and its case brief.[23]  And Commerce explained what Toyo Kohan had reported in SALEDATU but ignored the extensive discussion from the Section C Response

---

[20] *9th Review Final I&D Memo* at 4, (P.R. 108).

[21] *2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results Analysis Memorandum for Toyo Kohan Co., Ltd.* (Dep't Commerce, May 16, 2024) (P.R. 86) ("Prelim. Analysis Mem."),

[22] *Letter from Curtis, Mallet-Prevost, Colt & Mosle LLP to the U.S. Department of Commerce Regarding Ministerial Error Correction* (May 28, 2024) (P.R. 89).

[23] *Toyo Kohan's Case Brief* (June 21, 2024) at 2-3 (P.R. 92).

explaining why the U.S. date of sale should be invoice date and explaining that the

material terms of the sale – especially the price – were not settled until the invoice.

Commerce then went on to explain its determination about date of sale with the

following paragraph:

> We disagree with Toyo Kohan that we should base the U.S.
> date of sale on the invoice date (i.e., SALINDTU3) in our
> calculations for the final results. In previous reviews, we used
> invoice date as the U.S. date of sale because we found that
> that the materials terms of sale changed between the shipment
> date and invoice date.  For example, in 2019-20 DANP from
> Japan, we found that for some of Toyo Kohan's reported U.S.
> sales, the sales value changed between the date of shipment
> and the commercial invoice date. However, in this review, the
> record evidence does not support the same finding, but
> instead indicates that the material terms of sale were set at the
> shipment date.  Specifically, Toyo Kohan's sample sales
> documentation indicates that the material terms of sale, such
> as price and quantity, between Toyo Kohan and its U.S.
> customer were established at the time of the shipment date.
> Thus, because the record evidence does not support deviating
> from our normal practice of using the earlier of the shipment
> or invoice date as the U.S. date of sale, we continue to use
> SALEDATU as the date of sale for Toyo Kohan's U.S. sales
> in our calculations for the final results.[24]

Here again, Commerce makes various statements that ignore what Toyo Kohan

had explained in its Section C Response about the U.S. date of sale.  Instead, Commerce

cited the facts of a single U.S. sales transaction, while saying nothing about the numerous

other U.S. sales.

**Commerce Applied Its Cohen's d Differential Pricing Approach In This
Determination**

---

[24] *9th Review Final I&D Memo* at 4, (P.R. 108).

Beyond these facts about date of sale, we also note that Commerce applied its differential pricing test in this determination. Commerce applied the same differential pricing test here that it employs as standard boilerplate in every case.[25] And because of the differential pricing test, the dumping margin that would have been 0.0 percent under the average-to-average comparison methodology increased to 4.44 percent under the mixed comparison methodology.[26]

---

[25] *2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results Analysis Memorandum for Toyo Kohan Co., Ltd*. (Dep't Commerce, Nov. 25, 2024) ("*Final Analysis Memo*") at Attachment III (C.R. 200). Please note that the boilerplate macro language in the Attachment III is publicly available in the following URL from Commerce: access.trade.gov/resources/sas/programs/diffpriceprograms/me-macros-sas.txt.

[26] *2022-2023 Antidumping Duty Administrative Review of Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results Analysis Memorandum for Toyo Kohan Co., Ltd*. (Dep't Commerce, Nov. 25, 2024) ("*Final Analysis Memo*") at Page 11 of Attachment II (C.R. 198).

## ARGUMENT

## I.    COMMERCE'S DATE OF SALE CONCLUSION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE NOT IN ACCORDANCE WITH LAW

### A.    Commerce Has a Well-Settled Legal Framework and Practice for Determining the Date of Sale

For purposes of this determination, there were two important parts of Commerce's long settled legal framework and practice that the agency disregarded.  First, Commerce acknowledged but then ignored its general regulatory presumption in favor of using the date of invoice as the date of sale.  Second, Commerce also acknowledged but then ignored its own specific recent practice of applying this presumption to use invoice date as the date of sale in prior AD administrative reviews of Toyo Kohan's sales of DANP steel.  The date of sale decision here – to use shipment date as the date of sale for the U.S. sales – thus flies in the face of a regulatory presumption in place for almost 30 years, and consistent agency determinations for this specific product for the past four consecutive reviews.

### 1.    Commerce presumes that invoice date is the date of sale

Under its statutory framework, regulations, and policies Commerce has a consistent and well-settled practice that the date of sale is presumed to be the date of the invoice.  Commerce adopted this by practice by regulation, has applied it consistently since the regulation was adopted, and has defended it repeatedly in proceedings before this Court.

