**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

|  |  |  |
|---|---|---|
| TOYO KOHAN CO. LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | Court No. 24-00261 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | Business Proprietary Information |
| | ) | Removed from Brackets on Pages |
| and | ) | 2, 5, and 8-14. |
| | ) | |
| THOMAS STEEL STRIP CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenor*. | ) | |
| | ) | |

<u>**RESPONSE BRIEF OF DEFENDANT-INTERVENOR IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGEMENT ON THE AGENCY RECORD**</u>

James R. Cannon, Jr.
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. NW
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Thomas Steel Strip Corporation*

Date:   July 10, 2025

## Table of Contents

Page

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

    A.  Date of Sale ......................................................................................... 2

    B.  Cohen's d…. .......................................................................................... 3

II. STATEMENT OF ISSUES ............................................................................... 3

III. STATEMENT OF FACTS ................................................................................ 3

IV. ARGUMENT ..................................................................................................... 7

    A.  Commerce Acted Reasonably and in Conformity With Its Standard Practice to Find that the Date of Sale Should Be Based on the Earlier of Shipment Date or Invoice Date ........................................................................................... 7

        1.  Commerce's long-standing practice is to use the earlier of shipment date or invoice date as the date of sale ............................................................. 7

        2.  The record facts in this administrative review demonstrate that the material terms of sale were set by the shipment date ............................................. 9

        3.  Commerce is not bound by determinations in prior administrative reviews when the facts in a new administrative review support a different conclusion ................................................................................................. 15

    B.  Under *Marmen*, Whether or Not the Cohen's d Test is an Appropriate Statistical Test to Use on a Given Record Requires a Factual Analysis That Commerce Did Not Have an Opportunity to Perform Because Toyo Kohan Failed to Raise the Issue During the Administrative Proceeding ......................... 17

V.  CONCLUSION ................................................................................................... 19

NON-CONFIDENTIAL VERSION

## Table of Authorities

Page(s)

**Statutes**

28 U.S.C. § 2637(d) ...................................................................................................17

**Regulations**

19 C.F.R. § 351.224(c) ................................................................................................6

19 C.F.R. § 351.401(i) ................................................................................................7

**Court Decisions**

*ABB, Inc. v. United States*, 920 F.3d 811 (Fed. Cir. 2019) ......................................17

*Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017) ...................17

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ..........................17

*Dong-A Steel Company v. United States*, 337 F.Supp.3d 1356 (Ct. Int'l Trade 2018) ..................7

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ...............................17

*Elkem Metals Co. v. United States,* 193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002) .......................15

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed.Cir.1994) ..............................2, 16

*Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) ...........................3, 17-19

*Mittal Steel Point Lisas Ltd. v. United States*, 491 F.Supp.2d 1222 (Ct. Int'l Trade 2007) ...........8

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) .....................17-19

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ...............................15

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .................................7

*Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021) ........17

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir.1990) ..........................................15

*SeAH Steel Corp., Ltd. v. United States*, 25 C.I.T. 133 (Ct. Int'l Trade 2001) ........................2, 16

*Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ................................................................................................................18

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) .....................................19

*Tension Steel Industries Co., Ltd. v. United States*, 179 F.Supp.3d 1185 (Ct. Int'l Trade 2016) ...........................................................................................................................8

*Tianjin Magnesium Intern. Co., Ltd. v. United States*, 722 F.Supp.2d 1322 (Ct. Int'l Trade 2010) .........................................................................................................................15

*Trust Chem Co. v. United States*, 791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) .........................................................................................................................15

**<u>Administrative Determinations</u>**

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023,* 89 Fed. Reg. 95,735 (Dec. 3, 2024) ................................................................................................. 1-2, 6, 19

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Final Results of Reconsideration of Sunset Review*, 73 Fed. Reg. 67,131 (Nov. 13, 2008)...........................................................................................15

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Preliminary Results of Reconsideration of Sunset Review,* 71 Fed. Reg. 64,927 (Nov. 6, 2006)...........................................................................................16

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 Fed. Reg. 76918 (Dec. 23, 2004)...............................................................8

NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | | |
|---|---|---|
| TOYO KOHAN CO. LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | Court No. 24-00261 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | Business Proprietary Information |
| | ) | Removed from Brackets on Pages |
| and | ) | 2, 5, and 8-14 |
| | ) | |
| THOMAS STEEL STRIP CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenor*. | ) | |

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant-intervenor Thomas Steel Strip Corporation ("Thomas") respectfully submit this

response brief in opposition to the motion for judgment on the agency record filed on May 2,

2025, by Toyo Kohan Co. Ltd. ("Plaintiff" or "Toyo Kohan") (hereafter, "Toyo Kohan Br.").

