**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| TOYO KOHAN CO. LTD., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>THOMAS STEEL STRIP CORPORATION, )<br><br>Defendant-Intervenor. ) | Court No. 24-00261<br><br>PUBLIC VERSION<br>Business Proprietary Information<br>omitted from pages 7, 15, 22-24 |

**DEFENDANT'S RESPONSE TO PLAINTFF'S RULE 56.2**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

|  |  |
|---|---|
| | BRETT A. SHUMATE<br>Assistant Attorney General |
| | PATRICIA M. MCCARTHY<br>Director |
| | TARA K. HOGAN<br>Assistant Director |
| OF COUNSEL<br>CHARLIE CHUNG<br>Attorney<br>Office of the Chief Counsel<br>   for Trade Enforcement & Compliance<br>U.S. Department of Commerce | EMMA E. BOND<br>Senior Trial Counsel<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>P.O. Box 480<br>Washington, DC 20044<br>(202) 305-2034<br>Email: emma.e.bond@usdoj.gov |
| July 11, 2025 | *Attorneys for Defendant* |

# <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.    Administrative Determination Under Review ..........................................2

    II.    Issues Presented for Review ....................................................................2

STATEMENT OF FACTS ..........................................................................................2

    I.    Toyo Kohan Reports The Date Of Sale In Compliance With Commerce's
    Instructions.............................................................................................2

    II.    Commerce Issues The Preliminary Results, Preliminarily Relying On Toyo
    Kohan's SALEDATU Field For The Date Of Sale To The U.S. Customer And
    Applying The Average-To-Transaction Comparison Method To Certain U.S.
    Sales ......................................................................................................4

    III.    Toyo Kohan Files Comments, Arguing That Commerce Inadvertently Failed To
    Use Invoice Date As The Date Of Sale, And Did Not Mention The Comparison
    Method Used In The Preliminary Results.................................................6

    IV.    In The Final Results, Commerce Continued To Use The SALEDATU Field As The
    Date Of Sale ...........................................................................................8

SUMMARY OF THE ARGUMENT .............................................................................9

ARGUMENT ..........................................................................................................10

    I.    Standard Of Review ...............................................................................10

    II.    Commerce's Use Of The SALEDATU Field For Date Of Sale For U.S. Sales Is
    Lawful And Supported By Substantial Evidence ......................................11

        A.  Commerce Determines The Date Of Sale By Assessing The Material Terms Of
        Sale.................................................................................................12

        B.  Commerce Lawfully Determined That The Material Terms Of Sale Were
        Established By The SALEDATU Field, Reflecting The Earlier Of The Date Of
        Shipment Or Invoice Date .................................................................14

        C.  Toyo Kohan's Arguments Are Unpersuasive .......................................16

            1.  Each Administrative Review Is A Separate Exercise Of Commerce's
            Authority And Commerce Was Not Bound By Prior Determinations On
            Separate Records.........................................................................16

2.  Toyo Kohan Failed To Exhaust Its Remaining Challenges To The Date Of Sale .................................................................................................................. 19

3.  To The Extent The Court Reaches Toyo Kohan's Remaining Arguments, They Are Unpersuasive ............................................................................... 21

III.  Toyo Kohan Failed To Exhaust Administrative Remedies Concerning Commerce's Application Of The Differential Pricing Methodology ............................................ 25

A.  Legal Framework ............................................................................................. 26

B.  Toyo Kohan Failed To Exhaust Its Remedies With Respect To Differential Pricing ............................................................................................................... 27

CONCLUSION ................................................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Agro Dutch Indus. Ltd. v. United States*,
    508 F.3d 1024 (Fed. Cir. 2007) ................................................................................. 31

*Al Ghurair Iron & Steel LLC v. United States*,
    65 F.4th 1351 (Fed. Cir. 2023) .................................................................................. 16

*Allied Tube & Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ............................................................... 13

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ................................................................................. 10

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ............................................................................. 19, 26

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ................................................................................. 11

*Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*,
    40 F.3d 426 (D.C. Cir. 1994) .................................................................................... 28

*Consol. Bearings Co. v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) ................................................................................... 32

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938) ............................................................................................ 10, 15

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ............................................................................................ 10, 24

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007) ........................................................................ *passim*

*Dong-A Steel Co. v. United States*,
    337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) .................................................. 12, 14, 18

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ................................................................................. 19

*Essar Steel, Ltd. v. United States*,
    753 F.3d 1368 (Fed. Cir. 2014) ................................................................................. 26

iii

*Fuwei Films (Shandong) Co. v. United States*,
   791 F. Supp. 2d 1381 (Ct. Int'l Trade 2011)................................................................ 32

*Hormel v. Helvering*,
   312 U.S. 552 (1941) .............................................................................................. 31, 32

*Hyundai Elec. & Energy Sys. Co. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021)....................................................................................... 17

*Indep. Radionic Workers of Am. v. United States*,
   862 F. Supp. 422 (Ct. Int'l Trade 1994)........................................................................ 32

*Itochu Bldg. Prods. v. United States*,
   733 F.3d 1140 (Fed. Cir. 2013)....................................................................................... 27

*Jiaxing Bro. Fastener Co. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016)....................................................................................... 17

*Kaptan Demir Celik Endustrisi v. Ticaret A.S.*,
   756 F. Supp. 3d 1312 (Ct. Int'l Trade 2025), *appeal filed*, Fed. Cir. 25-1559 ................. 13, 18

*Marmen Inc. v. United States*,
   134 F.4th 1334 (Fed. Cir. 2025)................................................................................. *passim*

*Matra Americas, LLC v. United States*,
   681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024).................................................................. 30

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 F.3d 1375 (Fed. Cir. 2008)................................................................................ 26, 32

*Ningbo Dafa Chem. Fiber Co. v. United States*,
   580 F.3d 1247 (Fed. Cir. 2009)....................................................................................... 10

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003)....................................................................................... 15

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)....................................................................................... 10

*Nucor Corp., et al., v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009)............................................................ *passim*

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014)....................................................................................... 17

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011) ................................................................... 29

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ................................................................... 21

*Sahaviriya Steel Indus. Pub. Co. v. United States*,
   714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010) ............................................... 13

*Sandvik Steel Co. v. United States*,
   164 F.3d 596 (Fed. Cir. 1998) ......................................................... 26, 27, 29

*Save Domestic Oil, Inc. v. United States*,
   357 F.3d 1278 (Fed. Cir. 2004) ................................................................... 16

*Siemens Gamesa Renewable Energy v. United States*,
   621 F. Supp. 3d 1337 (Ct. Int'l Trade 2023) ............................................... 31

*Smith-Corona Grp. v. United States*,
   713 F.2d 1568 (Fed. Cir. 1983) ................................................................... 12

*Stanley Works (Langfang) Fastening Sys. Co. v. United States*,
   279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ..................................... 27, 29, 32

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ..................................................................... 30

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*,
   342 F. Supp. 2d 1191 (Ct. Int'l Trade 2004) ............................................... 28

*Timken Co. v. United States*,
   201 F. Supp. 2d 1316 (2002) ....................................................................... 20

*U.S. Steel Corp. v. United States*,
   953 F. Supp. 2d 1332 (2013) ................................................................. 15, 24

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) .................................................................................... 10

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ...................................................................................... 26

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) .................................................................................... 24

*USEC Inc. v. United States,*
    498 F.Supp.2d 1337 (Ct. Int'l Trade 2007) ........................................................................ 18

*Viraj Grp. Ltd. v. United States,*
    343 F.3d 1371 (Fed. Cir. 2003) ............................................................................................. 13

*Zhaoqing New Zhongya Aluminum Co. v. United States,*
    887 F. Supp. 2d 1301 (Ct. Int'l Trade 2013) ....................................................................... 24

*Zhejiang Mach. Imp. & Exp. Corp. v. United States,*
    471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) ........................................................................ 20

**Statutes**

19 U.S.C. § 1516a(b) ........................................................................................................ 10, 28, 30

19 U.S.C. § 1675(a) ...................................................................................................................... 12

19 U.S.C. § 1677(35) .................................................................................................................... 12

19 U.S.C. § 1677b(a) .................................................................................................................... 12

19 U.S.C. § 1677f-1(d) ................................................................................................................... 5

28 U.S.C. § 2637(d) ........................................................................................................... 19, 26, 33

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Rep. No 103-316, vol. 1, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153
    ................................................................................................................................... 12, 13

**Rules**

U.S. Ct. Int'l Trade R. 15(a) ........................................................................................................ 28

