# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Jane A. Restani, Judge**

| | |
|---|---|
| **TOYO KOHAN CO. LTD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Court No. 24-00261** |
| | ) |
| **UNITED STATES,** | ) <u>**NON-CONFIDENTIAL VERSION**</u> |
| | ) |
| **Defendant,** | ) *Confidential information removed from pages 9-11, 13-15.* |
| | ) |
| **THOMAS STEEL STRIP CORPORATION,** | ) |
| | ) |
| **Defendant-Intervenor.** | ) |
| | ) |
| | ) |

## PLAINTIFF TOYO KOHAN'S REPLY BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
Gina M. Colarusso
Will Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*

**August 8, 2025**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ........................................................................................................... 3

I.    THE COURT SHOULD REMAND FOR COMMERCE TO ADDRESS AND
CORRECT THE SERIOUS ERROR IN THE DATE OF SALE
DETERMINATION ............................................................................................ 3

    A.    Commerce's Date Of Sale Determination Is Not Supported By
Substantial Evidence ........................................................................... 3

    B.    Defendant's Exhaustion Arguments To Avoid Addressing The Date
of Sale Issues Should Be Rejected ............................................... 16

II.    THE COURT SHOULD REMAND FOR COMMERCE TO ADDRESS AND
CORRECT THE ERRONEOUS APPLICATION OF THE COHEN'S D TEST . 22

    A.    Commerce's Application of Cohen's d Test Was Contrary to Law .......... 22

    B.    Defendant's Exhaustion Arguments To Avoid Addressing The
Cohen's d Test Should Be Rejected ........................................... 22

CONCLUSION AND PRAYER FOR RELIEF ............................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hormel v. Helvering,*
    312 U.S. 552 (1941) ................................................................................... 21

*Itochu Bldg. Prods. v. United States,*
    733 F.3d 1140 (Fed. Cir. 2013) ................................................................ 16

*LTV Steel Co. v. United States,*
    985 F. Supp. 95 (Ct. Int'l Trade 1997) ..................................................... 17

*McKart v. United States,*
    395 U.S. 185 (1969) ................................................................................... 16

*Nakornthai Strip Mill Public Co. v. United States,*
    558 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ............................................ 16

*Qingdao Taifa Group Co. v. United States,*
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ....................................... 17, 18

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990) ............................................................... 17

*Saha Thai Steel Pipe Co. v. United States,*
    828 F. Supp. 57 (Ct. Int'l Trade 1993) ................................................... 18

*Timken Co. v. United* States,
    201 F. Supp. 2d 1316 (Ct. Int'l Trade 2002) ....................................... 16, 17

*Zhejiang Mach. Imp. & Exp. Corp. v. United States,*
    471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) ............................................ 17

**Administrative Determinations**

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023,*
    89 Fed. Reg. 95,735 (Dec. 3, 2024) .......................................................... 1

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2013-2015,*
    81 Fed. Reg. 91,116 (Dec. 16, 2016) ........................................................ 12

*Ripe Olives From Spain: Final Results of Antidumping Duty Administrative Review;*
   *2022–2023,* 90 Fed. Reg. 25,223 (June 16, 2025) ........................................................ 24

*Circular Welded Carbon Steel Standard Pipe and Tube Products from the Republic of*
   *Türkiye, Final Results of Antidumping Duty Administrative Review; 2022–2023,*
   90 Fed. Reg. 12,296 (Mar. 17, 2025) .................................................................................. 24

*Differential Pricing Analysis; Request for Comments,*
   90 Fed. Reg. 21,277 (May 19, 2025) ................................................................................... 24

**Statutes**

19 U.S.C § 1677 .................................................................................................................................. 4

19 U.S.C. § 1673 ................................................................................................................................. 4

19 U.S.C. § 1677b ............................................................................................................................... 3

**Regulations**

19 C.F.R. § 351.309 .......................................................................................................................... 16

19 C.F.R. §351.401 ............................................................................................................................. 4

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case requires a remand to correct two fundamental errors.  The Commerce Department ("Commerce") determinations here – about the date of sale and the Cohen's d test – simply do not address the relevant record evidence or follow current law, and the dumping margin cannot stand on the rationales in Commerce's determination as written.[1]

Regarding the proper date of sale, Defendant focuses myopically on a single piece of evidence, essentially ignoring the rest of the record.  Defendant focuses on a statement on page 17 of Plaintiff's initial Section A response and the price of a single example sales transaction and argues that such focus is "reasonable."  But it is not reasonable to ignore the second example in the same exhibit (A-10) that shows a price change.  It is not reasonable to ignore the remainder of the general discussion in the Section A response that makes explicit that the price at shipment is only tentative and is often not finalized until later when the final invoice is issued.  It is not reasonable to ignore the more specific discussion about U.S. prices in the Section C response that also makes explicit the price at shipment is only a tentative price to be finalized later in the final invoice.  Finally, it is not reasonable to ignore the actual U.S. prices at issue, since the U.S. price data here show that for more than half of the transactions, the price in fact did change after shipment.