Although the antidumping statute has never defined the "date of sale," that concept has long been understood to be the date when all the material terms of sales have been set. The governing statute drafted in 1979 introduced the concept of date of sale but has never directed how Commerce should determine the date of sale. The Uruguay Round Agreements in 1994 confirmed that "normally, the date of sale would be the date of contract, purchase order, order confirmation or invoice, whichever establishes the material terms of sale." Agreement on the Implementation of Article VI of the General Agreements on Tariffs and Trade 1994, Article 2.4.1, fn. 8. This principle was adopted in the Statement of Administrative Action, deemed as the authoritative interpretation of the Uruguay Round Agreements by Congress, confirming the date of sale is the "date when the material terms of sale are established." *See* Uruguay Round Agreements Act, Statement of Administrative Action, ("SAA") H.R. Rep. No. 103-316, vol. 1, at 810 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4153. *See generally Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 756 F.Supp.3d 1312, 1320, (Ct. Int'l Trade 2025); *Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*, 426 F.Supp.3d 1395, 1401-02 (Ct. Int'l Trade 2020). This focus on when the material terms of the sale have been adopted has been the touchstone for determining the date of sale since the SAA.

Based on this framework and the SAA, Commerce regulations have long defined its practice on date of sale as a presumption to use the date of invoice as the date of sale, since the invoice normally reflects the final agreement on the material terms of the sale. That regulation – Section 351.401(i) -- provides specifically that:

> **Date of sale.** In identifying the date of sale of the subject merchandise or foreign like product, the Secretary <u>normally will use the date of invoice</u>, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of the invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[27]

This regulation sets forth the presumption that the date of sale "normally will" be the date of the invoice.   And this Court has repeatedly recognized that this regulatory language creates a presumption for using the invoice date as the date of sale.  *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 693 F.Supp.3d 1368, 1373 (Ct Int'l Trade 2024) and *Allied Tube & Conduit Corp. v. United States*, 24 C.I.T. 1357, 1371 (2000).

The preamble to this regulation confirms the rationale underlying the presumption of using invoice date is that the price and quantity are frequently not finalized until the invoice has been issued:

> As a matter of commercial reality, the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established. <u>In the Department's experience, price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced.</u> The existence of an enforceable sales agreement between the buyer and seller does not alter the fact that as a practical matter, customers frequently change their minds and sellers are responsive to those changes… Thus, the date on which the buyer and seller appear to agree on the terms of a sale is not necessarily the date on which the terms of the sale actually are established.

---

[27] 19 C.F.R. § 351.401(i) (emphasis added).

Final Rule, 62 Fed. Reg. 27,296, 27,348-49 (Dep't Commerce, May 19, 1997) (emphasis added). In other words, the presumption is grounded in the business reality that material terms – especially the price – can be subject to continuing changes until the invoice has been issued.

The text of the regulation and the preamble, however, both recognize that the presumption can be rebutted. Commerce can use something other than invoice date as the date of sale, but only if a specific condition has been met – that a different date "better reflects" when the "material terms of sale" have been established. 19 C.F.R. § 351.401(i). The Preamble explains this high bar for overcoming the presumption:

> If [Commerce] is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of the invoice, [Commerce] will use that alternative date as the date of sale.... However, [Commerce] emphasizes that in these situations, the terms of sale must be firmly established and not merely proposed. A preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly "established" in the minds of the buyer and seller. This holds even if, for a particular sale, the terms were not renegotiated.

Final Rule, 62 Fed. Reg. 27,296, 27,348-49 (Dep't Commerce, May 19, 1997). The Preamble thus sets a high bar for rebutting the presumption in favor of the invoice date – there must be "satisfactory evidence" that the final terms were "firmly established" on some other date. Thus, the regulatory framework confirms that the date of invoice is presumed to be the date of sale, unless there is strong evidence that the final material terms of the sale were agreed on some other date.

### 2.    Commerce has regularly applied this presumption in favor of invoice date in the recent AD reviews of Toyo Kohan

The decision to use shipment date rather than invoice date in the 9th Review ignored this regulatory framework, but is also broke with Commerce's recent specific practice under this antidumping order.  From the 5th Review through the 8th Review, Commerce had regularly applied its regulation to use the invoice date as the date of sale for this specific product.  That recent history made the departure from the use of the invoice date in the 9th Review all the more puzzling.