Toyo Kohan challenges various aspects of the U.S. Department of Commerce's ("Commerce")

final results in the ninth administrative review of the antidumping duty order on Diffusion-

Annealed Nickel-Plated Steel ("DANP") from Japan, which covers the May 1, 2022 to April 30,

2023 time period.  *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan:

Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735

(Dec. 3, 2024)  ("*Final Results*") (P.R. 110), and accompanying Issues and Decision

Memorandum ("Final IDM") (P.R. 108).  As detailed below, the challenged *Final Results* were

supported by substantial record evidence and otherwise in accordance with law.  For these reasons, Commerce's determination should be sustained.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

### A.   Date of Sale

In determining which date to use as the date of sale in its *Final Results*, Commerce found that the record evidence "indicates that the material terms of sale were set at the shipment date." Final IDM at 4 (P.R. 108). Commerce therefore concluded that "the record evidence does not support deviating from our normal practice of using the earlier of shipment or invoice date as the U.S. date of sale."  *Id*. (P.R. 108).

Toyo Kohan asserts that a majority of its "U.S. sales transactions had changes in price after the shipment date."  Toyo Kohan Br. at 33.  However, the alleged "changes in price" were only internal accounting entries known to Toyo Kohan.  Whether Toyo Kohan made internal updates to its prices in its accounting system before or after shipment of the merchandise is not relevant if its customers [                                        ] the price established on the date of shipment.

Toyo Kohan alternatively suggests that Commerce should rely on the commercial invoice date as the date of sale because it had done so in prior reviews.  Commerce acknowledged that in certain prior administrative reviews of the same antidumping order it had relied on the commercial invoice date as the date of sale but explained that the facts in this administrative review did not support the same result.  Id. (P.R. 108).  This Court has approved such reasoning, making clear that the date of sale analysis is undertaken "in each review."  *SeAH Steel Corp., Ltd. v. United States*, 25 C.I.T. 133, 138 (Ct. Int'l Trade 2001) (quoting *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed.Cir.1994)).  Commerce acted accordingly in this administrative

review, analyzing the specific record facts and conducting an independent analysis to determine the appropriate date of sale to utilize in its margin calculations.

Commerce's determination to use the earlier of shipment or invoice date as the date of sale in this administrative review was reasonable, consistent with its long-standing practice, and supported by substantial evidence on the record of this review. This Court should therefore affirm Commerce's determination in this regard.

### B. Cohen's d

Citing the Federal Circuit's recent determination in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025), Toyo Kohan argues that Commerce acted unlawfully by applying the Cohen's d test to datasets that arguable did not have sufficient observations to support the underlying statistical assumptions embodied in Cohen's d. However, whether or not the underlying data met those statistical assumptions is a factual question that Toyo Kohan failed to raise during the course of the administrative review. The Court should therefore find that Toyo Kohan failed to exhaust its administrative remedies on this issue.

## II. STATEMENT OF ISSUES

1. Whether Commerce's reliance on the earlier of shipment date or invoice date as the date of sale was supported by substantial evidence and otherwise in accordance with law, when record evidence demonstrated that the material terms of sales were established with the U.S. customer by the date of shipment?

2. Whether Toyo Kohan's challenge to Commerce's use of the Cohen's d test is properly an issue on appeal when Toyo Kohan failed to raise the issue during the administrative proceeding such that Commerce had no opportunity to comment on the underlying factual claims Toyo Kohan relies on in its argument before the Court?

## III. STATEMENT OF FACTS

In its initial questionnaire, Commerce asked Toyo Kohan to provide details on its sales process for sales of subject merchandise in both the United States and home market. Letter from

Commerce, "Request for Information" (August 18, 2023) ("DOC IQR") at A-8 to A-9 (P.R. 17).

Commerce asked Toyo Kohan to provide "all sales-related documentation generated in the sales

process (including the purchase order, internal and external order confirmation, invoice, and

shipping and export documentation) for a sample sale in the foreign market and U.S. market

during the POR.")  *Id*. (P.R. 17).  Toyo Kohan responded that for sales to the United States made

through the trading company Metal One America, the final price is determined based on a "price

formula mechanism that sets forth a general agreement about how the price will be determined at

a later time based on changes in underlying raw material costs."  Letter from Toyo Kohan, "Toyo

Kohan's Section A Response" (September 15, 2023) ("Toyo Kohan AQR") at 15-16 (P.R. 22,

C.R. 3).