U.S. Ct. Int'l Trade R. 56.2 ............................................................................................................ 1

**Regulations**

19 C.F.R. § 351.309(c) ......................................................................................................... *passim*

19 C.F.R. § 351.401(i) .......................................................................................................... *passim*

19 C.F.R. § 351.414(c) ................................................................................................................... 5

**Administrative Determinations**

*Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan,*
    89 Fed. Reg. 45,638 (Dep't of Commerce, May 23, 2024) ..................................................... 4

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan*,
  89 Fed. Reg. 95,735 (Dep't of Commerce Dec. 3, 2024) ..................................................... 2, 8

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of
  Antidumping Duty Administrative Review; 2019–2020*,
  87 Fed. Reg. 4,842 (Dep't of Commerce, Jan. 31, 2022) .................................................. 8, 17

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the
  Antidumping Duty Administrative Review; 2021–2022*,
  88 Fed. Reg. 85,590 (Dec. 8, 2023) ................................................................................ 16, 17

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results
  of the Antidumping Duty Administrative Review; 2018–2019*,
  85 Fed. Reg. 44,041 (July 21, 2020) ...................................................................................... 16

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea:
  Final Determination of Sales at Less Than Fair Value*,
  81 Fed. Reg. 47,347 (Dep't of Commerce, July 21, 2016), and accompanying IDM at Cmt. 1,
  *sustained by Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1376 (Ct. Int'l Trade
  2018).................................................................................................................................... 14

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  88 Fed. Reg. 44,262 (Dep't of Commerce, July 12, 2023) ....................................................... 2

*Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from
  Germany*,
  67 Fed. Reg. 35,497 (May 20, 2002) ............................................................................... *passim*

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final
  Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp
  from Thailand*,
  69 Fed. Reg. 76,918 (Dep't of Commerce, Dec. 23, 2004) .............................................. *passim*

*Antidumping Duties, Countervailing Duties*,
  62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997) ............................................ 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| TOYO KOHAN CO. LTD., ) | |
| ) | |
| Plaintiff, ) | Court No. 24-00261 |
| ) | |
| v. ) | PUBLIC VERSION |
| ) | Business Proprietary Information |
| UNITED STATES, ) | omitted from pages 7, 15, 22-24 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| THOMAS STEEL STRIP CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, Toyo Kohan Co. Ltd. (Toyo Kohan). Pl. MJAR at 19-43, ECF No. 28. Toyo Kohan challenges the final results of the 2022-2023 administrative review of the antidumping duty order covering diffusion-annealed, nickel-plated flat-rolled steel products (nickel-plated steel products) from Japan, disputing the date of sale for Toyo Kohan's U.S. sales and the application of the Department of Commerce's differential pricing methodology. Because the final results are lawful and supported by substantial evidence, we respectfully request that the Court deny Toyo Kohan's motion and enter judgment for the United States.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.      <u>Administrative Determination Under Review</u>**

Toyo Kohan challenges Commerce's final results of the administrative review of the antidumping duty order covering nickel-plated steel products from Japan.  *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan*, 89 Fed. Reg. 95,735 (Dep't of Commerce, Dec. 3, 2024) (final results of 2022-2023 administrative review) (final results) (P.R. 110)[1], and accompanying Issues and Decision Memorandum (IDM) (P.R. 108).  The period of review is May 1, 2022, through April 30, 2023.  IDM at 1.  Toyo Kohan was the sole mandatory respondent.  *Id.*

**II.     <u>Issues Presented for Review</u>**

1.      Whether Commerce's reliance on the earlier of shipment date or commercial invoice date as the date of sale for Toyo Kohan's U.S. sales is supported by substantial evidence and in accordance with law.

2.      Whether Toyo Kohan failed to exhaust administrative remedies with respect to its challenge to Commerce's differential pricing methodology.

<u>**STATEMENT OF FACTS**</u>

**I.      Toyo Kohan Reports The Date Of Sale In Compliance With Commerce's Instructions**

On July 12, 2023, Commerce published the initiation notice for the 2022-2023 administrative review of the antidumping duty order covering nickel-plated steel products from Japan.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed.

---

[1]  Citations to the public documents (P.R.) and confidential documents (C.R.) refer to the record of the administrative review.

Reg. 44,262, 44,266 (Dep't of Commerce, July 12, 2023) (P.R. 10).  Commerce selected Toyo

Kohan as the sole mandatory respondent for individual examination.  *See* Respondent Selection

Memo (P.R. 16).  Toyo Kohan timely responded to Commerce's initial and supplemental

questionnaires regarding general information, comparison market sales, U.S. sales, and cost of

production.  *See* Preliminary Decision Memorandum (PDM) at 2 (P.R. 85) (citations omitted).

In the initial questionnaire, Commerce instructed Toyo Kohan to report information

"concerning the terms of delivery and payment and the dates" of each U.S. sale.  *See* Initial

Questionnaire at C-11 (P.R. 17).  "The Glossary of Terms at Appendix I describe{d}

Commerce's criteria for determining the date of sale."  *Id.*  Specifically, "{b}ecause Commerce

attempts to compare sales made at the same time, establishing the date of sale is an important

part of the dumping analysis."  *Id.* at I-5.  "Commerce will normally use the date of invoice, as

recorded in the exporter or producer's records kept in the ordinary course of business."  *Id.*

"However, Commerce may use a date other than the date of invoice (*e.g.*, the date of contract in

the case of a long-term contract) if satisfied that a different date better reflects the date on which

the exporter or producer establishes the material terms of sale (*e.g.*, price, quantity)."  *Id.* (citing

19 C.F.R. § 351.401(i)).  "If, for any specific sale, the date selected is after the shipment date for

that sale, *Commerce will use shipment date as the date of sale instead, but only for the sale in

question*."  *Id.* at I-6 (emphasis added).

In compliance with these instructions, Toyo Kohan reported the sale date field—

SALEDATU—as "the earlier of the invoice date . . . or the shipment date to the U.S.

customer{.}"  Section C Resp. at 16 (P.R. 39, C.R. 48).

**II.    Commerce Issues The Preliminary Results, Preliminarily Relying On Toyo Kohan's SALEDATU Field For The Date Of Sale To The U.S. Customer And Applying The Average-To-Transaction Comparison Method To Certain U.S. Sales**

Commerce published the preliminary results on May 23, 2024, and preliminarily calculated a weighted-average dumping margin of 12.69 percent for Toyo Kohan. *See Diffusion-Annealed Nickel-Plated Flat-Rolled Steel Products from Japan*, 89 Fed. Reg. 45,638 (Dep't of Commerce, May 23, 2024) (prelim. results of admin. review) (preliminary results) (P.R. 88), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 85).

Commerce preliminarily selected the SALEDATU field as the date of sale for Toyo Kohan's U.S. sales.  Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178) (citing PDM at 4 (P.R. 85)). In the PDM, Commerce explained its "long-standing practice of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established."  PDM at 3 (citing *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 Fed. Reg. 76,918 (Dep't of Commerce, Dec. 23, 2004) (*Shrimp from Thailand*), and accompanying IDM at Comment 10; *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 Fed. Reg. 35,497 (May 20, 2002) (*Steel Beams from Germany*), and accompanying IDM at Comment 2)).

In the PDM, Commerce also stated that it "based the date of sale . . . for U.S. sales on the commercial invoice date because this date was either the same as or preceded the shipment date for all of Toyo Kohan's sales, in accordance with Commerce's practice."  PDM at 3 (citing *Shrimp from Thailand*; *Steel Beams from Germany*).  Despite referencing the commercial invoice date, Commerce stated that it was adhering to its practice to use the earlier of the shipment date or the invoice date, *id.*, and in fact relied on the SALEDATU field for the U.S. date of sale in

which Toyo Kohan reported the earlier of the shipment date or invoice date in accordance with Commerce's instructions, *see* Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178); *see also* Sec. C Questionnaire Resp. at 16 (P.R. 39, C.R. 48).

Commerce also preliminarily selected the method for comparing export price to the normal value. PDM at 4-6. As Commerce explained, it generally calculates weighted-average dumping margins using the average-to-average (A-A) method by comparing weighted-average normal values to weighted-average export prices (or constructed export prices)—unless Commerce determines that another method is appropriate in a particular situation. PDM at 4. Commerce preliminarily applied its differential pricing analysis to determine whether to apply an alternative comparison method—namely, the average-to-transaction (A-T) method, which compares weighted-average normal values with the export prices or constructed export prices of individual sales. PDM at 4 (citing, *e.g.*, section 777A(d)(1)(B) of the Tariff Act of 1930, as amended, *codified as* 19 U.S.C. § 1677f-1(d)(1)(B); 19 C.F.R. § 351.414(c)(1)). The differential pricing analysis "examines whether there exists a pattern of prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." PDM at 4-5.