---

[1] *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 95,735 (Dec. 3, 2024), P.R. 110 ("*Final Results*"), and accompanying Issues and Decision Memorandum ("IDM"), P.R. 108 ("*Final IDM*").

Recognizing the weakness of its substantial evidence argument, Defendant relies heavily on the procedural defense of exhaustion, trying to avoid the need to defend its flawed decision on the merits. But exhaustion does not apply when the party did not have a full and fair opportunity to present its arguments below, and the facts here show that was the case. Commerce's preliminary determination was confusing, and the petitioner submitted no case brief to which Toyo Kohan could respond and raised the date of sale issue only in its rebuttal brief. Nonetheless, Commerce did have notice of Toyo Kohan's repeated argument that invoice date was the correct basis for the U.S. date of sale.

Regarding the proper application on the Cohen's d test, Defendant presents no argument on the merits. The recent Federal Circuit decisions leave no room for Defendant to present a defense on the merits, so Defendant relies exclusively on the procedural defense of exhaustion. But again, this effort to invoke an exhaustion defense fails. Indeed, we submit that this Court has *already* rejected these exhaustion arguments.

# ARGUMENT

## I. THE COURT SHOULD REMAND FOR COMMERCE TO ADDRESS AND CORRECT THE SERIOUS ERROR IN THE DATE OF SALE DETERMINATION

### A. Commerce's Date Of Sale Determination Is Not Supported By Substantial Evidence

#### 1. The relevant legal issue is when the material terms of the sale of these particular transactions were finally determined

The parties agree the focus is on when the material terms of the transaction are set. The parties also appear to agree that price is a material term of sale. But we disagree about how Commerce should determine when the price is finalized.

Defendant focuses on the Commerce policy about how the shipment affects the date of sale. Defendant argues that Commerce has a policy that price is fixed at shipment. Defendant's Response to Plaintiff's Rule 56.2 Motion for Judgement on the Agency Record (July 11, 2025) (ECF No. 40) ("Def. Br.") at 14. But this argument misses the point because this policy does not address situations when the material terms of the sale – like the price – change after shipment. The practice of using shipment date reflects the presumption that normally the material terms are set at that point. Contrary to Defendant's argument, this policy is not a binding rule that the material terms "do not change" after the shipment date. At most, this policy is a statement of what presumption Commerce will apply unless the specific facts of a particular case show to the contrary.

Plaintiff focuses on the binding regulatory language. The statute focuses on U.S. "sales", and the regulation clarifies that the date of sale is when all the "material terms of sale" have been established. *See* 19 U.S.C. §1677b(a)(1)(A) ("time of sale"); 19 U.S.C.

§1673(1) (merchandise "sold"); 19 U.S.C §1677(14) ("sold" or "sales"); 19 C.F.R.

§351.401(i).  The regulation correctly focuses on when the material terms of the sale have

been set, presumes those terms are set in the invoice, but leaves open what the facts of a

particular case will show.  Here the facts show, as we discuss in Section I.A.2 below, that

the U.S. price frequently changed after shipment.  The Commerce policy about generally

using the shipment date does not supersede the requirement under the statute and

regulation to determine the date of sale to be when all the material terms – including price

– have been finally set.

Defendant also focuses on what the questionnaire asked and how Toyo Kohan

responded.  Def. Br. at 14-15.  It is true that Toyo Kohan reported SALEDATU as

required by the questionnaire, and that meant reporting the earlier of shipment or invoice

date.  Reporting that field as required, however, does not change the facts here that the

U.S. price generally changed after shipment date.  That a respondent fills out

SALEDATU as instructed does not relieve Commerce of its obligations to follow its

regulation and consider the facts of a particular case and what those facts show about the

actual transactions at issue.

Defendant's arguments are really just efforts to bolster the fundamental weakness

of its position – that Commerce relied on a single statement and a single transaction to

extrapolate to the entire universe of U.S. sales.  But in light of the complete record here –

all the explanations and all the sales transactions – there simply is no substantial evidence

supporting Commerce's date of sale determination.

### 2. Substantial evidence confirms that most of the U.S. prices changed after the date of shipment

Defendant asserts that Commerce's decision to rely entirely on an isolated statement from Section A and the single sample sale transaction is enough and is reasonable.  Def. Br. at 15.  But these few facts in isolation do not constitute a decision based on substantial evidence.  Plaintiff presented extensive evidence in support of its position, Toyo Kohan's Rule 56.2 Memorandum in Support of Motion for Judgment on the Agency Record (May 2, 2025) (ECF No. 28) ("Pl. Br.") at 7-12, 26-28, but Defendant does not address much of it, choosing instead to defend the very narrow basis for Commerce's determination.  When considered as a whole, the record simply does not support Commerce's date of sale determination.