After the initial few reviews, in the 5th Review Commerce settled into the regular use of invoice date as the date of sale for this antidumping order.  In earlier years, the reporting was somewhat different, and Toyo Kohan data sets did not distinguish between the date of physical shipment from its factory and the actual commercial invoice issued to the customer.  Once that distinction was made, Commerce continued using the shipment date for a few reviews.  This changed in the 5th Review, when the Petitioner argued that the date of sale should be the invoice date. Toyo Kohan objected at the time to this change, but Commerce agreed with the Petitioner and changed the date of sale to the invoice date.  *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results of the Antidumping Duty Administrative Review; 2018–2019*, 85 Fed. Reg. 44,041 (July 21, 2020), and accompanying Issues and Decision Mem. at 3. Petitioner made the same argument in the 6th Review, and Commerce again agreed with the petitioner and used the invoice date.  *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative*

*Review; 2019–2020*, 87 Fed. Reg. 4,842 (Jan. 31, 2022), and accompanying Issues and

Decision Mem. at 2–4.  Commerce used the invoice date in the 7th Review, and the issue

was not contested by either party.  *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel*

*Products from Japan: Final Results of the Antidumping Duty Administrative Review;*

*2020–2021*, 87 Fed. Reg. 57,455 (Sept. 20, 2022), and accompanying Issues and

Decision Mem.

In the 8th Review, Commerce used the shipment date as the date of sale in the

preliminary results but changed to the invoice date in the final results after Toyo Kohan

pointed out what appeared to be a clerical error in the programming instructions.

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results*

*of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85,590 (Dec.

8, 2023), and accompanying Issues and Decision Mem. at 4.   Commerce agreed in the 8th

Review that the departure from invoice date was an inadvertent error.   Accordingly, for

the past four cycles of reviews, Commerce has consistently used the invoice date as the

date of sale.  Indeed, the shift to this approach started in the 5th Review based on the

Petitioner's argument to do so.

Although every proceeding has its own specific factual record, and ultimately this

case must be decided based on the specific facts of the 9th Review, this consistent practice

to use invoice date over the four most recent consecutive reviews is the context against

which to view Commerce's decision for the same company and the same industry in this

particular proceeding, the 9th Review.  As this Court has recognized, Commerce decisions

on date of sale in prior reviews can provide context for a decision in a current review

when nothing has otherwise changed.  *See Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

*v. United States*, 693 F.Supp.3d 1368, 1374 (Ct Int'l Trade 2024) (using information "not

to make an independent factual determination, but to provide context to Respondents'

questionnaire responses stating that their sales process had not changed since the prior

review").  If Commerce can use the prior reviews as context to support a decision, the

logical corollary is that Commerce bears a particular burden when it seeks an abrupt

change after many years of consistent practice when nothing has changed.

> **B.      Commerce Ignored Its Regulation and Its Well-Settled Practice and
> Determined the Date of Sale in This Proceeding Without Any Support
> in Substantial Evidence**

In the determination at issue here, Commerce ignored both the regulatory

presumption in favor of using invoice date as the date of sale and its own recent practice

of using the invoice date as the date of sale for Toyo Kohan's U.S. sales of DANP steel.

Given the abrupt departure from its regulation and this recent past practice under this

specific antidumping order, one might have expected a particularly robust explanation

why.  Instead, Commerce largely ignored the record evidence and instead cited the

circumstances of a single U.S. transaction, while ignoring the record evidence about all

the other U.S. sales transactions.  Contrary to Commerce's assertion that there were no

changes in price after shipment, the record actually shows that more than half of the U.S.

sales transactions had price changes after the shipment date.  Commerce's statement that

there were no price changes after the shipment date – and the conclusion to use the

shipment date as the date of sale for many U.S. sales transactions – is thus not supported by substantial evidence.

### 1. The record evidence here confirms that the material terms were not set until the invoice date

Toyo Kohan explained to Commerce in its various questionnaire responses that the material terms of sale – in particular, the price – were not finalized until the invoice date. Toyo Kohan explained these facts to Commerce in its responses, and Commerce did not question or seek clarification about these key facts concerning the sales process. Indeed, in light of the recent history of using invoice date as the date of sale in prior reviews, the lack of any questions about the sales process and when the price is finally fixed is not at all surprising. Over the past several reviews, these facts have always been understood and well settled. Nothing about these business practices changed materially in the 9th Review.

These facts about the date of sale were first presented in the Section A Response addressing general information. Section A is where respondents first review the sales process and date of the sale issues for Commerce, and Toyo Kohan did so in this review. The Section A Response explained that after shipment, Toyo Kohan then prepares a payment invoice for each shipment of subject merchandise sent to the customer, and that the invoice charges the finally agreed-upon sales price, which reflects any changes to raw material prices, exchange rates, or other factors.[28]

---

[28] Toyo Kohan's AQR at 15-18.