   This mechanism was used by Toyo Kohan and Metal One to determine prices during the

underlying period of review.  *Id*. (P.R. 22, C.R. 3).  Pursuant to the formula, prices were indexed

to changes in raw material costs for the "base steel (hot band) component," the "nickel

component," and the "all others" component.  *Id*. at 24-25. (P.R. 22, C.R. 3).  Using the pre-

established formula, both Toyo Kohan and Metal One knew the ultimate price by the date that

the subject merchandise was actually shipped.

   Toyo Kohan states that its internal systems do not always update prices before the subject

merchandise was shipped from its factory at Kudamatsu.  Toyo Kohan CQR at 25 (P.R. 39, C.R.

48); *see also* Toyo Kohan AQR at 17 (P.R. 22, C.R. 3).  Consequently, its sales system issued "a

summary billing document" on the shipment date using "the price in Toyo Kohan's system at the

time of shipment" which is equal to "the most recent order confirmation price."  Toyo Kohan

CQR at 24-25 (P.R. 39, C.R. 48); *see also* Toyo Kohan AQR at 17 (P.R. 22, C.R. 3).  However,

although this "summary bill" did not always reflect the actual sales price, "with each shipment of

subject merchandise sent to Metal One America" [

] invoice reflecting "the agreed-upon sales price" [

].  Toyo Kohan AQR at 17 (P.R. 22,

C.R. 3).  According to Toyo Kohan, [

].  Toyo Kohan AQR at

17 (P.R. 22, C.R. 3).  In other words, as of the date of shipment, the sale took place at the agreed-

upon price regardless of the internal entries and updates in Toyo Kohan's accounting system.

*See* Toyo Kohan CQR at 25 (P.R. 39, C.R. 48).

The sales documentation confirmed the lack of any real change in price.  Toyo Kohan

provided sales documentation for SEQU [        ], a sample sale with a "price change" reported in

the VAL_ADJU field, in Exhibit A-10A.  Toyo Kohan AQR at Exhibit A-10A (P.R. 23, C.R. 5-

6); *see also* Toyo Kohan Br. at 3.  This documentation confirms that the [

] Metal One America [                                                    ] final price indicated

by the pricing formula, which was [

].  *Id.* (P.R. 23, C.R. 5-6).

This final price was also [

].  *Id*. at Exhibit A-13A

(P.R. 23, C.R. 9).  As such, any change in price shown by Toyo Kohan's internal accounting

entries, GRSUPRU_ORIG or VAL_ADJU, was not relevant to the price actually negotiated with

or paid by Metal One America.  Indeed, Toyo Kohan itself confirms as much, noting that the

amounts reported in the VAL_ADJU field are not true "billing adjustments" reflecting actual

price changes, but are instead "simply an <u>internal difference</u> between the most recent order

confirmation price and the actual sales price." Toyo Kohan CQR at 25 (P.R. 39, C.R. 48) (emphasis supplied).

Following the preliminary results, , Toyo Kohan argued that the results included a ministerial or clerical error. Toyo Kohan averred that Commerce intended to use the commercial invoice date, but that the SAS margin program incorrectly used the shipment date as the date of sale. Letter from Toyo Kohan, "Toyo Kohan's Request for Correction of Ministerial Error" (May 28, 2024) (P.R. 89). Commerce did not make any adjustments based on Toyo Kohan's comments as allegations of ministerial errors should be raised in the case brief. *See* 19 C.F.R. § 351.224(c).

Toyo Kohan again raised the issue in its case brief, arguing that Commerce had erroneously relied on the earlier of shipment date or commercial invoice date (SALEDATU) to define the date of sale, rather than the reported commercial invoice date (SALINDTU3). Letter from Toyo Kohan, "Toyo Kohan's Case Brief" (June 21, 2024) (P.R. 92) at 4-6. Thomas filed a rebuttal, arguing that Commerce should follow its well-established practice and define the date of sale to be the date on which the material terms of sale were established—*i.e.*, the earlier of shipment date or invoice date. Letter from Thomas, "Petitioner's Rebuttal Brief" (June 27, 2024) (P.R. 95, C.R. 191) at 2-9.

In its *Final Results*, Commerce found that the evidence on the record of this proceeding "indicates that the material terms of sale were set at the shipment date" and therefore that the "record evidence does not support deviating from our normal practice of using the earlier of shipment date or invoice date as the U.S. date of sale." Final IDM at 4 (P.R. 108). Commerce's conclusion was reasonable and wholly supported by evidence on the record of this administrative review.