Applying the differential pricing analysis, Commerce preliminarily found that "63.32 percent of the value of {Toyo Kohan's} U.S. sales" passed the Cohen's *d* test, "a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group." PDM at 5-6. Commerce also preliminarily determined that there was "a meaningful difference" between the weighted-average dumping margins calculated using the A-A and the A-T methods. PDM at 6. Thus, for the preliminary results, Commerce applied the A-T method to U.S. sales passing the Cohen's *d* test and the A-A method for those U.S. sales that did not pass.

PDM at 6.  Commerce explicitly stated that "{i}nterested parties may present arguments and justifications" relating to Commerce's differential pricing analysis.  PDM at 6.

### III.    Toyo Kohan Files Comments, Arguing That Commerce Inadvertently Failed To Use Invoice Date As The Date Of Sale, And Did Not Mention The Comparison Method Used In The Preliminary Results

After Commerce issued the preliminary results, Toyo Kohan submitted a case brief in accordance with 19 C.F.R. § 351.309(c)(2), which requires parties to include "all arguments that continue in the submitter's view to be relevant" to the final results.  *See* Case Br., at 2, 4-6 (P.R. 92).  Toyo Kohan's case brief did not address differential pricing or the Cohen's *d* test.  *Id.* Instead, Toyo Kohan limited its arguments to two allegedly inadvertent errors in the preliminary results, including the data set used for the date of sale.  *See, e.g.*, Case Br. at 2-3 (P.R. 92).

Specifically, Toyo Kohan argued that Commerce made "an unintentional mistake" with respect to Toyo Kohan's date of sale for U.S. sales.  Case Br. at 4-5 (P.R. 92).  Toyo Kohan argued that Commerce had intended to use Toyo Kohan's commercial invoice date for the date of sale, but instead used the database field SALEDATU.  *Id.* Toyo Kohan asked Commerce to correct the date of sale to reflect the commercial invoice date, as Commerce had done in prior reviews.  *Id.* at 5-6.

The petitioner, Thomas Steel Strip Corporation (Thomas Steel), submitted a rebuttal brief with respect to the date of sale.  Rebuttal Br. (P.R. 95, C.R. 191).  Thomas Steel argued that Commerce should continue to use the date of sale reported in SALEDATU, which reflected the earlier of the shipment date or invoice date.  *Id.* at 1-2.  As Thomas Steel explained, "the material terms of sale with Toyo Kohan's U.S. customer were established by the date subject merchandise was shipped from Toyo Kohan's factory at Kudamatsu."  *Id.* at 2.

Thomas Steel argued that Commerce's "long-standing practice is to use the earlier of shipment date or invoice date as the date of sale." *Id.* at 3 (citing *Shrimp from Thailand*, IDM at Cmt. 10; *Steel Beams from Germany*, IDM at Cmt. 2). "{T}he reason for Commerce's practice regarding the use of the date of shipment is that when a party ships its product to a customer, it is reasonable to assume that the material terms of the sale have been established." *Id.* (P.R. 95, C.R. 191) (citing *Union Steel Mfg. Co. v. United States*, Consol. Court No. 10-00106; Slip Op. 14-27 (Ct. Int'l Trade Mar. 4, 2014), Results of Redetermination Pursuant to Remand, at 40, ECF No. 223 (Aug. 1, 2014)). Thus, Thomas Steel argued, "absent 'compelling evidence to demonstrate that the material terms of sale change after shipment,' Commerce follows its 'normal practice of using shipment date as the date of sale where shipment date precedes invoice date.'" *Id.* at 3 (citing *Shrimp from Thailand*, IDM at Cmt. 10).

Citing the factual record in this administrative review, Thomas Steel argued that "[ █████ █████████████████████████████████████████ ], the ultimate price was set with the U.S. customer on the date of shipment [ ██████████████████ ]" for the imported merchandise. Rebuttal Br. at 4-5 (P.R. 95, CR. 191). Thomas Steel cited "{a}n internal Toyo Kohan [ █████████████ ], dated [ ██████████ ] which lists the unit price as [ ████████ ]," and explained that "these internal documents are not shared with the customer{.}" *Id.* at 6-7 (citing Section A Resp. at 17 (P.R. 22, C.R. 3)).

Overall, Thomas Steel argued that the sales trace documentation in Exhibit A-10A showed that "[ ████████████████████ ] the date of shipment and the issuance of a commercial invoice [ ███████████████████ ]," but that the final price paid is "[ ██████████████████████████ ] the date of shipment." *Id.* at 5 (citing Sec. A Questionnaire Resp. at Exhibit A-10A (P.R. 23, C.R. 5-6)). Thus, Thomas Steel

argued that "Commerce should continue to use SALEDATU as the date of sale for Toyo

Kohan's U.S. sales in its final results," which "best reflects the date on which the final material

terms of sale were established." *Id.* at 9 (citation omitted).

## IV.    In The Final Results, Commerce Continued To Use The SALEDATU Field As The Date Of Sale

On December 3, 2024, Commerce issued the final results of the administrative review.

*Final Results*, 89 Fed. Reg. 95,735 (P.R. 110).  Commerce determined a weighted-average

dumping margin for Toyo Kohan of 4.44 percent.  *Id.*

In the final results, Commerce continued to use the SALEDATU field as the date of sale,

determining that the appropriate date of sale for Toyo Kohan was the earlier of the invoice date

or shipment date.  IDM at 4.  Although Commerce "used invoice date as the U.S. date of sale" in

prior reviews, that was because "the material terms of sale changed between the shipment date

and invoice date."  IDM at 4 (citing, *e.g.*, *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel*

*Products From Japan: Final Results of Antidumping Duty Administrative Review; 2019–2020*,

87 Fed. Reg. 4,842 (Dep't of Commerce, Jan. 31, 2022), and accompanying IDM at Comment

(*2019-20 DANP from Japan*)).

In this review, by contrast, "the record evidence {did} not support the same finding, but

instead indicate{d} that the material terms of sale were set at the shipment date."  IDM at 4

(citing Sec. A Questionnaire Resp. (P.R. 22, C.R. 3), Exhibit A-10A (P.R. 23, C.R. 5-6)).

"Specifically, Toyo Kohan's sample sales documentation indicates that the material terms of

sale, such as price and quantity, between Toyo Kohan and its U.S. customer were established at

the time of the shipment date." *Id.*; *see also* Toyo Kohan Section A Questionnaire Response at 16-17 (P.R. 22, C.R. 3); and Exhibit A10-A (P.R. 23, C.R. 5-6).[2]

## SUMMARY OF THE ARGUMENT

Commerce's determination to use the SALEDATU field as the date of sale for Toyo Kohan's U.S. sales is lawful and supported by substantial evidence. Commerce "normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business," but "may use a date other than the date of invoice if {Commerce} is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i). Consistent with this provision, Commerce determined that the SALEDATU field reflects the dates on which the material terms of sale were established for Toyo Kohan's U.S. sales. As Commerce explained, Toyo Kohan's sample sales documentation shows that the material terms of sale, such as price and quantity, between Toyo Kohan and its U.S. customer were established as of the shipment date. Thus, substantial evidence supports Commerce's determination that the material terms of sale were established by the date reflected in the SALEDATU field.

Toyo Kohan failed to exhaust administrative remedies with respect to its challenge to Commerce's differential pricing framework. Toyo Kohan did not challenge Commerce's application of the differential pricing methodology during the administrative review. Having failed to exhaust the issue before Commerce, Toyo Kohan cannot provide record support for its current claims that the data sets considered by Commerce lacked normal distribution, equal variances, and sufficient numerosity. It would not have been futile for Toyo Kohan to raise its

---

[2] Although Commerce did not alter the date of sale field as requested by Toyo Kohan, Commerce corrected the second issue raised in Toyo Kohan's case brief "by using the modified home market sales datasets for Toyo Kohan and Kohan Shoji in {the} calculations for the final results." IDM at 5.

current arguments before Commerce, when doing so was necessary to develop the factual record,

enable Commerce to decide the issue, and allow for judicial review pursuant to 19 U.S.C.