First, consider the Section A response as a whole.  Defendant points to a single statement in the Section A response, Def. Br. at 15, but does not put that statement into any broader context.  The Section A response also explained the following about U.S. prices and how they were set:

- Toyo Kohan periodically gave its U.S. customer a tentative new price utilizing a "temporarily agreed pricing formula";

- a summary bill is generated every time merchandise is shipped from the factory, including a tentative sales prices reflected on the summary bill (generated with shipment to the trading company) that "may well change" based on subsequent discussions; and

- the final U.S. price is not finalized until later to "take into account changing raw material costs and market conditions".

Toyo Kohan's Section A Response (Sept. 15, 2023), P.R. 22, C.R. 3 ("AQR") at 16, 23; *See also* Pl. Br. at 8.  And the documents in Exhibit A-10 provided two examples:  one

did not show a price change after shipment (*see* AQR at Exhibit A-10B, C.R. 6-8 ("Exhibit A-10B")), and one showed a price change after shipment (*see* AQR at Exhibit A-10A, C.R. 5-6 ("Exhibit A-10A")).  *See* Pl. Br. at 31-32, n.36.  Read as a whole – the entire narrative response and the examples in both Exhibit A-10A and Exhibit A-10B -- the Section A response does not support Commerce's determination that the U.S. price was fixed at the time of shipment.  Rather, the Section A response described a more dynamic process, with a tentative price set at shipment but then often revised later after shipment as part of the final invoicing.  *See also* Pl. Br. at 8-12, 26-28.  And the examples in Exhibit A-10A and Exhibit A-10B showed examples with and without a price change after shipment.

Second, consider the Section C response (Toyo Kohan's Section C Response (Oct. 10, 2023), P.R. 39, C.R. 48 ("CQR")).  Building on the initial explanation from the Section A response, Toyo Kohan explained specifically in the CQR narrative about its accounting practices when the price changes after shipment and documented the magnitude and frequency of those changes.  Pl. Br. at 9-11, 27.  Surprisingly, Defendant does not address this discussion. Def. Br. at 14-19.  Section A provides a general discussion of pricing practices in general, but the Section C response and database (Toyo Kohan's Section C Database (Oct. 10, 2023), C.R. 65 ("Section C Database"), revised at Exhibit SC-1, C.R. 138) provides the actual U.S. price data being considered here.  Yet, Defendant has nothing to say about this highly probative source of record evidence about the specific U.S. prices at issue.

- 6 -

Third, consider the actual U.S. price data.  The price changes set forth in the "value adjustment" or VAL_ADJU field showed both the frequency and magnitude of the U.S. price changes between shipment and final invoicing and confirmed that more than half of the U.S. sales prices at issue here had price changes (*see* Section C Database). Surprisingly, the Defendant says nothing about this actual U.S. price data, the frequency of price changes after shipment, or how the frequency affected the analysis. Nor did Commerce even raise this during the underlying proceeding as a question in its supplemental questionnaire (*see* Department's Supplemental A Questionnaire (March 25, 2024), P.R. 54; Department's Supplemental C Questionnaire (April 15, 2024), P.R. 62; and Department's Supplemental ABC Questionnaire (April 30, 2024), P.R. 78). Defendant argues only that Commerce could ignore this data because Toyo Kohan did not exhaust its administration remedies on this point.  Def. Br. at 19-21.  As we discuss in Section I.B below, this exhaustion argument fails.

Moreover, whatever the Court decides about the exhaustion argument for the specific arguments regarding the VAL_ADJU field, the other record evidence remains and has not been addressed.  Defendant says nothing about the Section A response as a whole, or the narrative parts of the Section C response aside from the VAL_ADJU field. In other words, even without the VAL_ADJU field argument, substantial evidence shows the Commerce date of sale determination was wrong.

Defendant argues the single sample sales trace is "representative," Def. Br. at 22, but this argument is myopic.  Sample sales traces provided with Section A are about illustrating the sales process with an example and sample documents.  A sample sales

trace does not purport to be representative of whether or not there are price changes for all the other sales transactions; the sale trace illustrates that single transaction. Moreover, in this particular case, the one sales trace cited by Defendant has to be read against (1) the other sample sales trace in Exhibit A-10 that did show a change, (2) the other general statements in the Section A response explaining that tentative prices were often changed after shipment, (3) the further statements in the Section C narrative also explaining the price changes after shipment, and (4) the actual Section C U.S. sales that showed the high frequency with which U.S. prices changed after shipment.