These facts were confirmed in the Section C Response about U.S. sales.  The
Section C narrative confirmed the basic point about the invoice date and the frequency of
price changes before the invoice was issued.  In particular, the Section C Response
specifically explained that the price could change between shipment and invoice:[29]

>Specifically, Toyo Kohan's sales system requires it to
>generate upon shipment from Kudamatsu a summary billing
>document.  This date has been used to report the field
>SHIPDATU1. This billing document is issued at the price in
>Toyo Kohan's system at the time of shipment. However, this
>price can change up to the date of invoicing to the U.S.
>customer as noted in Toyo Kohan's Section A response…

The Section A and C Responses thus made explicit that the price changed after the
shipment, and that the final invoice price often differed from the tentative price recorded
on the shipment documents.[30]

Indeed, to demonstrate and document this specific point, Toyo Kohan added a
separate field in its U.S. sales database to highlight these price changes being made
between shipment and invoicing.  Although this field is not part of the standard
Commerce questionnaire, Toyo Kohan added this field to emphasize and document these
frequent changes to price after shipment.   This field was called "VAL_ADJU" – an
abbreviation referring to the "value adjustments" or price changes -- being made to the
U.S. price of each of the U.S. sales transactions after product shipment but before the
invoice was issued.   The full electronic data set submitted to Commerce provides the

---

[29] Toyo Kohan's CQR at 16.

[30] *See* discussion above at pages 7-12.  *See* POR8 Verification Report at 7-8.

data showing that 83 out of 135 U.S. transactions, or 61 percent, had price changes after shipment reported in the VAL_ADJU field.

Although the electronic data may be more difficult for the court to review, there is a more easily reviewable close proxy.  In every proceeding, Commerce requires parties to submit a paper printout of sample transactions for each larger electronic data set.  The standard practice for sales listings is to provide a printout of 100 sample transactions.  In this proceeding, this sample printout showed there were changes in the VAL_ADJU field for 61 out of 100 transactions, or 61 percent of the instances.  *See* Exhibit SC-1 of Supplemental Section C Response. *Toyo Kohan's Supplemental Section C Response* (Apr. 24, 2024) at Exhibit SC-1 (P.R. 62) (C.R. 133).  In this case, the paper summary of sample transaction thus provides a convenient and reliable summary of what the full electronic data provided, covering 100 of the 135 total U.S. transactions.

Commerce issued several supplemental questionnaires in this proceeding, addressing many other issues, but these questionnaires did not raise any questions about the U.S. date of sale or the frequency of adjustments to the U.S. price.

The factual record here thus confirms that the material terms were not set until the invoice date.  For most of the U.S. sales transactions, there were price changes after the date of shipment up until the time of invoice.

**2.    Commerce's statement in the final results about no changes in the material terms of sale is flatly contradicted by substantial evidence**

In the final determination, Commerce largely ignored this extensive record evidence about the U.S. sales database as a whole.  Instead, Commerce cited a single fact in isolation and ignored the rest of the evidence.  As this Court noted in *Borusan*, when finding a Commerce date of sale determination not to be supported by substantial evidence, the legally fatal "omission on Commerce's part is that it did not truly grapple with" the whether the facts actually supported the date of sale finding.  *Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*, 426 F.Supp.3d 1395, 1403 (Ct. Int'l Trade 2020).  *See also Nucor Corp. v. United States*, 612 F.Supp.2d 1264, 1313 (Ct Int'l Trade 2009) (date of sale analysis "does not, and should not, hinge on a single change in price or quantity, or the volume of sales affected by that change, with no regard for any other relevant facts."). The same problem of failing to grapple with the record evidence and consider other relevant facts fatally infects the Commerce date of sale determination here.

The entire discussion of the date of sale issue can be found in the following two short paragraphs.   Commerce first noted what it had done in the preliminary results:

> In the Preliminary Results, we used the variable SALEDATU, which is the earlier of shipment date or commercial invoice date, as the date of sale for Toyo Kohan's U.S. sales.  Specifically, we stated that we based Toyo Kohan's date of sale on the earlier of the commercial invoice date or the shipment date (i.e., SALEDATU).  In its questionnaire response Toyo Kohan stated that, to be consistent with Commerce's policy, it has reported SALEDATU as the earlier of the invoice date (SALINDTU3)

> or the shipment date to the U.S. customer (SHIPDATU1).
> Commerce's long-standing practice is to use the earlier of
> shipment date or invoice date as the date of sale."