Toyo Kohan did not raise any challenges to Commerce's use of the Cohen's d test during the administrative proceeding and therefore Commerce had no opportunity to consider or address whether the sales data on this record meet the statistical assumptions of normality and equal variances underlying the Cohen's d test.

## IV.  ARGUMENT

### A.  Commerce Acted Reasonably and in Conformity With Its Standard Practice to Find that the Date of Sale Should Be Based on the Earlier of Shipment Date or Invoice Date

#### 1.  Commerce's long-standing practice is to use the earlier of shipment date or invoice date as the date of sale

There is no dispute that the statute does not define the exact manner in which Commerce is to determine the date of sale, but that the Statement of Administrative Action ("SAA") makes clear that the date of sale is the "date when the material terms of sale are established."  Toyo Kohan Br. at 20; *see Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1299-1300 (Ct. Int'l Trade 2009) (quoting SAA, H.R. Doc. No. 103–316, at 810, reprinted in 1994 U.S.C.C.A.N. at 4153).  This Court has thus previously emphasized that when choosing the date of sale, the important factor to consider "is when the parties {to the sale} have reached a 'meeting of the minds'" as to price, quantity, and other terms.  *Dong-A Steel Company v. United States*, 337 F.Supp.3d 1356, 1364 (Ct. Int'l Trade 2018) (quoting *Nucor Corp. v. United States*, 612 F.Supp.2d 1264, 1300 (2009)).

Commerce's regulations reflect that it "normally will use the date of invoice" as the date of sale <u>unless</u> Commerce "is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale."  19 C.F.R. § 351.401(i).  Under these regulations, Commerce's "long standing practice is to use the earlier of shipment date or invoice date as the date of sale."  Final IDM at 4 (P.R. 108); *see also Dong-A Steel*, 337

F.Supp.3d at 1363 (noting that Commerce "has a long-standing practice of finding that, where shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established"); *Mittal Steel Point Lisas Ltd. v. United States*, 491 F.Supp.2d 1222, 1231 (Ct. Int'l Trade 2007) (noting that "Commerce has adopted a practice of calculating the date of sale to be the date of invoice, unless the date of shipment is earlier").

This Court has previously upheld Commerce's practice of using the earlier of shipment date or invoice date as the date of sale, noting that "{t}here is, of course, a baked in practical logic to this practice" because "{w}hen a party ships its product to a customer, it is reasonable to assume that the material terms of the sale have been established" with the customer. *Tension Steel Industries Co., Ltd. v. United States*, 179 F.Supp.3d 1185, 1194 (Ct. Int'l Trade 2016). Logically, where there is no "compelling evidence to demonstrate that the material terms of sale change after shipment," Commerce uses the earlier of shipment date or invoice date as the date of sale. *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 Fed. Reg. 76918 (Dec. 23, 2004), and accompanying Issues and Decision Memorandum ("IDM") at Comment 10. This is precisely the reasoning that Commerce applied in this administrative review. *See* Final IDM at 4 (P.R. 108). And, this approach is set forth in every Commerce questionnaire. *See, e.g.*, IQR, Appendix I at I-5 to I-6 (P.R. 17).

Contrary to Toyo Kohan's assertions, Commerce did not inexplicably depart from its regulations. *See* Toyo Kohan Br. at 5. Rather, in light of the record evidence that the [

] prices on the date of shipment, Commerce's determination was consistent with its regulations, long-standing practice, and judicial precedent.

### 2.   The record facts in this administrative review demonstrate that the material terms of sale were set by the shipment date

The factual record established does not support any deviation from the standard "earlier of" methodology in establishing the date of sale.  Toyo Kohan avers that Commerce should have relied on the date of invoice as the date of sale because Toyo Kohan's records show that "price changes" occurred between the date of shipment and date of invoice.  Toyo Kohan Br. at 27-28.  However, Toyo Kohan's own explanations as well as record evidence submitted during the course of this administrative review confirm that such "price changes" only reflect the adjustment of Toyo Kohan's internal records back to the actual, negotiated sales price.  *See, e.g.,* Toyo Kohan CQR at 25 (P.R. 39, C.R. 48).  Contrary to Toyo Kohan's assertions, the record contains no evidence that the material terms of sale negotiated with the U.S. customer changed after the date of shipment.