§ 1516a(b)(1)(B)(i).  Accordingly, we respectfully request that the Court dismiss Toyo Kohan's

challenges to the application of Commerce's differential pricing methodology for failure to

exhaust administrative remedies.

## ARGUMENT

### I.    Standard Of Review

The Court upholds Commerce determinations that are supported "by substantial evidence

on the record" and otherwise "in accordance with law{.}"  19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's factual findings "are conclusive unless unsupported by substantial evidence."

*United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)).  "Substantial

evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) (citations

omitted); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the

record, doing so "does not prevent an administrative agency's finding from being supported by

substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation

omitted).

A party disputing Commerce's determination as unsupported by substantial evidence thus

"has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's

determinations if they are reasonable and supported by the record as a whole, even if some

evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed.

Cir. 1984).  An agency decision may not be overturned "simply because the reviewing court

would have reached a different conclusion based on the same record."  *Cleo Inc. v. United States*,

501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

## II.    Commerce's Use Of The SALEDATU Field For Date Of Sale For U.S. Sales Is Lawful And Supported By Substantial Evidence

Commerce determined to use Toyo Kohan's reported SALEDATU field, representing the

earlier of the invoice or shipment date to the U.S. customer, as the date of sale.  IDM at 4.  Toyo

Kohan challenges this determination, arguing that it conflicts with Commerce's determination in

prior reviews and is not supported by substantial evidence.  Pl. MJAR at 25-35.  These

arguments lack merit.

As an initial matter, Toyo Kohan does not meaningfully dispute the legal standards

applied by Commerce.  For example, although Toyo Kohan argues that the regulation imposes a

presumption "to use the invoice date," it agrees that the shipment date should be used if it

"'better reflects the date on which the exporter or producer establishes the material terms of

sale.'"  Pl. MJAR at 34 (quoting 19 C.F.R. § 351.401(i)).  Nor does Toyo Kohan dispute that

Commerce has a long-standing practice "'to use the earlier of the shipment date or the invoice

date as the date of sale,'" or "the reality that, in many cases, the shipment will fix the price and

quantity, and there will be no changes after shipment." *Id.* at 33 (citations omitted).

Instead, Toyo Kohan argues that Commerce erred in determining that the material terms

of sale in this case support Commerce's determination—thus presenting a factual question.  As

discussed below, Commerce's finding that "the material terms of sale were set at the shipment

date" is supported by substantial evidence.[3]  IDM at 4 (citing Section A Resp. (P.R. 22, C.R. 3),

Ex. A-10A (P.R.23, C.R. 5-6)).

A.    Commerce Determines The Date Of Sale By Assessing The Material Terms Of
Sale

In an administrative review of an antidumping duty order, Commerce shall determine

"the normal value and export price (or constructed export price) of each entry of the subject

merchandise," and "the dumping margin for each such entry."  19 U.S.C. § 1675(a)(2).  "The

term 'dumping margin' means the amount by which the normal value exceeds the export price or

constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  When

conducting this analysis, Commerce "must conduct a 'fair comparison' of normal value and

export price in determining whether merchandise is being, or is likely to be, sold at less than fair

value."  *Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1364 (Ct. Int'l Trade 2018)

(citing 19 U.S.C. § 1677b(a); *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1578 (Fed.

Cir. 1983)).

In making this fair comparison, "normal value must be from 'a time reasonably

corresponding to the time of sale used to determine the export price or constructed export

price.'"  *Id.* (quoting 19 U.S.C. § 1677b(a)(1)(A)).  The "date of sale" is "a date when the

material terms of sale are established."  *See* Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Rep. No 103-316, vol. 1, at 810 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4153 (SAA).  By regulation, Commerce "normally will use the date

of invoice, as recorded in the exporter or producer's records kept in the ordinary course of

business."  19 C.F.R. § 351.401(i).  "However, the Secretary may use a date other than the date

---

[3]  Toyo Kohan states that "the invoice date was virtually always after the shipment date,"
such that the SALEDATU field "equaled the shipment date."  Pl. MJAR at 11 n.10.

of invoice if {Commerce} is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." *Id.*

Commerce's regulations thus create a "rebuttable presumption that Commerce will use the invoice date as the date of sale, but that Commerce may use another date if it better reflects the date on which the material terms of the sale were established." *Kaptan Demir Celik Endustrisi v. Ticaret A.S.*, 756 F. Supp. 3d 1312, 1320 (Ct. Int'l Trade 2025), *appeal filed*, Fed. Cir. 25-1559 (citing 19 C.F.R. § 351.401(i)) (other citation omitted). "This presumption is meant to be flexible and is not irrefutable." *Id.* In other words, "{a}lthough the date of sale is normally the date of invoice, Commerce may use another date that 'better reflects the date on which the exporter or producer establishes the material terms of sale.'" *Viraj Grp. Ltd. v. United States*, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003) (quoting 19 C.F.R. § 351.401(i)).

 The focus of Commerce's date of sale inquiry typically centers on the date or time at which the material terms of sale have been established by the parties to the transaction. *See* SAA at 810; *Sahaviriya Steel Indus. Pub. Co. v. United States*, 714 F. Supp. 2d 1263, 1280-82 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371, 1373 (Fed. Cir. 2011). Congress has expressed its intent that "the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale were established." *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000). Two of the primary material terms of sale are price and quantity. *See Nucor Corp., et al., v. United States*, 612 F. Supp. 2d 1264, 1312-13 (Ct. Int'l Trade 2009).

Pursuant to 19 C.F.R. § 351.401(i), Commerce has "discretion to determine whether there is a date other than invoice date{} that better reflects when the material terms of sale are set." *Shrimp from Thailand*, IDM at Cmt. 10. Indeed, Commerce looks "beyond the invoice date to

13

the parties' actual course of conduct, as well as the parties' expectations concerning the transaction, to determine whether an earlier date—such as the contract date—represents the point at which the parties reached a meeting of the minds on the material terms of sale." *Kaptan Demir Celik Endustrisi v. Ticaret A.S.*, 756 F. 3d at 1319–21 (quoting *Nucor*, 612 F. Supp. 2d at 1308). Considering these factors, Commerce has historically applied a practice that the material terms of sale do not change after the shipment date. *See, e.g.*, *Shrimp from Thailand*, IDM at Cmt. 10; *Steel Beams from Germany*, IDM at Cmt. 2. Commerce "has a longstanding practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 47,347 (Dep't of Commerce, July 21, 2016), and accompanying IDM at Cmt. 1, *sustained by Dong-A Steel*, 337 F. Supp. 3d at 1360.

> B. Commerce Lawfully Determined That The Material Terms Of Sale Were Established By The SALEDATU Field, Reflecting The Earlier Of The Date Of Shipment Or Invoice Date

Commerce's determination to use the SALEDATU field as the date of sale is supported by substantial evidence. In reporting the SALEDATU field "consistent with Department policy," Toyo Kohan provided "the earlier of the invoice date (SALINDTU3) or the shipment date to the U.S. customer (SHIPDATU1)." Section C Resp. at 16 (P.R. 39, C.R. 48). This was consistent with the initial questionnaire's instructions for providing the date of sale, which stated that "{i}f, for any specific sale, the date selected is after the shipment date for that sale, Commerce *will use shipment date as the date of sale instead*, but only for the sale in question." Initial Questionnaire at I-5 – I-6 (P.R. 17) (emphasis added); *see also id.* at A-8, C-11 (instructing Toyo Kohan to follow these instructions in providing the date of sale). Consistent

14

CONFIDENTIAL MATERIAL OMITTED

with these instructions, Commerce "based Toyo Kohan's date of sale on the commercial invoice

date or shipment date (*i.e.*, SALEDATU)." Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178)

(citing PDM at 4); *see also* Margin Log at 5 (C.R. 182) (stating "LET USSALEDATE =

SALEDATU").[4]

    Substantial evidence supports this finding. In the Section A response, Toyo Kohan stated

that "{d}ocumentation for each U.S. and home market negotiation process is provided in Exhibit

A-10 and Exhibit A-12, respectively," with Exhibit A-10 containing the documentation for U.S.

sales. Section A Resp. at 16-18 (P.R. 22, C.R. 3), *see also, e.g.*, Ex. A-10A (P.R. 23, C.R. 5-6).

Toyo Kohan explained that Exhibit A-10A contained "a trace of documents and a summary of

the documents" for the sales process from Metal One America to [                    ]

[                    ]. Section A Resp. at 16-18 (P.R. 22, C.R. 3). Toyo Kohan's

response explained that the price of the merchandise at the time of shipment was [          ]

[    ], with the subsequent payment invoice showing the price charged to the customer was [    ]

[          ]. *Id.*; *see also* Ex. A-10A (P.R. 23, C.R. 5-6). By necessity, the quantity of the

merchandise was fixed on the shipment date.