Defendant argues the single sales trace example cited somehow supersedes the narrative point that the price changes. Def. Br. at 22-23. But this argument makes little sense. The single example does not make the narrative discussion of price changes irrelevant. To the extent Commerce perceived the narrative and example to be at tension with each other, Commerce could have asked for clarification (which it did not). Pl. Br. at 12-13. More fundamentally, Commerce had the information to check this transaction and all the other U.S. sales transactions. Toyo Kohan reported both the tentative price at shipment (GRSUPRU_ORIG, *i.e.*, the "gross unit price in the US-original"), final price actually invoiced (GRSUPRU, *i.e.*, the "gross unit price in the US"), and the difference between them, the VAL_ADJU field. *See* Section C Database. Commerce actually used the final price invoiced (GRSUPRU) not the tentative price at the time of shipment (GRUPRU_ORIG). Had it bothered to do so, Commerce would have seen that even if this one example had no change, more than half of the U.S. sales transactions did show a price change after shipment. Given that Commerce argued that this lack of price change

- 8 -

was different from the prior review, Def. Br. at 8, 18 (citing *Final IDM* at 4), one would

have expected Commerce to check the frequency of changes.  Commerce did not do so.

Defendant also claims there was no example in the sales trace Exhibit A-10 that

showed a price change, arguing the VAL_ADJU field for the sample sales transaction is

somehow wrong, Def. Br. at 23-24, but this argument is just incorrect.  Defendant's

attempt to dismiss the relevance of the extensive data about U.S. price changes

misunderstands and misrepresents the underlying documents.  Defendant argues that page

17 of the Section A response did not describe both a preliminary and final price and

explicitly mentioned only a single price that remained unchanged in Exhibit A-10A.  But

this focus on one part of the Section A response ignores the documents provided in

Exhibit A-10A, which in fact demonstrate that the unit price at the time of shipment

*differed* from the final agreed-upon price.  For the Court's convenience, we provide the

relevant excerpts of these documents below.

First, here is an excerpt of the original billing statement issued at the shipment

date of [                    ], reflecting the tentative "billed u{nit} price" of [                ],

from Exhibit A-10A (C.R. 5, p. 5).

*NON-CONFIDENTIAL VERSION*

Second, here is the sales contract issued on **[            ]** with the final price of

**[            ]**, from Exhibit A-10A (C.R. 5, p. 4), which is different from the price at

shipment documented above.[2]

Third, here is the revised billing statement with the final price of **[            ]**

issued in **[            ]**, from Exhibit A-10A (C.R. 5, p. 6).

---

[2] We note this sales contract can be linked to the original transaction by the product type, quantity, and contract number (**[      ]**) as can be seen in a different part of the same billing statement excerpted above on the far right of the document.

Note the revised billing statement shows both the tentative price at the time of shipment and the final price at the time of the invoice.  Although the narrative on page 17 does not explicitly state that the price at shipment of **[        ]** was a tentative price, the narrative also does not state that the price was final at the time of shipment or that the final price invoiced of **[        ]** was the same as the shipment-date price.  Defendant mischaracterizes the narrative by disregarding the supporting documents in Exhibit A-10A – particularly (1) the document issued at the time of shipment (*i.e.*, original billing statement), whose unit price ties to the GRSUPRU_ORIG ("gross unit price in the US-original") reported in the US database; and (2) the final sales contract, whose unit price ties to the GRSUPRU ("gross unit price in the US") reported in the US database so as to distinguish explicitly the tentative price at the time of shipment from the final price at the time of invoice.

These documents from Section A are consistent with the transaction details reported in the Section C Database, revised at Exhibit SC-1 (C.R. 133, 138), that demonstrate (1) the U.S. sales database for observation number **[    ]**, showed an original price of **[        ]** in the field GRSUPRU_ORIG; and (2) the final invoice price for the same observation number of **[        ]** in the field GRSUPRU.

Finally, the Defendant-Intervenor presents a different argument that the price change is only an internal accounting adjustment and that the actual price did not change, Response Brief of Defendant-Intervenor in Opposition to Plaintiff's Motion for Judgement on the Agency Record (July 10, 2025) (ECF No. 37) ("Def-Int. Br.") at 10-14,

but this argument is also incorrect. This argument does not address the unambiguous evidence discussed above showing that the preliminary price at shipment and the final actual price invoiced differed.

Moreover, Defendant-Intervenor's argument mischaracterizes the documents, confusing the internal accounting adjustments to reconcile the preliminary tentative price to the final price. Both prices appear in the records at a particular point in time, but that is because the final price has changed and therefore there needs to be documents to reflect that change. As Toyo Kohan explained in its Section C response, whenever a change in price occurs after shipment, Toyo Kohan reverses the original billing document (effectively cancelling the original invoice) and issues a new billing document at the final price. *See* CQR at 24-25, C.R. 48. This explanation thus reinforced the discussion from the Section A response discussed above.

In addition, this change reflects an actual price change and is not merely an accounting adjustment as Defendant-Intervenor argues. The fact that the pricing <u>formula</u> might have been known at the time of shipment does not mean the <u>price</u> was known at the time of shipment. The formula would generate different results based on changing data that was not known and fixed at the time of shipment.[3]

---

[3] We note that Petitioner raised a similar argument in a prior review, asserting that the pricing formula established the material terms before the invoice date. Commerce rejected this argument. *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2013-2015*, 81 Fed. Reg. 91,116 (Dec. 16, 2016), accompanying IDM at Cmt. 2.