The problem with this discussion, however, is that Commerce glosses over the confusion from the preliminary results. In the quoted statement, Commerce cites what it said in the preliminary results analysis memo.[31] But Commerce ignores what it said in the contemporaneously issued *9th Review Prelim I&D Memo* that it based the date of sale for U.S. sales "on the commercial invoice date."[32] And Commerce ignores the statements from the Toyo Kohan allegation of clerical errors submission,[33] and the Toyo Kohan case brief,[34] noting Commerce's statement from the *9th Review Prelim I&D Memo* that they meant to use the invoice date.

Commerce then explains its determination. The rationale is very brief, and quoted below in its entirety:

> We disagree with Toyo Kohan that we should base the U.S.
> date of sale on the invoice date (i.e., SALINDTU3) in our
> calculations for the final results. In previous reviews, we used
> invoice date as the U.S. date of sale because we found that
> that the materials terms of sale changed between the shipment
> date and invoice date. For example, in 2019-20 DANP from
> Japan, we found that for some of Toyo Kohan's reported U.S.
> sales, the sales value changed between the date of shipment
> and the commercial invoice date. However, in this review, the
> record evidence does not support the same finding, but
> instead indicates that the material terms of sale were set at the
> shipment date. Specifically, Toyo Kohan's sample sales

---

[31] *Prelim Analysis Memo* (P.R. 86)

[32] *9th Review Prelim I&D Memo* (P.R. 85).

[33] *Letter from Curtis, Mallet-Prevost, Colt & Mosle LLP to the U.S. Department of Commerce Regarding Ministerial Error Correction* (May 28, 2024) (P.R. 89).

[34] *Toyo Kohan's Case Brief* (June 21, 2024) at 2-3 (P.R. 92).

documentation indicates that the material terms of sale, such
as price and quantity, between Toyo Kohan and its U.S.
customer were established at the time of the shipment date.
Thus, because the record evidence does not support deviating
from our normal practice of using the earlier of the shipment
or invoice date as the U.S. date of sale, we continue to use
SALEDATU as the date of sale for Toyo Kohan's U.S. sales
in our calculations for the final results.[35]

We note several key points about Commerce's conclusory discussion.

First, Commerce asserts that the record evidence here is different from prior
reviews based on a single, isolated example. Commerce cites only a single fact in
support of this conclusion, stating: "Specifically, Toyo Kohan's sample sales
documentation indicates that the material terms of sale, such as price and quantity,
between Toyo Kohan and its U.S. customer were established at the time of the shipment
date." This statement is a reference to Exhibit 10-A of the Section A Response. *Toyo
Kohan's Section A Response* (Sept. 15, 2023) at Ex. 10-A (C.R. 5-8). This statement
characterizes documents related to a single sales transaction out of a total of 135 U.S.
sales transactions. As such, this lone example sheds little light on the situation for the
numerous other sales transactions at issue. Moreover, the single example (Exhibit A-
10A) that Commerce cited in the *9th Review Final I&D Memo* to justify its date of sale
determination <u>contradicts</u> Commerce's own claim. The U.S. sales database makes clear
that the single sales transaction that Commerce cited actually shows a price change
between shipment and invoice, demonstrating that the price was not finalized at the
shipment date as Commerce assumed. Indeed, Commerce even overlooks that this very

---

[35] *9th Review Final I&D Memo*, at 4 (P.R. 108) (emphasis added).

document reflects a price change after shipment, further undermining its argument that

the final price was set at the shipment date.[36]

Second, independent of the flaws in the single example cited by Commerce, as

discussed above in Section II.A, a more complete review of all the U.S. sales at issue

shows changes in more than half of the total universe of 135 U.S. sales transactions. In

Commerce's discussion quoted above, there is no discussion of the record evidence as a

whole. And so, most of the language quoted above is a conclusion without any

supporting factual basis. The complete electronic database for all U.S. sales transactions

shows that for 83 of the 135 transactions, Commerce's characterization is false; rather,

for these U.S. sales transactions the evidentiary record actually shows price changes after

shipment before invoice. Even if one focuses just on the paper record documenting 100

of the 135 transactions, that document shows 61 transactions where there was a price

change after shipment but before invoicing. *Toyo Kohan's Supplemental Section C*

*Response* (Apr. 24, 2024) Exhibit SC-1 (C.R. 133).

Third, Commerce makes an erroneous comparison between the 9th Review at issue

here and the 6th Review. Commerce contrasts this 9th Review, citing a single transaction

showing no change, with the 6th Review (referenced by Commerce as the "2019-20

DANP from Japan") where "some" of the U.S. sales showed change. The 9th Review,

however, also had "some" changes – more than half of the U.S. sales showed price

---

[36] We note that the U.S. sales database indicates that the other sample invoice in Exhibit A-10B
does show an example where the shipment price and the invoice price were the same. However,
this is not the example that Commerce cited in its *9th Review Final I&D Memo*. *See 9th Review
Final I&D Memo* at 4, footnote 19, (P.R. 108).

changes between the shipment and invoice.   Indeed, the majority of U.S. sales with price changes in the 9th review were much more than the "some" Commerce cited from the 6th review.  Contrary to Commerce's statement, the 9th Review was just like the 6th Review, where numerous transactions had changes, and therefore, the presumption to use the invoice date as the date of sale applied.