The record shows that both Toyo Kohan's [                    ] and its U.S. customer were well aware of the final "agreed-upon sales price" by the date of shipment.  That price was reflected in the [

], both of which were [

] and both of which contain the final "agreed-upon sales price" that was [                         ].  *See* Toyo Kohan AQR at 17 (P.R. 22, C.R. 3), Exhibit A-10A (P.R. 23, C.R. 5-6), and Exhibit A-13A (P.R. 23, C.R. 9).  Accordingly, the record evidence provides no basis for Commerce to depart from its long-established practice of using the earlier of shipment date or invoice date as the date of sale.

Toyo Kohan's argument is based on an internal accounting practice, not on any actual change in the negotiated price that occurred prior to the date of shipment.  Although Toyo Kohan asserts that "the price frequently changes after shipment, and the invoice reflects the final agreed

upon price," Toyo Kohan Br. at 10, the evidence shows that the agreed-upon prices between

Toyo Kohan and its customer [                                                    ] only changed

in Toyo Kohan's <u>internal accounting records</u>.

 Toyo Kohan's accounting processes are not relevant to the material elements of the sale.

On the date of shipment, the quantity shipped was known.  Likewise, the price was known.  The

so-called "summary bill" issued using the price in Toyo Kohan's internal system at the time of

shipment and the "value adjustment" reported in the field VAL_ADJU, are only "price changes"

in Toyo Kohan's internal systems.  These changes are made for "internal reconciliation of sales

records to accounting records."  Toyo Kohan CQR at 24 (P.R. 39, C.R. 48).  They are not

changes in the price determined by the pricing formula mechanism, which was set between Toyo

Kohan and Metal One America on the date of shipment.

 Moreover, "with each shipment of subject merchandise sent to Metal One America"

[                                                    ] a payment invoice that "reflect{s}

the {final} agreed-upon sales price," [

                        ].  Toyo Kohan AQR at 17 (P.R. 22, C.R. 3).  As discussed further

below, record evidence shows that the final agreed-upon sales price [

    ] are clearly set forth in [

                                                    ].  As such, it is clear that

both Toyo Kohan and Metal One America knew the final price at the time of shipment.

 Importantly, the sales trace documentation provided in Exhibit A-10A, demonstrates

that—even where Toyo Kohan's internal billing system recorded a "price change" —the reported

"price change" did not reflect any change in the price or other material terms of sale.  *See* Toyo

Kohan AQR at Exhibit A-10A (P.R. 23, C.R. 5-6); Toyo Kohan Br. at 3.  Exhibit A10-A shows

that, for SEQU [        ], Toyo Kohan reported that [                                    ] occurred between

the date of shipment (*i.e.* [                ]) and the date of its commercial invoice (*i.e.* [

]).[1]  This "price change" [              ] the price in Toyo Kohan's internal systems from [

] to [        ].  **However**, examination of the sales trace documents for SEQU [        ] in

Exhibit A-10A shows that Metal One America [

] before the product was shipped on [

].  *See* Toyo Kohan AQR at Exhibit A-10A (P.R. 23, C.R. 5-6).  Moreover, the "supporting

documentation for the utilized pricing formula mechanism" provided in Exhibit A-13A show that

[                                                                              ] showing the final

sales price of [        ] on [                                        ] before the product was

shipped.  *Id.* at 18 (P.R. 22, C.R. 3) and Exhibit A-13A (P.R. 23, C.R. 9).

      In particular, Exhibit A-10A contains the following:

- A purchase order ([                          ]) issued by Metal One America to Toyo Kohan, dated [                    ] and showing a unit price as [                      ] for a [                  ] shipment that is expected to arrive in the United States in [                ].  *See* Toyo Kohan AQR at 16 (P.R. 22, C.R. 3) and Exhibit A-10A (P.R. 23, C.R. 5-6).

- An [                                      ], dated [              ] which lists the unit price as [                ].  *Id.* at Exhibit A-10A (P.R. 23, C.R. 5-6).  Toyo Kohan elsewhere explains that this "summary bill" was generated automatically on the shipment date (i.e. [

---

[1] This [      ] is reported in the VAL_ADJU field in Toyo Kohan's U.S. sales database and reflects the difference between the price of [        ] reported in the field GRSUPRU_ORIG and the price of [        ] reported in the field GRSUPRU.  The former price of [            ] is the price recorded in Toyo Kohan's internal system on the date of shipment (SHIPDATU1), which for SEQU [      ] is [            ].  The later price of [          ] is the price recorded in Toyo Kohan's internal system on the date the commercial invoice is issued (SALINDTU3), which for SEQU [      ] is [                ].  Letter from Toyo Kohan, "Toyo Kohan's Supplemental Section C Response" (April 24, 2024) ("Toyo Kohan SCQR") at Revised U.S. Sales Database (C.R. 138).