    In light of the sample sale described by Toyo Kohan, a reasonable mind could conclude

that the material terms of sale, such as price and quantity, were established as of the shipment

date. Nothing more is required for Commerce's finding to be supported by substantial evidence.

*See U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1336 (Ct. Int'l Trade 2013) (quoting

---

[4] Although the preliminary decision memorandum stated that Commerce used the
"commercial invoice date because this date was either the same as or preceded the shipment date
for all of Toyo Kohan's sales," PDM at 4, Toyo Kohan did not dispute that the shipment date
preceded the commercial invoice date for certain sales or that Commerce's instructions indicated
that the shipment date would be used if before the invoice date. *See generally* Case Br. at 4 (P.R.
92); Initial Questionnaire at I-5 – I-6 (P.R. 17).

15

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (stating "{s}ubstantial evidence exists on the record when there is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'").

Commerce's determination is also consistent with its longstanding practice of using "the earlier of shipment or invoice date as the date of sale{.}" IDM at 4 (citing *Shrimp from Thailand* IDM at Comment 10; and *Steel Beams from Germany* IDM at Comment 2); Initial Questionnaire at I-5 – I-6 (P.R. 17). Toyo Kohan does "not dispute that Commerce has such a practice." Pl. MJAR at 33. "{I}f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1360 (Fed. Cir. 2023) (quoting *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004)). The record evidence in this case did not "support deviating from {Commerce's} normal practice of using the earlier of the shipment or invoice date as the U.S. date of sale{.}" IDM at 4 (citing Section A Resp. (P.R. 22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6). Instead, "Toyo Kohan's sample sales documentation indicates that the material terms of sale, such as price and quantity, between Toyo Kohan and its U.S. customer were established at the time of the shipment date." IDM at 4 (citing Section A Resp. (P.R. 22, C.R. 5), Ex. A-10A (P.R. 23, C.R. 5-6)). Thus, substantial evidence supports Commerce's determination that the SALEDATU field reflected the material terms of sale. *See* IDM at 4.

C.    Toyo Kohan's Arguments Are Unpersuasive

None of Toyo Kohan's challenges undermine the substantial record evidence supporting Commerce's determination. *See* Pl. MJAR at 23-35.

16

> 1. Each Administrative Review Is A Separate Exercise Of Commerce's Authority And Commerce Was Not Bound By Prior Determinations On Separate Records

First, Toyo Kohan argues that Commerce failed to justify the use of the SALEDATU field when it had previously used the commercial invoice date in the fifth administrative review to the eighth administrative review of the same antidumping duty order.  Pl. MJAR Br. at 23-25 (citing, *e.g.*, *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Preliminary Results of the Antidumping Duty Administrative Review; 2018–2019*, 85 Fed. Reg. 44,041 (July 21, 2020), and accompanying Issues and Decision Mem. at 3; *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of the Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85,590 (Dec. 8, 2023), and accompanying Issues and Decision Mem. at 4).  But Commerce is not "'forever bound by its past practices.'" *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089–90 (Fed. Cir. 2021) (quoting *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016)). Instead, "'each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'"  *Id.* (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).  Toyo Kohan concedes that "every proceeding has its own specific factual record" and that "ultimately this case must be decided based on the specific facts of the 9th Review{.}"  Pl. MJAR at 24.  Because the facts on this record support the determination that the material terms of sale were established on the shipment date, Commerce's determination is supported by substantial evidence.

Toyo Kohan nonetheless claims that Commerce "ignored . . . its own recent practice of using the invoice date as the date of sale" for Toyo Kohan's U.S. sales.  Pl. MJAR at 25. However, Commerce acknowledged that "{i}n previous reviews, {it} used invoice date as the

U.S. date of sale because {it} found that that the materials terms of sale changed between the shipment date and invoice date." IDM at 4 (citing *2019-20 DANP from Japan* IDM at Comment 1; and *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review: 2021–2022*, 88 Fed. Reg. 85,590 (Dep't of Commerce, Dec. 8, 2023) (*2021-2022 DANP from Japan*), and accompanying IDM at Comment 2). For example, in the 2019 to 2020 administrative review, Commerce found "{t}hat for some of Toyo Kohan's reported U.S. sales, the sales value changed between the date of shipment and the commercial invoice date." IDM at 4 (citing *2019-20 DANP from Japan*, IDM at Cmt. 1). In this review, however, "the record evidence does not support the same finding, but instead indicates that the material terms of sale were set at the shipment date." IDM at 4 (citing Section A Resp. (P.R. 22, C.R. 3), at Exhibit A-10A (P.R. 23, C.R. 5-6)). Thus, Commerce reasonably explained the basis for determining, based on this record, to use the SALEDATU field for the date of sale.

Toyo Kohan also argues that "Commerce ignored . . . the regulatory presumption in favor of using invoice date as the date of sale{.}" Pl. MJAR at 25. However, "{t}his presumption is meant to be flexible and is not irrefutable." *Kaptan Demir Celik Endustrisi*, 756 F. Supp. 3d at 1320–21. "For example, the Preamble to Commerce's regulation states that "{i}n some cases, it may be inappropriate to rely on the date of invoice as the date of sale, because the evidence may indicate that, for a particular respondent, the material terms of sale usually are established on some date other than the date of invoice."" *Id.* (quoting *Antidumping Duties; Countervailing Dutie*s, 62 Fed. Reg. 27,296, 27,349 (Dep't of Commerce, May 19, 1997); citing 19 C.F.R. § 351.401(i)). Thus, Commerce "*may use a date other than the date of invoice if* {Commerce} is satisfied that a different date better reflects the date on which the exporter or producer establishes

the material terms of sale." *Dong-A Steel*, 337 F. Supp. 3d at 1364 (quoting 19 C.F.R.

§ 351.401(i) (2016)) (emphasis in *Dong-A Steel*).

"{T}he material terms of a sale generally include the price, quantity, and payment

terms." *Dong-A Steel*, 337 F. Supp. 3d at 1364–66 (citing *USEC Inc. v. United States*, 498 F.

Supp. 2d 1337, 1344–45 (Ct. Int'l Trade 2007)).  "The important factor to determine is when the

parties have reached a 'meeting of the minds.'"  *Id.* (quoting *Nucor Corp. v. United States*, 612

F. Supp. 2d 1264, 1300 (Ct. Int'l Trade 2009)).  In this case, Commerce determined that "the

material terms of sale were set at the shipment date."  IDM at 4.  Toyo Kohan's sample sale

supports that terms of sale such as price and quantity were established by that date.  IDM at 4

(citing Section A Resp. at 16-18 (P.R. 22, C.R. 5), Ex. A-10A (P.R. 23, C.R. 5-6)).  Accordingly,

Commerce did not ignore the regulation, but rather applied it by using a date of sale reflecting

the date on which the exporter or producer established the material terms of sale.  *See* 19 C.F.R.

§ 351.401(i).

      2.     Toyo Kohan Failed To Exhaust Its Remaining Challenges To The Date Of Sale

Toyo Kohan raises several other challenges to Commerce's use of the SALEDATU field

as the date of sale, including that the VAL_ADJU field shows post-shipment alterations in price.

*See, e.g.*, Pl. MJAR at 27-28.  However, Toyo Kohan did not exhaust administrative remedies

with respect to these arguments by failing to include them in its case brief to Commerce.  *See*

Case Br. at 3-5 (P.R. 92).

By statute, this Court "shall, where appropriate, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d).  This statutory mandate "'indicates a congressional intent that,

absent a strong contrary reason, the court should insist that parties exhaust their remedies before

the pertinent administrative agencies.'"  *Boomerang Tube LLC v. United States*, 856 F.3d 908,

912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  An interested party may exhaust administrative remedies by presenting "all issues and arguments in a party's administrative case brief" to Commerce.  *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing 19 C.F.R. § 351.309(c)(2)).  Although a brief statement may suffice "if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it," "{r}espondents do not meet exhaustion requirements 'by merely mentioning a broad issue without raising a particular argument{.}'" *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1338 (Ct. Int'l Trade 2020) (quoting, *e.g.*, *Timken Co. v. United States*, 201 F. Supp. 2d 1316, 1340–41 (2002)) (other citations omitted).