The record demonstrates that negotiations and price changes took place after the shipment date and that the customer knew about these changes.  First, Toyo Kohan explicitly stated that the price could change up to the date of invoicing to the U.S. customer throughout its responses.  *See* AQR at 23, C.R. 3; CQR at 16-18, 24, C.R. 48; Toyo Kohan's Supplemental Section C Response (April 24, 2024), C.R. 132 ("SCQR") at 2-3.  Moreover, the Section C Response (at 24) specifically explained that the billing document issued at the time of shipment can change up to the date of invoicing to the U.S. customer.

Second, regarding the price formula, although Toyo Kohan offers a new price for the next three-month period to its customer, this formula only created a temporary price.  *See* AQR at 16, 18.  Record evidence confirms this point.  The order confirmation in Exhibit A-10A shows that the initial tentative price at the time of the first purchase order, which was based on the preliminary pricing formula, was later updated to [                    ] on [                    ], as shown in the below screenshot.  This order confirmation shows the updated unit price of [                    ] on [                    ] from Exhibit A-10A (C.R. 5, p. 3).

Subsequently, the price was updated through the negotiation between Toyo Kohan and its customer, and both a final sales contract and billing statement were issued to reflect the final invoice price. *See also* SCQR at 2, C.R. 132. Please see the screenshots of the final sales contract and revised billing statement from Exhibit A-10A, provided above, which reflect the changed final invoice price. This sequence and the accounting records confirm that the material terms of sale were not fixed until the final invoice, and that the earlier prices served only as a preliminary basis for discussion and interim payments.

Third, Toyo Kohan repeatedly clarified throughout its responses that the price adjustment resulted from negotiations with the U.S. customer. For example, in the supplemental Section C response, Toyo Kohan provided payment records and the corresponding invoice for the sample sales trace in Exhibit A-10A, showing two separate invoices and payments. *See* SCQR at Exhibit SC-4, C.R. 133. Those documents show that the shipment unit price of **[        ]** was a tentatively agreed price and an initial payment was made based on this tentative price after the shipment date, but prior to the commercial invoice date. And the subsequent invoice and payment reflected the final negotiated price. *See id.*

Defendant-Intervenor characterizes these transactions are purely internal and alleges the customer did not know. Def-Int. Br. at 9-14. But this argument is incorrect, because the payment records in Exhibit SC-4 – showing bank transfers from the customer to Toyo Kohan as payments at different points – confirm that the customer knew about these tentative prices. The customer had to know because payments were made from the

customer's account.  Thus, contrary to the Defendant-Intervenor's argument that the final price was fixed by the shipment date and that the shipment price of **[          ]** was only used for internal accounting and not shared with the customer, the bank statements demonstrate that the tentative price was in fact known to the customer, discussed, and used as the basis for the initial payment.

Taken together, these documents establish that actual price negotiations occurred, contrary to Defendant-Intervenor's assertion that the adjustment was merely an internal accounting reconciliation.

### 3.    The prior reviews are relevant context for evaluating the specific evidence in this review

Defendant tries to ignore completely the prior reviews of this antidumping order, Def. Br. at 17-17, but this argument fails for two reasons.  First, this review may be limited to the facts of this review, but these facts must still be viewed in context.  Courts may and should examine the facts of a specific review in context.  Pl. Br. at 24-25 (citing *Kaplan Demir*).  When Commerce has been following a particular practice in repeated reviews, as was the case here, that context reasonably informs what Commerce is doing in a particular review.  Second, in this case Commerce implicitly acknowledged this point.  Commerce itself in its determination – and Defendant in its brief -- specifically compared the facts in this review to prior reviews, so as to distinguish this review.  Def. Br. at 8, 18 (citing *Final IDM* at 4).  In such a situation, it is reasonable for Plaintiff to take issue with this characterization, and to use Commerce's determinations in prior reviews to highlight the unjustified departure here.

**B.    Defendant's Exhaustion Arguments To Avoid Addressing The Date of Sale Issues Should Be Rejected**

Defendant argues that, during the underlying proceeding, Toyo Kohan did not raise the <u>same</u> date-of-sale arguments made in its opening brief and thus failed to exhaust administrative remedies requiring this Court to ignore Toyo Kohan's arguments.  Def. Br. at 19-21.  Defendant-Intervenor did not make any exhaustion arguments on the date of sale issues.  These exhaustion arguments have no merit.  The relevant precedents and the particular circumstances here demonstrate that there is no justification to apply the exhaustion doctrine.