Commerce's assertion that the record here did not show changes after the shipment date is thus just wrong.  The record actually established that more than half of the U.S. sales transactions had changes in price after the shipment date.  Even the single example that Commerce cited in the POR9 Final I&D Memo shows a price change after the shipment date.  Accordingly, the Commerce determination to use something other than the invoice date is not supported by substantial evidence.

### 3. The Commerce practice of using the earlier of shipment date or invoice date does not apply here

In its final results, Commerce noted a policy: "Commerce's long-standing practice is to use the earlier of shipment date or invoice date as the date of sale."[37]  We do not dispute that Commerce has such a practice.  That practice, however, does not apply here.

At the outset, we note that this policy is not part of the regulation and simply reflects the reality that, in many cases, the shipment will fix the price and quantity, and there will be no changes after shipment.   In that sense, this agency practice simply

---

[37] *9th Review Final I&D Memo* at 4, (P.R. 108).

reflects Commerce's view that when the prices and quantities do not change after shipment, then there is "satisfactory evidence that the material terms of sale are finally established on a date other than the date of the invoice," as noted in the preamble to the regulation.  Under the regulation, the presumption is to use the invoice date.  If the shipment date "better reflects the date on which the exporter or producer establishes the material terms of sale," 19 C.F.R. § 351.401(i), then under the regulation the shipment date should be used.  But under the express language of the regulation, the shipment date, which somehow "better reflects" the invoice date, must be shown based on "satisfactory evidence."

When the record shows frequent price changes after shipment, this Commerce policy to use the shipment date simply does not apply.   Commerce has regularly adopted the invoice date when respondents showed frequent price changes after shipment.  That is precisely why the regulation states the general rule that Commerce will use the invoice date.  And that is why Commerce often adopts the use of invoice date in such situations.

Indeed, we note that Commerce itself recognized that ultimately the specific facts of a particular record must govern.   In this review, Commerce stated that "the record evidence does not support deviating from our normal practice of using the earlier of the shipment or invoice date as the U.S. date of sale."[38]  But this statement admits the record evidence must govern.  And as we show above, the record evidence here shows that more than half of the U.S. transactions had changes after shipment before the invoice.  On

---

[38] *9th Review Final I&D Memo* at 4, (P.R. 108).

these facts, it is simply not credible to assert that the shipment date "better reflects" the date of sale than the invoice date.

Indeed, we also note that Commerce applied this policy to set the date of sale but used the later in time price from the invoice, not the tentative price from the shipment document.[39]  As discussed above, Toyo Kohan continues negotiations with the customer between the time of shipment and the time of invoice.   That is why about 60 percent of the time, the price changes. And that is why Commerce used the price from the invoice, the final price for the U.S. transaction.  It would be odd to derive the date of sale from the shipment documents but then use the price from the later in time invoice. Yet that is what Commerce did here.

In sum, the evidence supporting the use of invoice date as the date of sale is substantial, and nothing about Commerce's policy to use the first of shipment date or invoice date – when there are no changes after shipment – changes this basic conclusion about the date of sale in this case.

## II.  COMMERCE UNLAWFULLY APPLIED DIFFERENTIAL PRICING TO AVOID USING THE AVERAGE-TO-AVERAGE COMPARISON METHODOLOGY

In light of the Federal Circuit's recent decisions in *Marmen* and *Stupp II*, the underlying dumping margin calculated here is unlawful.  This Court should therefore order a remand so Commerce can either use the average-to-average comparison methodology to calculate the dumping margin or otherwise replace the now-unlawful

---

[39] *9th Review Final Analysis Memo*, page 145 of Attachment I, (C.R. 197).  At the bottom of the page, you will see the invoice price being used.

differential pricing test with some other legally permissible basis for not using the average-to-average methodology required by the statute.