]) using "[                                        ]." *Id*. at 17 (P.R. 22,
C.R. 3).

- An [                                    ], dated [              ],
  which shows Toyo Kohan's [
       ]. *Id*. at Exhibit A-10A (P.R. 23, C.R. 5-6).  Toyo Kohan explains that [
                                        ]. *Id*. at 17 (P.R. 22, C.R. 3).
  Unlike the subsequent payment invoice [
                    ] are shared with the customer.  *See id*.

- A payment invoice numbered [              ] and dated [              ] which lists
  a final unit price of [         ].[2]  *Id*. at Exhibit A-10A (P.R. 23, C.R. 5-6).
  According to Toyo Kohan, this is the document sent to Metal One America as it reflects
  the "agreed-upon sales price, [
                    ]." *Id*. at 17 (P.R. 22, C.R. 3).

- A copy of the relevant CBP Form 7501, dated [              ] which includes the final
  unit price of [       ] included on invoice [              ]. *Id*. at Exhibit A-10A
  (P.R. 23, C.R. 5-6).

  In addition, Exhibit A-13A contains the following:

- A [
       ] which includes the final contract prices applicable for all sales to Metal One
  America [
                    ].  Toyo Kohan AQR at Exhibit A-13A (P.R. 23, C.R.
  9).  The [                    ] is dated [              ]—*i.e.* [
               ]—and also clearly indicates the final price of [              ].

  The documentation included in Exhibit A-10A and Exhibit A-13A demonstrate that both

Toyo Kohan and Metal One America knew the final "agreed-upon sales price" of [         ] by

the date of shipment on [              ] because that price, [         ], and not the unadjusted

price of [          ], was included on the [

---

[2] Thomas notes that it is unclear why the [              ] in Exhibit A-10A is dated [
       ] when Toyo Kohan's US sales database lists a [              ] date of [
       ].  However, in either case, the fact remains that both Toyo Kohan and Metal One America
knew the final price of [                    ] before the date of shipment on [              ].

], issued in [                              ],

respectively.

The fact that the final purchase price to be paid by Metal One America was set as of the

date of shipment is also supported by Toyo Kohan's description of the pricing mechanism on

pages 26-30 of its Section A questionnaire response.  Toyo Kohan explains in detail how the

change in price from [        ] to [         ] was calculated for the SEQU [       ]. In particular,

Toyo Kohan explains that the price for sales [

      ] [3] is based on [

                              ] (1) the base steel ("hot-band") component, (2) the nickel

component, and (3) the others component.  Toyo Kohan AQR at 30 (P.R. 22, C.R. 3) .  Each of

these components is in turn [

                      ].  *Id.* at 25-30.  If all the components of the price

mechanism applicable for sales in the [                              ] were known by [

     ] it follows that the final price could be calculated—and thus was known to—both Toyo

Kohan and Metal One America prior to the [         ] date of shipment.  [

                                     ] which documents the price change from

[        ] to [          ] using the pricing formula mechanism was issued by [

---

[3] Toyo Kohan elsewhere clarifies that the [

            ].  Toyo Kohan AQR at Exhibit A-10A (P.R. 23, C.R. 5-6) and Exhibit A-13A (P.R.
23, C.R. 9); *see also* see also AQR at 16 (P.R. 22, C.R. 3) (noting that sales terms are based on
the [                    ] when Toyo Kohan will ship the DANP to [                    ]).  In
the case of SEQU [      ] the shipment month indicated on the [
           ] was [            ].  Toyo Kohan AQR at Exhibit A-10A (P.R. 23, C.R. 5-6).  Thus the
[                                     ].  Exhibit A-13A (P.R. 23, C.R. 9).

] on [

]. *Id*. at 18 and Exhibit A-13A (P.R. 23, C.R. 9).

The above record evidence confirms that the "price changes" reported by Toyo Kohan in the VAL_ADJU field are internal accounting matters, not changes in the material terms of sale negotiated with the U.S. customer.  Contrary to Toyo Kohan's assertions, this evidence is not isolated to "a single U.S. sales transaction."  Toyo Kohan Br. at 17.