Despite raising the broad date-of-sale issue in the case brief, *see* Case Br. at 4-6 (P.R. 92), Toyo Kohan failed to exhaust its current argument that the VAL_ADJU field shows post-shipment changes in price.  *See, e.g.*, Pl. MJAR at 27-28.  In its case brief to Commerce, Toyo Kohan argued that Commerce made an "unintentional" mistake by using the SALEDATU field instead of the commercial invoice date reported in SALINDTU3.  Case Br. at 4-5 (P.R. 92). Toyo Kohan pointed out that the invoice date was reflected in the SALINDTU3 field, but did not present its current argument regarding the VAL_ADJU field.  *See id.*

To the extent Toyo Kohan claims that it had no opportunity to present these arguments to Commerce, it is incorrect.  In the preliminary results, Commerce used the SALEDATU field as the date of sale for U.S. sales.  *See, e.g.*, Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178).  In the preliminary decision memorandum, Commerce mistakenly stated that it used the "commercial invoice date *because this date was either the same as or preceded the shipment date for all of Toyo Kohan's sales*{.}"  PDM at 4 (citing *Shrimp from Thailand*, IDM at Cmt. 10; *Steel Beams*

*from Germany*, IDM at Cmt. 2) (emphasis added).  In fact, "the invoice date was virtually always after the shipment date{.}"  *See* Pl. MJAR at 11 n.10.  Despite referencing the commercial invoice date in the PDM, Commerce stated that it was adhering to its practice to use the earlier of the shipment date or the invoice date, *id.* at 3-4, and in fact relied on the SALEDATU field in which Toyo Kohan reported the earlier of the shipment date or invoice date in accordance with Commerce's instructions, *see* Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178); *see also* Sec. C Questionnaire Resp. at 16-18 (P.R. 39, C.R. 48).  Thus, the preliminary decision memorandum referenced Commerce's practice to use the earlier of the invoice date or the shipment date, PDM at 3-4, and Commerce used the SALEDATU field reflecting the same practice, Prelim. Analysis Mem. at 2 (P.R. 86, C.R. 178).  Thus, if Toyo Kohan believed that this practice should not apply because the material terms of sale were not established until *after* the shipment date, it was required to make that argument in the case brief.  *See* 19 C.F.R. § 351.309(c)(2).

Yet, in its, case brief, Toyo Kohan did not argue that Commerce should depart from its usual practice to use the earlier of the invoice date or the shipment date.  Case Br. at 3-5 (P.R. 92).  Nor did Toyo Kohan argue that the material terms of sale were not established as of the shipment date, or that the SALEDATU field did not reflect either the invoice date or shipment date, whichever was earlier.  *See id.*; *see also* Section C Resp. at 16 (P.R. 39, C.R. 48).  Instead, Toyo Kohan argued that Commerce made an inadvertent mistake and noted that Toyo Kohan's invoice date was "reported in field 'SALINDTU3.'"  Case Br. at 4-5 (P.R. 92).

Although Toyo Kohan challenged another aspect of the date-of-sale argument, *see* Case Br. at 4-6 (P.R. 92), that does not incorporate every conceivable factual argument under the umbrella of date of sale.  *See, e.g.*, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (holding that plaintiff's failure to raise a particular argument before Commerce

CONFIDENTIAL MATERIAL OMITTED

precluded judicial review even though plaintiff characterized that argument as "simply another angle to an issue"). By failing to raise its current arguments in the case brief as required by 19 C.F.R. § 351.309(c), Toyo Kohan failed to exhaust administrative remedies.

>3.     To The Extent The Court Reaches Toyo Kohan's Remaining Arguments, They Are Unpersuasive

In any event, Toyo Kohan's arguments regarding the material terms of sale and the VAL_ADJU field are unpersuasive.

For example, Toyo Kohan argues that Commerce cited "*a single U.S. transaction*, while ignoring the record evidence about all the other U.S. sales transactions." Pl. MJAR at 25. But Toyo Kohan provided the *sample* sales trace, which Commerce considered in determining that the terms of sale were established at the shipment date. *See* Section A Resp. at 16-18, 23 (P.R. 22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6). This sample sale documentation was self-selected by Toyo Kohan and depicts the full sales trace documentation requested by Commerce in its questionnaire. *See id.* Thus, Toyo Kohan chose this sale as representative of its sales for this type of agreement, and Commerce reasonably relied on that reporting in making its finding regarding the proper date of sale for such transactions. *See* IDM at 4.

Toyo Kohan also argues that its Section A response shows that the final price is not established until the final invoice is issued after shipment. *See, e.g.*, Pl. MJAR at 26. Toyo Kohan highlights the portion of the response stating that after shipment, Toyo Kohan "prepares a payment invoice for each shipment of subject merchandise sent to the customer," charging "the finally agreed-upon sales price, that reflects any changes to raw material prices, exchange rates, or other factors." Pl. MJAR at 8, 26 (citing Section A Resp. at 16-18 (P.R. 22, C.R. 3)). But the same Section A response supports that the unit price per metric ton [ ███████████ ] between the shipment date (reflecting a price of [ █████████ ]) and the final invoice ([ █

22

CONFIDENTIAL MATERIAL OMITTED

██████████████████████ ]).  Section A Resp. at 16-18 (P.R. 22, C.R. 3); Ex. A-10A

(P.R. 23, C.R. 5-6)) (listing, *e.g.*, sales contract and invoice).  Thus, the sample sale does not

support Toyo Kohan's argument that the price in fact "*changed* after the shipment" or that the

"final invoice price often differed" from the price charged to the customer upon shipment, Pl.

MJAR at 27 (emphasis added).  Instead, Toyo Kohan's description of the sample sale shows that

the terms of sale established by the shipment date [ ████████ ] in the final invoice.  Section

A Resp. at 16-18 (P.R. 22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6 (stating that [ ████████

██████████████████████ ]).

     Moreover, although Toyo Kohan critiques Commerce for relying on a single U.S.

transaction, the other sales trace listed in the Section A response also lists [ ████████ ] at

shipment and final invoice.  *See* Section A Resp. at 18-20 (P.R. 22, C.R. 3) (citing Exhibit A-

10B (P.R. 23, C.R. 6-7)) (listing [ ████████████ ] at shipment and final

invoice).  Toyo Kohan did not provide any sales trace examples reflecting a [ ██████ ] price at

the time of shipment and final invoice.  *See* Section A Resp. at 16-20 (P.R. 22, C.R. 3).

     Toyo Kohan nonetheless argues that "the record actually shows that more than half of the

U.S. sales transactions had price changes after the shipment date."  Pl. MJAR at 25.  As support

for this claim, Toyo Kohan argues that "83 out of 135 U.S. transactions, or 61 percent of those

transactions, had price changes after shipment reported in the VAL_ADJU field."  *Id.* at 12.

However, any argument that the VAL_ADJU field reflects changes in the price *after* shipment

conflicts with the information presented regarding the sample sale.  *Compare, e.g.*, Section A

Resp. at 16-17 (P.R. 22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6), *with* Ex. C-1 at 18-19 (P.R. 40,

C.R. 49).  For example, the sample U.S. sales database for invoice [ ██████████ ] reflects a

[ ██████ ] VAL_ADJU field, yet Toyo Kohan reported that the shipment price for this sale

[ ████ ] the final invoice price for the same invoice.  *Compare* Section A Resp. at 16-18 (P.R.

22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6) (discussing the sample sale in Exhibit A-10A for

invoice [ ████████ ] with [ ██████████████████ ]) *with*

Exhibit C-1 at 18-19 (P.R. 40, C.R. 49) (listing invoice [ ████████ ] as observation

number [ ██ ] and showing a [ ██████████ ] field for that sale).

As Toyo Kohan explained, it derived the VAL_ADJU field by calculating the "difference

between the price invoiced to the U.S. customer and the original price," reported as

GRSUPRU_ORIG.  Pl. MJAR at 11 (quoting Section C Response at 25 (P.R. 39, C.R. 48)).  Yet,

Toyo Kohan reported [ ██████████████████████████████████

████████████ ]—even though the GRSUPRU_ORIG field reflects [ ████████████

████ ] and the VAL_ADJU for that sale was [ █████ ].  *Compare* Section A Resp. at 16-18

(P.R. 22, C.R. 3); Ex. A-10A (P.R. 23, C.R. 5-6); Exhibit C-1 at 18-19 (P.R. 40, C.R. 49) (listing

invoice [ ████████ ] as observation number [ ██ ] ).  Thus, Toyo Kohan has not

supported its argument that the VAL_ADJU field reflects actual price changes to the customer

"after product shipment but before the invoice was issued."  Pl. MJAR at 27.