**1.    Past precedent supports a fairness approach when applying the exhaustion doctrine**

The exhaustion doctrine is discretionary and only required "where appropriate," *see* 28 U.S.C. §2637(d), meaning it must "serve some practical purpose where applied." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).  Courts have long recognized that an overarching purpose of the exhaustion requirement is to provide the agency "a chance to discover and correct its own errors." *McKart v. United States*, 395 U.S. 185, 195 (1969).  And so, to exhaust its administrative remedies, a party usually must submit a case brief "present{ing} all arguments that continue in {its} view to be relevant to {Commerce's} final determination or final results."  19 C.F.R. § 351.309(c)(2); *see Nakornthai Strip Mill Public Co. v. United States,* 558 F. Supp. 2d 1319, 1329 (Ct. Int'l Trade 2008).  That is, the agency must have had notice of a party argument and been afforded a chance to consider and decide its view of that argument. *See Timken Co. v. United* States, 201 F. Supp. 2d 1316, 1340-41 (Ct. Int'l Trade 2002).

Here, the single best evidence that Commerce was fully aware of the date of sale issue is Commerce directly addressed this issue in its *Final Results*.  The exhaustion doctrine is just not relevant here.

Perhaps Defendant recognizes this, which is why its exhaustion argument is limited only to certain aspects of Toyo Kohan's arguments.  Def. Br. at 19-22.  But exhaustion does not require a party to raise "every conceivable factual argument under the umbrella of {the issue}."  *See id.* at 21.  A "brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it."  *Timken*, 201 F. Supp. 2d at 1340-41.[4]

Again, here, Commerce clearly had notice, since it addressed this issue in its *Final Results*.  That Toyo Kohan's 56.2 brief is not *identical* to its administrative case brief is the result of Plaintiff not having a full and fair opportunity to respond to Commerce's thinking during the administrative proceeding.  The court has long recognized that the exhaustion doctrine does not apply in such circumstances.  *See Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1236 (Ct. Int'l Trade 2009) (citing *LTV Steel Co. v. United States*, 985 F. Supp. 95, 120 (Ct. Int'l Trade 1997)) ("A party…may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address

---

[4] Defendant cites *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) and *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) to support their argument that the court should limit its review of Toyo Kohan's arguments, Def. Br. at 20-22, but neither of these cases support that outcome.  Plaintiff in those cases raised separate issues on appeal that were not mentioned before the agency despite a full and fair opportunity to do so.  Here, Toyo Kohan did not have an opportunity to fully address Commerce's incorrect view that the material terms of sale were set at shipment, because Commerce did not adopt this finding until its *Final Results*.

the issue until its final decision…").  Nor is the respondent "required to predict that Commerce would accept other parties' arguments and change its decision {in the final determination}."  *Id.* at 1237 (citing *Saha Thai Steel Pipe Co. v. United States*, 828 F. Supp. 57, 59–60 (Ct. Int'l Trade 1993)).  As in *Qingdao Taifa*, Toyo Kohan did not have a full and fair opportunity to challenge Commerce's date-of-sale conclusion in the final determination that, for U.S. sales, the material terms of sale were deemed set at the shipment date.

As in *Timken*, where the court found that clarity arose not only from the case brief itself, but also from the broader record developed in the proceeding, the record developed throughout the instant proceeding demonstrates that Toyo Kohan's argument was sufficiently aired below.  Toyo Kohan raised the issue clearly, supported it with programming references and narrative explanation, and did so in a timely manner, preserving all of the claims it now brings before the court.

### 2.    Toyo Kohan raised its date-of-sale argument with sufficient specificity to alert Commerce

The circumstances here demonstrate that Toyo Kohan provided sufficient notice to Commerce that Toyo Kohan disagreed with Commerce's conclusion not to use the usual invoice date as the date of sale.  We set forth below the key facts:

- In the prior AD review (POR 8) Commerce's preliminary results contained (a) several programming mistakes, and (b) confusion as to Commerce's date of sale conclusion in that Commerce's <u>decision</u> memorandum stated that Commerce agreed with Toyo Kohan's proffered date of sale (invoice date), but the programming code indicated that shipment date was used as the appropriate date of sale in the AD margin calculation.  *See DANP from Japan: Final Results of*

*Antidumping Duty Administrative Review; 2021–2022*, 88 Fed. Reg. 85,590 and accompanying IDM ("POR8 Final IDM") at Cmt. 2.

- Toyo Kohan submitted a request to correct ministerial errors and a case brief arguing that Commerce made multiple ministerial errors, including the date of shipment as the date of sale in the programming code. *See* POR8 Final IDM at Cmt. 2.

- In its POR8 final results, Commerce agreed with all ministerial error arguments made by Toyo Kohan, underlining that the appropriate date of sale was invoice date. Toyo Kohan's POR9 Case Br. (June 21, 2024), P.R. 92 ("TK POR9 Br.") at 5-6; POR8 Final IDM at Cmt. 2.

- In this proceeding, Commerce's Preliminary Results contained (a) virtually all of the same programming mistakes made in the POR8 preliminary results and (b) the same confusion concerning date of sale, in that Commerce's decision memorandum stated that Commerce agreed with Toyo Kohan's proffered date of sale, but the programming code indicated that shipment date was used as the appropriate date of sale. *Prelim. IDM* at 3; TK POR9 Br. at 5.