### A.    The Exhaustion Doctrine Does Not Apply

Although we acknowledge that this argument was not raised before Commerce, the intervening legal authority exception to the exhaustion requirement recognized in *Hormel v. Helvering*, 312 U.S. 552, 556 (1941), which has been reaffirmed repeatedly in this circuit, plainly applies.  *See  Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337, 1348 (Ct. Int'l Trade 2023) (applying *Hormel* to permit a post-review challenge where a Federal Circuit decision "materially altered" the result); *Papierfabrik Aug. Koehler AG v. United States*, 36 CIT 1632, 1635 (2012) (Excusing exhaustion where a post-decision pair of Federal Circuit rulings unsettled previously settled law on zeroing); *Polaris Indus. v. Arctic Cat, Inc.*, 724 F. App'x 948, 949 (Fed. Cir. 2018) (quoting *Hormel* for the proposition that "precedent holds that a party does not waive an argument that arises from a significant change in law during the pendency of an appeal").

This is not a case of invoking dicta or incremental clarification to excuse waiver. *See, inter alia, Garg Tube Export LLP v. United States,* 698 F. Supp. 3d 1230 (Ct. Int'l Trade 2024*)* ("*Garg*")*.*  In fact, *Garg* squarely supports our argument, as the precise prerequisites for an exception to the exhaustion requirement the Court found lacking there are present here.

The *Garg* court noted that the Federal Circuit "merely vacated this Court's decision sustaining Commerce's use of the Cohen's d test with instructions to further

explain the reasonableness of its application" and, crucially, "this Court again affirmed Commerce's use of the Cohen's d test as reasonable in light of the remand order."  *Garg* at 1242 (quoting *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1318 (Ct. Int'l Trade 2023)).

As the Federal Circuit itself stated just days ago in *Marmen Inc. v. United States*, "we pick up where the court in *Stupp I* left off." *Marmen*, No. 23-1877, Slip Op. at 19 (Fed. Cir. Apr. 22, 2025).  In contrast to *Stupp I*, which left the door open for Commerce to justify its methodology on remand, *Marmen* and *Stupp II* have now squarely held that Commerce's application of Cohen's d to data sets that do not meet the necessary statistical assumptions is unlawful.  The *Marmen* court, echoing *Garg,* makes clear in its description of the Federal Circuit's holding in *Stupp I*: "We did not reverse; rather we remanded the case to Commerce giving it an opportunity to 'explain whether the limits on the use of the Cohen's d test prescribed by Professor Cohen and other authorities were satisfied.'" *Id.*  But in *Marmen*, the Federal Circuit found Commerce's post-*Stupp I* rationale unpersuasive and held as a matter of law that its continued use of Cohen's d under those conditions, also present here, "was unreasonable." *Id.* at 6, 20–23; *See also Stupp II* at 6.

The key legal distinction, then, is that while *Stupp I* initiated the legal scrutiny of Commerce's methodology, *Marmen* and *Stupp II* resolved it. *Garg* was decided in the interim, when the legality of Cohen's d was still unsettled.  That is no longer the case.  The change in controlling law wrought by *Marmen* thus meets the standard articulated in *Hormel v. Helvering*, 312 U.S. 552 (1941): an intervening judicial interpretation "which,

- 37 -

if applied, might have materially altered the result." *Id.* at 559.  In light of these decisions, the intervening authority exception to the exhaustion doctrine plainly applies.

*Marmen* and *Stupp II* represent a fundamental shift in controlling law that directly forecloses Commerce's prior use of the Cohen's d methodology in circumstances identical to those at issue here.  Any pre-*Marmen* or *Stupp II* challenge before Commerce would have been a textbook case of futility.  Requiring such a challenge merely because the issue was percolating in the courts would not render it any less futile -- especially before an agency that was, at the time, vigorously defending its use of the Cohen's d test. Such a requirement would be a gross elevation of form over substance.  In this context, the Court should exercise its discretion under 28 U.S.C. § 2637(d) and consider this argument because it would be "appropriate" to do so.  "[J]ustice requires" this well-established exception to the exhaustion requirement be applied in light of recent Federal Circuit decisions.  *Hormel*, 312 U.S. at 556.

### B.    Commerce's Application of Its Cohen's d Approach Is Unlawful

Turning to the merits of this issue, *Marmen* summarizes the relevant background. The statute requires Commerce to use the average-to-average comparison methodology to determine dumping margins.  *Marmen*, No. 23-1877, Slip Op. at 15 (Fed. Cir. Apr. 22, 2025).  Commerce has been using the differential pricing methodology to justify finding a "pattern of sales" to qualify for an exception to this basic rule of average-to-average comparisons.  *Id.* at 15-16.  The differential pricing test, in turn, depends critically on the Cohen's d test to establish that enough prices diverge from the average to justify finding the required pattern.  *Id.* at 16.