This factual evidence also contradicts Toyo Kohan's suggestion that "continue{d} negotiations with the customer between the time of shipment and the time of invoice" affected the actual prices paid during the period under review.  Toyo Kohan Br. at 35.  Because the final "agreed-upon sale price" of [        ] for SEQU [      ] was reflected on [

], it was not the result of a price adjustment after [              ] due to "negotiations with the customer between the time of shipment and the of invoice."

Any changes to the price recorded in Toyo Kohan's internal records after the date of shipment <u>do not</u> reflect a change in the material terms of sale negotiated with the U.S. customer. The date of such changes is entirely a feature of Toyo Kohan's internal systems and not relevant to setting a date of sale.[4]  Indeed, use of such a date would be a recipe for manipulation as unscrupulous respondents could merely post-date commercial invoices well beyond the date of

---

[4] In the case of SEQU [      ], Commerce's reliance on the reported commercial invoice date of [
            ] would be wholly nonsensical as Toyo Kohan reports that [

            ] which is notably [
                                    ] .  Toyo Kohan SCQR at Revised U.S. Sales
Database (C.R. 138).

shipment to the customer in order to manipulate Commerce's dumping margin calculations.

Commerce's acceptance of such dates would defy Commerce's "paramount obligation under the

to use the best available information to calculate dumping margins as accurately as possible."

*Tianjin Magnesium Intern. Co., Ltd. v. United States*, 722 F.Supp.2d 1322, 1333 (Ct. Int'l Trade

2010) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed.Cir.1990)).

Based on record evidence from this administrative review, Commerce thus correctly

concluded that record evidence "indicates that the material terms of sale, such as price and

quantity, between Toyo Kohan and its U.S. customer were established at the time of the

shipment date" and therefore that the record evidence "does not support deviating from our

normal practice of using the earlier of the shipment or invoice date as the U.S. date of sale."

Final IDM at 4 (P.R. 108).

### 3. Commerce is not bound by determinations in prior administrative reviews when the facts in a new administrative review support a different conclusion

Toyo Kohan additionally argues that Commerce was required to use the commercial

invoice date as the date of sale because Commerce has used this date as the date of sale since the

fifth administrative review of this order.  Toyo Kohan Br. at 23.  Such arguments are without

merit.  Indeed, it is well-established that each of Commerce's proceedings is *sui generis,* and

Commerce may reconsider previous analyses of similar issues, and take into account new facts,

as long as its determination in each case is reasonably explained.   *See generally Nucor Corp. v.

United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005); *Trust Chem Co. v. United States*, 791 F.

Supp. 2d 1257, 1268 (Ct. Int'l Trade 2011); *Elkem Metals Co. v. United States*, 193 F. Supp. 2d

1314, 1320 (Ct. Int'l Trade 2002); *Large Newspaper Printing Presses and Components Thereof,

Whether Assembled or Unassembled, from Japan: Final Results of Reconsideration of Sunset

Review*, 73 Fed. Reg. 67,131 (Nov. 13, 2008), and accompanying Issues and Decision

Memorandum ("IDM") at 4-5; *see also Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Preliminary Results of Reconsideration of Sunset Review*, 71 Fed. Reg. 64,927 (Nov. 6, 2006), and accompanying Preliminary Decision Memorandum at 6-7 (clarifying that this authority is not limited to certain situations but is a "general principle that federal agencies possess the authority to reconsider their prior determinations").

      With respect to Commerce's selection of a date of sale in particular, this Court has determined that Commerce is in no way "'required' to employ the same date of sale in an ongoing review as it had relied upon in a previous review."  Instead, the Court has made clear that an independent "date of sale analysis is essential in each review 'to guarantee that {Commerce}|makes the fair value comparison on a fair basis—comparing apples with apples.'" *SeAH Steel Corp., Ltd. v. United States*, 25 C.I.T. 133, 138 (Ct. Int'l Trade 2001) (quoting *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed.Cir.1994)).

      In this administrative review, Commerce reviewed the record evidence, including the proprietary sales trace documentation submitted by Toyo Kohan in Exhibit A-10 which was not present in prior reviews.  Commerce reasonably concluded that this sample sales trace documentation "indicates that the material terms of sale, such as price and quantity, between Toyo Kohan and its U.S. customer was established at the time of the shipment date," Final IDM at 4 (P.R. 108), even in cases where Toyo Kohan reported a "price change" in its U.S. sales database.  Commerce further explained that "{i}n previous reviews, we used invoice date as the U.S. date of sale because we found that the material{} terms of sale changed between the shipment date and invoice date" but that "in this review, the record evidence does not support the same finding, but instead indicates that the material terms of sale were set at the shipment date."