In sum, Toyo Kohan's questionnaire responses and sample sales documentation provide

substantial evidence supporting Commerce's finding that the material terms of sale, including

price and quantity, were established at the time of shipment.  IDM at 4; Section A Resp. at 16-18

(P.R. 22, C.R. 3), Ex. A-10A (P.R. 23, C.R. 5-6).  The existence of "other documents" does not

detract from Commerce's findings with respect to the date when the material terms were set.  *See*

*U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1340 (Ct. Int'l Trade 2013).  Even if it

were "conceivable that Commerce might have drawn another conclusion from these documents,

'the possibility of drawing two inconsistent conclusions from the evidence does not invalidate

Commerce's conclusion as long as it remains supported by substantial evidence on the record.'"

*Id.* (quoting *Zhaoqing New Zhongya Aluminum,* 887 F. Supp. 2d at 1305 (*citing Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)); *see also Consolo*, 383 U.S. at 620 (citation omitted).

Finally, this Court's decision in *Nucor Corp. v. United States*, does not support Toyo Kohan's argument. *See* Toyo Kohan Br. at 29. In *Nucor*, the Court found that a single change in price does not automatically disqualify the contract date from being selected as the appropriate date of sale. *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1312-13 (Ct. Int'l Trade 2009). In this case, by contrast, Commerce reasonably relied on Toyo Kohan's detailed illustration of a representative "sample" sale between Toyo Kohan and its U.S. customer. *See* Exhibit A-10A (P.R. 23, C.R. 5-6); *see also* IDM at 4. Commerce reasonably determined that this "sample sales documentation indicate{d} that the material terms of sale, such as price and quantity, between Toyo Kohan and its U.S. customer were established at the time of the shipment date." IDM at 4. Accordingly, substantial evidence supports Commerce's use of the SALEDATU field for the date of sale, reflecting the earlier of the shipment date or the invoice date. *See* IDM at 4.

## III.    Toyo Kohan Failed To Exhaust Administrative Remedies Concerning Commerce's Application Of The Differential Pricing Methodology

Toyo Kohan also challenges Commerce's differential pricing analysis, relying on the recent decision in *Marmen Inc. v. United States*, holding that it was "unreasonable for Commerce to use Cohen's *d* test as part of its differential pricing analysis when the test is applied to data sets that do not satisfy the statistical assumptions (normal distribution, equal variability, and equally and sufficiently numerous data){.}" *Marmen Inc. v. United States*, 134 F.4th 1334, 1345 (Fed. Cir. 2025). Toyo Kohan argues "here, like in *Marmen*, the three underlying assumptions

on which Cohen's d test rests have not been met." Pl. MJAR at 40. Yet, Toyo Kohan did not mention differential pricing in its case brief to Commerce, nor did it develop a record to support its new factual argument that the relevant data does not satisfy assumptions of normal distribution, equal variance, or sufficient numerosity. *See, e.g.*, Case Br. (P.R. 92). Thus, Toyo Kohan failed to exhaust administrative remedies.

Although the Court allowed Toyo Kohan to amend its complaint to challenge differential pricing based on the futility exception to exhaustion, Order at 3, ECF No. 32, Toyo Kohan's motion for judgment on the agency record demonstrates that it would not have been futile for Toyo Kohan to exhaust administrative remedies with respect to its current factual arguments, *see, e.g.*, Pl. MJAR at 40-42, ECF No. 28. At a minimum, presenting these arguments to Commerce in the first instance would have facilitated development of the administrative record, which is a necessary prerequisite to judicial review of the factual and statistical arguments in Toyo Kohan's brief. *See id.* Because Toyo Kohan failed to exhaust its administrative remedies with respect to its challenge to Commerce's differential pricing analysis, Toyo Kohan's challenge should be "dismissed . . . without reaching the merits." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017).

A.    Legal Framework

This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548

F.3d 1375, 1383–84 (Fed. Cir. 2008) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344

U.S. 33, 37 (1952)) (emphasis in *Mittal Steel*).

The statutory exhaustion requirement "indicates a congressional intent that, absent a

strong contrary reason, the court should insist that parties exhaust their remedies before the

pertinent administrative agencies." *Corus Staal*, 502 F.3d at 1379.  "The doctrine of exhaustion

provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the

prescribed administrative remedy has been exhausted.'" *Essar Steel, Ltd. v. United States*, 753

F.3d 1368, 1374 (Fed. Cir. 2014) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599

(Fed. Cir. 1998)).

"Exhaustion serves two main purposes: 'to allow an administrative agency to perform

functions within its special competence—to make a factual record, to apply its expertise, and to

correct its own errors,' and to 'promote judicial efficiency by enabling an agency to correct its

own errors so as to moot judicial controversies.'" *Stanley Works (Langfang) Fastening Sys. Co.

v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (quoting *Sandvik Steel*, 164

F.3d at 600) (bracketing omitted).  Exceptions to the exhaustion requirement are limited, such as

when a challenge "would clearly be futile" by requiring a plaintiff to "'go through obviously

useless motions,'" or when an issue presents a "pure question of law" that can be addressed

without further factual development or exercise of discretion.  *Itochu Bldg. Prods. v. United

States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (quoting, *e.g.*, *Corus Staal,* 502 F.3d at 1378–79)

(other citations omitted).

B.    Toyo Kohan Failed To Exhaust Its Remedies With Respect To Differential
      Pricing

There is no dispute that Toyo Kohan failed to exhaust administrative remedies by failing

to raise any challenge to differential pricing in its case brief to Commerce.  *See generally* Case

Brief (P.R. 92). "It is uncontested that Toyo Kohan did not raise this argument at any point before the agency." Order at 2, ECF No. 32 (citations omitted). Thus, the only question is whether an exception to the exhaustion requirement applies.

In allowing Toyo Kohan to amend its complaint by adding a challenge to differential pricing, the Court reasoned that "{a}ny efforts by Toyo Kohan to challenge Commerce's application of the Cohen's d methodology in the underlying proceedings would have been futile . . . because the Federal Circuit had not yet resolved the issue of how Cohen's d could be applied properly, while Commerce adhered to the methodology faithfully after several opportunities to reconsider it{.}" Order at 3, ECF No. 32. Applying the standard for amending the complaint pursuant to USCIT Rule 15(a)(2), the Court concluded that "justice requires" allowing Toyo Kohan to address differential pricing "under the standard articulated by the Federal Circuit in *Marmen*." *Id.* at 3.

It would not have been futile, however, for Toyo Kohan to exhaust the factual arguments now presented to the Court—such as Toyo Kohan's claim that "the Shapiro-Wilk test" shows that the U.S. price data are "not normally distributed." *See, e.g.*, Pl. MJAR at 40-42. "The futility exception to the exhaustion requirement has been applied in situations in which enforcing the exhaustion requirement would mean that parties would be required to go through obviously useless motions in order to preserve their rights." *Corus Staal*, 502 F.3d at 1379 (citation and internal quotation marks omitted). "That exception, however, is a narrow one." *Id.* "The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Id.* (citing *Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.,* 40 F.3d 426, 432–33 (D.C. Cir. 1994)). "Moreover, . . . the Court of International Trade generally takes a 'strict view' of the requirement that parties exhaust their

administrative remedies before the Department of Commerce in trade cases." *Id.* (quoting, *e.g.*, *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004)) (other citation omitted).

It would not have been "obviously useless" for Toyo Kohan to present its current arguments to Commerce in the first instance. *See Corus Staal*, 502 F.3d at 1379. Toyo Kohan argues that requiring such a challenge would have been futile because Commerce "was, at the time, vigorously defending its use of the Cohen's d test." *See* Toyo Kohan Br. at 38. However, even if an adverse decision from Commerce may have been likely, it would not have been futile for Toyo Kohan to develop the factual record of its challenge to differential pricing for judicial review pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i). Indeed, one of the core purposes of the exhaustion requirement is "'to allow an administrative agency to perform functions within its special competence,'" including "'to make a factual record{.}'" *Stanley Works (Langfang)*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (quoting *Sandvik Steel*, 164 F.3d at 600) (bracketing omitted). "{T}he burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (internal citation, quotation marks, and bracketing omitted). Having failed to exhaust administrative remedies, Toyo Kohan is left making factual arguments to this Court in the first instance, without any citations to record evidence. *See* Pl. MJAR at 40-42.