- In POR9, Toyo Kohan, once again, submitted a request for correction of clerical errors that was nearly identical to Toyo Kohan's POR8 request. Toyo Kohan Request for Correction of Ministerial Error (May 28, 2024), P.R. 89. Commerce did not respond.

- Toyo Kohan's POR9 Case Brief, accordingly, was virtually identical to its POR8 Case Brief, identifying the programming errors and noting the date of sale confusion (and apparent programming error), Toyo Kohan's Case Brief explicitly asked Commerce to fix (what Toyo Kohan perceived to be) a programming mistake vis-à-vis date of sale and to apply invoice date as data of sale. TK POR9 Br. at 4-13.

- Notwithstanding the date of sale confusion and Commerce's *Prelim. IDM* agreeing with invoice date as the date of sale, Petitioner did not submit a case brief in POR9. So, there was no alternate date of sale argument for Toyo Kohan to address.

- Unlike in POR8, in POR9, Petitioner submitted a rebuttal brief in which Petitioner argued – for the very first time – that the shipment date was the more appropriate date of sale. Petitioner's Rebuttal Brief (June 27, 2024) at 4-9, C.R. 191.

- Toyo Kohan immediately filed a surrebuttal brief, arguing that Petitioner's argument was completely contrary to the administrative record. Toyo Kohan's surrebuttal brief explicitly argued that good cause existed for Commerce to accept the surrebuttal brief given that Petitioner had never previously challenged Toyo Kohan's proffered date of sale. Toyo Kohan's (Rejected) Surrebuttal to Rebuttal Brief (July 8, 2024), P.R. 98.

- But Commerce unreasonably refused to accept Toyo Kohan's surrebuttal brief. Letter Rejecting Toyo Kohan's Surrebuttal (Aug. 13, 2024), P.R. 103.

Given the above facts and circumstances, Commerce was fully aware that Toyo Kohan completely disagreed with the conclusion that date of shipment was the appropriate date of sale. Toyo Kohan's Request for Correction of Ministerial Errors, Case Brief, and Surrebuttal Brief were clear on this point.

Defendant argues that Toyo Kohan should have argued against shipment date in its case brief. Def. Br. at 21. But Toyo Kohan did exactly that when it drew the explicit comparison to prior segments where Commerce used the commercial invoice date based on its finding that price and quantity were set at that point. In particular, in its case brief Toyo Kohan quoted Commerce's POR6 Final IDM and emphasized that "the commercial invoice date best reflects the date on which material terms of sale are established for its U.S. sales because the commercial invoice date is the date when the price and quantity are set for each sale." TK POR9 Br. at 5 n.6, P.R. 92. Although framed in the context of recent agency precedent, this was plainly an argument that the same rationale applied to the facts of POR9.

Moreover, Toyo Kohan's Surrebuttal Brief explicitly informed Commerce that Petitioner's date of sale arguments (the same arguments that Commerce ultimately

adopted in its *Final Results*) were not supported by the full evidentiary record. Yet

Commerce simply ignored these arguments.[5]

     This case is a textbook application of the core principle that exhaustion "should

not be applied where the obvious result would be a plain miscarriage of justice." *Hormel*

*v. Helvering*, 312 U.S. 552, 558 (1941). Here, Commerce's actions themselves caused

any perceived limitations of Toyo Kohan's date of sale arguments.

     Nothing in the preliminary phase signaled a deliberate change in methodology;

Commerce did not announce any new date-of-sale approach or invite substantive debate

on the issue. To the contrary, Commerce used substantially identical language to what it

had used in the prior review (when it ultimately adopted the invoice date that Toyo

Kohan advocated for) to describe its methodology, including an explicit statement by

Commerce in its preliminary IDM that it was using "commercial invoice date." *Prelim.*

*IDM.* at 3-4, P.R. 85. Exhaustion does not require clairvoyance, and it would have been

impossible for Toyo Kohan to challenge – in its Case Brief – the precise date of sale

rationale that Commerce ultimately adopted, given that such rationale was articulated for

the first time in Petitioner's Rebuttal Brief.

---

[5] Although we believe that Toyo Kohan's Surrebuttal Brief is important context, it is not critical to our defense. We believe that Toyo Kohan's Ministerial Error Submission and Case Brief, combined with the circumstances detailed above are more than sufficient to defeat the exhaustion claim.

## II. THE COURT SHOULD REMAND FOR COMMERCE TO ADDRESS AND CORRECT THE ERRONEOUS APPLICATION OF THE COHEN'S D TEST

### A. Commerce's Application of Cohen's d Test Was Contrary to Law

The Federal Circuit decisions are clear on the point that Cohen's d – as applied

here without any regard to whether the underlying assumptions have been met – is

unreasonable and contrary to law. Pl. Br. at 38-42. Defendant has not presented any

argument on the merits to the contrary. Def. Br. at 25-33. This failure to respond is not

surprising given that the Federal Circuit decisions are quite emphatic on this point.