The Federal Circuit in *Stupp I* had called into question the appropriateness of Commerce's use of Cohen's d test without first ensuring the underlying assumptions had been met. *Stupp Corporation v. United States*, 5 F.4th 1341, 1357 (Fed. Cir. 2021) ("[T]here are significant concerns relating to Commerce's application of the Cohen's d test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances."). Having given Commerce another chance to explain and possibly justify its current use of the Cohen's d test, the Federal Circuit considered and in *Marmen* definitely rejected Commerce's attempted rationale. *See* Slip Op. at 19-23. The Federal Circuit concluded as matter of law "it was unreasonable to rely on Cohen's d test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Id*. at 23. *See also Stupp Corporation v. United States*, 5 F.4th 1341, 1357-60 (Fed. Cir. 2021).

These same flaws fatally infect the dumping margin calculated here. At the outset, we note that Commerce applied the same differential pricing test here that it employs as standard boilerplate in every case.[40] And because of the differential pricing test, the dumping margin that would have been 0.0 percent under the average-to-average

---

[40]  *Final Analysis Memo* at Attachment III (C.R. 200). Please note that the boilerplate macro language in the Attachment III is publicly available in the following URL from Commerce: access.trade.gov/resources/sas/programs/diffpriceprograms/me-macros-sas.txt.

comparison methodology increased to 4.44 percent under the mixed comparison methodology.[41]

And here, like in *Marmen*, the three underlying assumptions on which Cohen's d test rests have not been met. First, the data is not normally distributed. Within the SAS programming language that Commerce uses for margin calculations, there are ways to test that the data is normally distributed. Commerce's differential pricing test does not test for normality in the data. Using the Shapiro-Wilk test, which is commonly used to assess normality, we confirmed the U.S. price data here fail the test and are thus not normally distributed. As an example, according to the test results using the Shapiro-Wilk test for CONNUM 100030604050 in Quarter 2, the p-value was 0.0016, which is well below the 0.05 probability threshold for the test[42] and therefore fails the normality test. We chose this CONNUM and quarter as an example because it contains the largest volume of U.S. sales of those at issue.

Second, the data does not have equal variances. Commerce's differential pricing test does not test for equal variances in the data. As an example, we note that for the same example in Quarter 2 for CONNUM 100030604050, the standard deviation is (1) 59.767 for the test group and (2) 160.490 for the base group.[43] It is hard to see how such

---

[41] *Final Analysis Memo* at Page 11 of Attachment II (C.R. 198).

[42] For statistical tests, it is common to use a probability threshold, typically at 5 percent. This means one can reject the so-called "null hypothesis" at least 95 percent or more of the times. In this example, the test result of p=0.0016 means that in 99.84 percent of the cases the data will not be normally distributed.

[43] *Final Analysis Memo* at Page 11 of Attachment II (C.R. 198).

a large gap could be considered equal variances. And this problem is pervasive in this case. Of the nine-pricing period possible comparisons that otherwise passed the Cohen's d test, the variances between the test and base groups differed by more than 10 percent in all nine cases. Indeed, in 7 of the 9 cases, the gap between the two variances is about 100 percent or more. Nevertheless, the Department's margin program classified most of these comparisons as "pass."[44]

Third, the data are not sufficiently numerous. Commerce's differential pricing test does not test for the number of observations in the data. The Commerce differential pricing test requires only that the test group and base group each have 2 or more transactions. A more typical rule of thumb is that a data set should have about 30 transactions for statistical tests based on an assumption of normality to work. In the underlying data here, for the 18 group-level comparisons Commerce used in the differential pricing test, comprising of both base and test groups across pricing periods, 13 of the 18 comparisons failed this rule of thumb test.[45] Indeed, for 12 of the comparisons, the number of transactions was 15 or fewer, well below the typical tests for numerosity, but most of these group comparisons were still classified as "pass" under the Commerce's Cohen's d test.

Accordingly, in this case Commerce did not have a proper factual basis to apply the Cohen's d test, did not have a proper conceptual basis to apply its differential pricing

---

[44] *Id.*

[45] *Id.*

test based on Cohen's d, and did not have a proper legal basis to use the mixed comparison method instead of the average-to-average method.  Put more directly, the 4.44 percent margin calculated here rested on a legally flawed foundation.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Toyo Kohan respectfully requests that the Court find that Commerce's determination to use shipment date rather than invoice date as the date of sale was unlawful and not supported by substantial evidence.  Commerce's determination ignored its own regulatory presumption, and failed to account for the extensive record evidence showing that material terms were not finalized until the invoice date.  Accordingly, Toyo Kohan asks that the Court remand Commerce's final results for further proceedings consistent with the law.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Will Chandler

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 11,310 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<u>s/ Daniel L. Porter</u>

Daniel L. Porter
James P. Durling
Will Chandler

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*

- 44 -