*Id.* Commerce pointed particularly to the sample sales documentation included in Exhibit A-10A, which it found "indicates that he material terms of sale, such as price and quantity, between Toyo Kohan and its U.S. customer were established at the time of the shipment date." *Id.*

Such evidence, which was not found on the record of prior reviews, indicated that Toyo Kohan and its U.S. customer knew the material terms of sale by the time that the subject merchandise was shipped. Commerce's decisions—and Petitioner's arguments—about the date of sale based on the unique facts of prior administrative reviews do not alter the reasonableness of Commerce's conclusions in this review.

**B.    Under *Marmen*, Whether or Not the Cohen's d Test is an Appropriate Statistical Test to Use on a Given Record Requires a Factual Analysis That Commerce Did Not Have an Opportunity to Perform Because Toyo Kohan Failed to Raise the Issue During the Administrative Proceeding**

Congress has mandated that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The statute thus "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). To raise an issue on appeal, courts typically require parties to exhaust administrative remedies before the agency by raising all issues in their initial case briefs before Commerce. *See ABB, Inc. v. United States*, 920 F.3d 811, 818 (Fed. Cir. 2019); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008); *Prime Time Commerce LLC v. United States*, 495 F. Supp. 3d 1308, 1313-14 (Ct. Int'l Trade 2021). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only

has erred but has erred against objection made at the time appropriate under its practice." *Mittal Steel*, 548 F.3d at 1383-84; *see also Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (discussing purposes of exhaustion requirement).

In this case, Toyo Kohan acknowledges that it failed to raise any challenge to the Cohen's d test as applied during the administrative proceeding. Toyo Kohan Br. at 36. Toyo Kohan nonetheless invokes the "intervening legal authority exception" to the exhaustion doctrine and argues that the Federal Circuit's decision in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir 2025), constitutes such an intervening legal authority. *Id*. However, Toyo Kohan overstates *Marmen* and its application to the case at hand. *Marmen* did not hold that Commerce's use of the Cohen's d test was legally improper to determine whether prices differ significantly in <u>all</u> circumstances. Rather, it held that application of the Cohen's d test on the specific administrative record before the Commerce was unreasonable. *Marmen*, 134 F.4th at 1348 (finding that "the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous"). Here, in contrast to *Marmen*, Toyo Kohan never contested the application of the Cohen's d test or whether its sales data were "normally distributed, equally variable, and equally and sufficiently numerous," and Commerce thus never had an opportunity to determine whether or not the Cohen's d test was appropriate on this factual record. While Toyo Kohan claims these conditions are not met, *see* Toyo Kohan Br. at 40-42, this is a <u>factual question</u> that Commerce did not have an opportunity to consider or discuss in the underlying legal proceeding.

As discussed above, the Federal Circuit's determination in *Marmen* did not reject the use of Cohen's d in all cases or as a matter of law. Rather, the decision in that case was based on the

record facts regarding the distribution of U.S. prices, facts which Commerce never had an opportunity to review and assess in this administrative proceeding, as Toyo Kohan failed to raise the issue. Moreover, insofar as the underlying issue is a legal one, *Marmen's* analysis of the Cohen's d test "begins where Stupp ended." *Marmen*, 134 F.4th at 1345 (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1357 (Fed. Cir. 2021)). It was the decision in *Stupp* that raised "significant concerns relating to Commerce's application of the Cohen's d test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." *Stupp*, 5 F.4th at 1357. *Stupp* was decided in 2021, well before the period covered by this administrative review. Yet, Toyo Kohan failed in 2023 or 2024 to indicate that Commerce should conduct any analysis of whether the U.S. sales data were small in number, normally distributed, or had disparate variances. Any attempt by counsel to address these facts now—or challenge the validity of Toyo Kohan's claims—would be post-hoc reasoning, as Commerce did not have the opportunity to address the issue during the course of the proceeding. In such circumstances, "simple fairness" to both Commerce and litigants dictates that the exhaustion rule be applied. *See Mittal Steel*, 548 F.3d at 1383-84;

## V.  CONCLUSION

For the foregoing reasons, Thomas requests that this Court affirm Commerce's *Final Results en toto*.

Respectfully submitted,

/s/ James R. Cannon Jr.

Date:   July 10, 2025

James R. Cannon, Jr.
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
2112 PENNSYLVANIA AVE. NW
SUITE 300
WASHINGTON, D.C. 20037
(202) 567-2300
*Counsel to Thomas Steel Strip Corporation*