For example, Toyo Kohan argues without citation that "{u}sing the Shapiro-Wilk test, which is commonly used to assess normality, we confirmed the U.S. price data here fail the test and are thus not normally distributed." Pl. MJAR at 40 (arguing that "for CONNUM 100030604050 in Quarter 2, the p-value was 0.0016, which is well below the 0.05 probability threshold for the test and therefore fails the normality test"). Toyo Kohan further claims that

"{f}or statistical tests, it is common to use a probability threshold, typically at 5 percent," which, according to Toyo Kohan, "means one can reject the so-called 'null hypothesis' at least 95 percent or more of the times." *Id.* n.42. Toyo Kohan asks the Court to find that in one example, "the test result of p=0.0016 means that in 99.84 percent of the cases the data will not be normally distributed." *Id.* With respect to equal variances, Toyo Kohan argues (again, without citation), that "{o}f the nine-pricing period possible comparisons that otherwise passed the Cohen's d test, the variances between the test and base groups differed by more than 10 percent in all nine cases." *Id.* at 41. Finally, in arguing that the data are not sufficiently numerous, Toyo Kohan argues (without citation) that "a data set should have about 30 transactions for statistical tests{.}" *Id.*

      None of these questions are appropriate for resolution by the Court in the first instance. The Court reviews Commerce's determinations pursuant to the substantial evidence standard; it does not adjudicate questions of fact in the first instance. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). By failing to exhaust administrative remedies with respect to its new factual arguments, Toyo Kohan failed to develop the administrative record and frustrated both agency adjudication and judicial review. It would not have been futile for Toyo Kohan to present its arguments to Commerce to—at a minimum—develop a record to allow for judicial review of its current arguments.

      Moreover, although the Court determined that "the Federal Circuit's decision in *Marmen* fundamentally shifted the legal standard controlling Commerce's application of the Cohen's d test," Order at 3, that conclusion does not show that it would have been futile for Toyo Kohan to exhaust administrative remedies before the *Marmen* decision with respect to its current arguments. *Contra* Pl. MJAR at 36-37. Active challenges to Commerce's use of differential pricing and the Cohen's *d* test continued while the issue was pending review by the Federal

Circuit—including in the *Marmen* case. Three years prior to Toyo Kohan's filing of its case brief, the Federal Circuit issued a decision remanding nearly the same issue that Toyo Kohan now belatedly seeks to raise. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1360 (Fed. Cir. 2021) (remanding for Commerce to address whether Commerce's application of the Cohen's *d* test in the challenged investigation violated the assumptions of normality, sufficient observation size, and roughly equal variances). In February 2024—several months before Toyo Kohan submitted its case brief in June 2024—this Court stayed Commerce's remand decision in another case involving differential pricing and Cohen's *d*, confirming that even before the recent decision in *Marmen*, it was not futile for parties to challenge the differential pricing issue. *See Matra Americas, LLC v. United States*, 681 F. Supp. 3d 1339, 1360–61, 1382 (Ct. Int'l Trade 2024).

Thus, if Toyo Kohan believed that any challenges to differential pricing and Cohen's *d* continued "to be relevant" to the final results, it was obliged to raise the issue in its case brief. *See* 19 U.S.C. § 351.309(c)(2). Such exhaustion would not have been futile. Even if Commerce may have ultimately rejected the requested relief, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency, for {Toyo Kohan} to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." *See Corus Staal,* 502 F.3d at 1380.

No other exception to the exhaustion requirement applies. In limited circumstances, an exception to the exhaustion of administrative remedies may apply where there is a new interpretation from an intervening judicial decision that would have materially altered the result. *See Siemens Gamesa Renewable Energy v. United States,* 621 F. Supp. 3d 1337, 1348 (Ct. Int'l Trade 2023) (*citing Hormel v. Helvering,* 312 U.S. 552, 558–59 (1941)). As the Court explained, however, the intervening judicial decision exception "applies to issues that present a

pure question of law."  Order at 2-3, ECF No. 32 (citing *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (noting that the Court of International Trade has developed a "pure legal question" exception to the exhaustion requirement in trade cases)).

The pure question of law exception does not apply here.  Toyo Kohan's arguments concerning Commerce's practice and methodology are record-based.  A claim is not "purely legal" where a remand would require Commerce to perform recalculations and would thus be likely to consider other evidence in the record or even reopen the record.  *Indep. Radionic Workers of Am. v. United States*, 862 F. Supp. 422, 434 (Ct. Int'l Trade 1994).[5]  "Statutory construction alone is not sufficient to resolve this case."  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).  "Rather, the question is whether the methodology is justifiable, and to resolve that issue, a factual record needs to be developed."  *Stanley Works*, 279 F. Supp. 3d at 1190 (citing *Consol Bearings*, 348 F.3d at 1003).  Whether the data on this record satisfies these statistical assumptions is a question of fact dependent on the unique facts of this proceeding.  Thus, the issue presented to this Court does not meet the "purely legal" exception to exhaustion.

Finally, to qualify for the intervening judicial decision exception, there must have been an intervening judicial interpretation "which if applied might have materially altered the result."  *Hormel*, 312 U.S. at 558–59 (footnote omitted).  However, having failed to develop the agency

---

[5]  *See, e.g.*, *Stanley Works*, 279 F. Supp. 3d at 1190 (citing *Consol Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003)) (explaining that the pure legal question exception did not apply when the court would have to assess Commerce's justifications for its practice); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (finding the pure question of law exception not applicable when argument relies on unique facts of the case*); Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384–85 (Ct. Int'l Trade 2011) (concluding that the pure legal question exception did not apply when resolution of the issue would require remand of the issue to Commerce, "an inefficiency occasioned solely by Plaintiff's inaction").

record with its current factual arguments regarding normal distribution, equal variances, and numerosity, Toyo Kohan cannot show that the *Marmen* decision would materially alter the result in this case. In *Marmen*, the Federal Circuit held that Commerce was "unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly *when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous*." *See Marmen*, 134 F.4th at 1348 (emphasis added). The Federal Circuit did not hold that Commerce could never apply the Cohen's *d* test in its differential pricing analysis. *Id.* Instead, the Federal Circuit held that Commerce could not rely on Cohen's *d* test for data sets "like those {at issue in *Marmen*}." *Id.*

Here, Toyo Kohan argues that the data in this case are similar to those at issue in *Marmen*, claiming that the relevant data sets are not normally distributed, do not have equal variances, and are not sufficiently numerous. *See* Pl. MJAR at 40-41. Yet, Toyo Kohan failed to present these arguments to Commerce, depriving Commerce—as the administering authority charged with making findings of fact in antidumping duty proceedings—of the opportunity to review the record and make findings of fact. Thus, Court is presented with only Toyo Kohan's opinions regarding whether the data in this case match conditions in the data subject to the Federal Circuit's ruling in *Marmen*. As discussed above, it would not have been futile for Toyo Kohan to exhaust these factual arguments to Commerce and, without these factual predicates, Toyo Kohan cannot demonstrate that the precedent in *Marmen* applies to this case. Thus, we respectfully request that the Court dismiss Toyo Kohan's challenge to the differential pricing methodology pursuant to 28 U.S.C. § 2637(d).

Should the Court nonetheless excuse Toyo Kohan's failure to exhaust its remedies, we respectfully request that the Court remand Commerce's determination for reconsideration and to consider Toyo Kohan's arguments in the first instance.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain the final results and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Emma E. Bond
EMMA E. BOND
CHARLIE CHUNG                Senior Trial Counsel
Senior Attorney              Commercial Litigation Branch
Office of the Chief Counsel  U.S. Department of Justice
    for Trade Enforcement & Compliance    P.O. Box 480
U.S. Department of Commerce  Washington, DC 20044
                             (202) 305-2034
                             Email: emma.e.bond@usdoj.gov

July 11, 2025               Attorneys for Defendant

34

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 10,635 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

Dated: July 11, 2025                    /s/ Emma E. Bond
                                        Emma E. Bond
                                        Counsel for Defendant

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| TOYO KOHAN CO. LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | )    Court No. 24-00261 |
| | ) |
| Defendant, | ) |
| | ) |
| THOMAS STEEL STRIP CORPORATION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the agency record filed by plaintiff, all responses thereto, the administrative record, and other pertinent papers, it is hereby

ORDERED that the motion is DENIED; and it is further

ORDERED that the Department of Commerce's final results in this matter are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2025
      New York, NY                                       _____
                                                                             JUDGE