Accordingly, there should be a remand to fix this legal error.

### B. Defendant's Exhaustion Arguments To Avoid Addressing The Cohen's d Test Should Be Rejected

Defendant and Defendant-Intervenor devote substantial space in their response

briefs urging that the Court should "dismiss {Toyo Kohan's} challenge . . . without

reaching the merits." Def. Br. at 26; Def-Int. Br. at 17. This renewed procedural

offensive is puzzling, since these arguments are largely duplicative of those <u>already</u>

<u>presented</u> and briefed in connection with the parties' dispute over Toyo Kohan's motion

to amend its complaint. *See* Def.'s Opp'n to Mot. to Amend (May 21, 2025) (ECF No.

29); Def-Int.'s Opp'n to Mot. to Amend (May 21, 2025) (ECF No. 30). Plaintiff's

motion was granted. *See Toyo Kohan Co. v. United States*, Slip Op. 25-77 at 3 (CIT June

17, 2025) (ECF No. 32) (noting that the "Federal Circuit's decision in *Marmen*

fundamentally shifted the legal standard" and that "justice requires" that Toyo Kohan be

allowed to address Commerce's application of Cohen's d under the new standard).

This decision to dedicate large portions of their briefs to rehash already rejected procedural objections may reflect a lack of confidence in the strength of Commerce's substantive determinations. Toyo Kohan has no interest in burdening the Court with redundant briefing. But Defendant and Defendant-Intervenor continue to labor under two critical misapprehensions that require response.

First, Defendant recites a familiar string of cases for the proposition that the exhaustion doctrine exists to "develop the factual record" and "allow the agency . . . to perform functions within its special competence." Def. Br. at 29 (quoting *Stanley Works (Langfang) Fastening Systems Co. v. United States*). Defendant then proceeds to list an array of statistics, economic assumptions, and data science terms, implying that judicial review of Commerce's application of the Cohen's d test is beyond this Court's competence and must be filtered through Commerce's "expertise" to argue the issues should have been raised below. But the reality shows this would have been pointless. Before *Marmen* and *Stupp IV*, and in the wake of *Stupp II,* numerous respondents raised the very issues addressed in those cases, and Commerce responded with a near-verbatim, boilerplate refusal to reconsider its methodology, stating essentially that "we disagree with Respondent X that the Federal Circuit findings in *Stupp II* require Commerce to change its application of the Cohen's d test." There was no expert discretion, no factual development – just the repeated restatement of Commerce's legal conclusion that the "concerns" raised by the Court of Appeals for the Federal Circuit (CAFC) in *Stupp II* were non-binding dicta. Indeed, Commerce applied the same level of analysis, "record development" and "agency expertise" whether the issue was raised or not: zero. *See e.g.,*

- 23 -

*Circular Welded Carbon Steel Standard Pipe and Tube Products from the Republic of Türkiye, Final Results; 2022–2023*, 90 Fed. Reg. 12,296 (Mar. 17, 2025), accompanying IDM at 8-9.

Commerce's post-*Marmen* conduct confirms what this Court stated in granting Toyo Kohan's motion to amend its complaint – the Federal Circuit's decision in *Marmen* "fundamentally shifted the legal standard controlling Commerce's application of the Cohen's d test." Since the Federal Circuit's decisions, Commerce has not only initiated a public comment period seeking input on how to revise its differential pricing analysis, *Differential Pricing Analysis; Request for Comments*, 90 Fed. Reg. 21,277 (May 19, 2025), it has begun acknowledging, in active determinations, that the CAFC "held that it is unreasonable to use the current Cohen's d test when the Cohen's d test is applied to data that do not satisfy the statistical assumptions of normal distribution, equal variances, and sufficiently numerous data." *See Ripe Olives From Spain: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 25,223 (June 16, 2025), accompanying IDM at 10.

This leads directly to the second misapprehension: that "Toyo Kohan overstates" the significance of these cases, *Marmen* and *Stupp IV* are one-offs with limited precedential value. Def-Int. Br. at 18. They are not. Commerce's own statements, both in the Federal Register and in final determinations since those rulings, confirm that these cases represent a paradigm shift. The claims that Toyo Kohan failed to exhaust this issue are thus both procedurally misplaced and misaligned with Commerce's own understanding of the state of the law around differential pricing analysis.

- 24 -

*NON-CONFIDENTIAL VERSION*

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Toyo Kohan respectfully requests that the Court find that Commerce's determination to be unsupported by substantial evidence and otherwise not in accordance with law.  Accordingly, Toyo Kohan asks that the Court remand Commerce's *Final Results* for further proceedings consistent with the law.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Gina M. Colarusso
Will Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft 365 Word using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2(B)(1) of the Chambers Procedures (*i.e.*, the table of contents, table of authorities, and counsel's signature block), I hereby certify that this brief contains 6,998 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief and is inclusive of the words in the embedded images, which were counted manually.

s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Gina M. Colarusso
Will Chandler
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*