A-588-869
Remand
Slip Op. 25-141
~~Business Proprietary Document~~
E&C/OIX:  LA
**Public Version**

### *Toyo Kohan Co., Ltd. v. United States*
### Consol. Court No. 24-00261, Slip Op. 25-141 (CIT October 23, 2025)
### Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court), in *Toyo Kohan Co., Ltd. v. United States*.[1]  This action arises out of the final

results in the 2022-2023 administrative review of the antidumping duty (AD) order on diffusion-

annealed, nickel-plated flat-rolled steel products from Japan.[2]  The period of review (POR) of the

underlying administrative review is May 1, 2022, through April 30, 2023.

In this administrative review, Commerce used as the date of sale for Toyo Kohan Co.,

Ltd.'s (Toyo Kohan) U.S. sales the earlier of the commercial invoice date or shipment date (*i.e.,*

the variable SALEDATU).[3]  Toyo Kohan challenged the *Final Results* and Commerce's use of:

(1) the variable SALEDATU, instead of the commercial invoice date, as the date of sale for its

U.S. sales; and (2) the Cohen's *d* test, given the U.S. Court of Appeals for the Federal Circuit's

---

[1] *See Toyo Kohan Co., Ltd. v. United States*, Consol. Court No. 24-00261, Slip Op. 25-141 (CIT October 24, 2025) (*Remand Order*).

[2] *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 89 FR 95735 (December 3, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

[3] *See* Memorandum, "Preliminary Results Analysis Memorandum for Toyo Kohan Co., Ltd.," dated May 16, 2024. For all of Toyo Kohan's U.S. sales, the shipment date preceded the invoice date; thus, in using the dates reported in the field SALEDATU in our calculations, we used the shipment date as the U.S. date of sale for all transactions.

(Federal Circuit's) recent decision in *Marmen*.[4]  The Court remanded Commerce to reevaluate its U.S. date of sale determination, and to recalculate Toyo Kohan's margin using a revised differential pricing analysis, consistent with *Marmen*.[5]

As set forth in detail below, pursuant to the Court's *Remand Order*, Commerce has:  (1) further analyzed and explained its use of the earlier of shipment or invoice date as the date of sale for Toyo Kohan's U.S. sales; and (2) reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis.  As a result of Commerce's changes to its differential pricing methodology, Toyo Kohan's estimated weighted-average dumping margin increases from 4.44 percent to 4.58 percent.

## II.    BACKGROUND

Commerce published the *Final Results* on December 3, 2024.[6]  As discussed in the *Final Results*, Commerce explained that it used SALEDATU as the date of sale for Toyo Kohan's U.S. sales in accordance with Commerce's long-standing practice, because Toyo Kohan's sample sales documentation demonstrated that the material terms of sale were established between Toyo Kohan and its U.S. customer at the time of shipment.[7]  Commerce also applied the Cohen's *d* test as part of its differential pricing analysis.[8]  Following publication of the *Final Results*, Toyo Kohan challenged Commerce's findings before the Court.

On October 24, 2025, the Court remanded the *Final Results* to Commerce regarding its use of the earlier of the shipment date or invoice date as the U.S. date of sale, as well as its

---

[4] *See Marmen Inc. v. United States*, 134 F.4th 1334, 1345 (Fed. Cir. 2025) (*Marmen*).
[5] *See Remand Order* at 15.
[6] *See Final Results*.
[7] *See Final Results* IDM at Comment 1.
[8] *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan:  Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2022–2023,* 89 FR 45638 (May 23, 2024), and accompanying Preliminary Decision Memorandum (PDM) at 4-5, unchanged in *Final Results* IDM; *see also* Memorandum, "Final Results Analysis Memorandum for Toyo Kohan Co., Ltd.," dated September 25, 2024.

differential pricing methodology, consistent with *Marmen*.[9]  In the *Remand Order*, the Court questioned whether the evidence on the record indicates that the price at the time of shipment has any substance and whether the pricing formula sets the price at a point earlier than the invoice date.[10]  Thus, the Court remanded the *Final Results* to Commerce to reconsider both the date of sale and the sales price, holding that when there is an agreed-to pricing formula, there may be a disconnect in the record data for the two matters.[11]  Regarding Commerce's use of a differential pricing analysis, the Court remanded the *Final Results* to Commerce to perform its differential pricing analysis consistent with the Federal Circuit's opinion in *Marmen*.[12]  In accordance with the Court's *Remand Order*, we explain below our use of the earlier of the shipment date or invoice date as the U.S. date of sale, and revise our differential pricing methodology, consistent with *Marmen*.

On January 12, 2026, we released the Draft Remand to interested parties.[13]  On January 20, 2026, we received comments from the petitioner and Toyo Kohan.[14]  We respond to these comments below.

After considering the comments raised by interested parties, made no changes to the Draft Remand with regard to the U.S. date of sale for Toyo Kohan or Commerce's differential

---

[9] *See Remand Order* at 11, 15.

[10] *Id.* at 11.

[11] *Id*.

[12] *Id.* at 15 (citing *Marmen*, 134 F.4th at 1343-1348).

[13] *See* Draft Results of Redetermination Pursuant to Court Remand, *Toyo Kohan Co., Ltd. v. United States*, Slip Op. 25-141(CIT October 23, 2025), dated January 12, 2026 (Draft Remand).

[14] *See* Petitioner's Letter, "Petitioner's Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand," dated January 20, 2026 (Petitioner Remand Comments); *see also* Toyo Kohan's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated January 20, 2026 (Toyo Kohan Remand Comments).

pricing methodology.  As a result, the final estimated weighted-average dumping margin for Toyo Kohan is 4.58 percent.[15]

## III.    ANALYSIS

### 1.    Toyo Kohan's U.S. Date of Sale

Consistent with the Court's *Remand Order*, we reconsidered Toyo Kohan's U.S. date of sale and, correspondingly, the U.S. sale price.[16]  We continue to find that the evidence on the record shows that the material terms of sale for Toyo Kohan's U.S. sales did not change between the shipment date and the invoice date, and thus, that Toyo Kohan's reported shipment date is the appropriate date of sale for its U.S. sales.  Moreover, we continue to find that Toyo Kohan's reported gross unit price (*i.e.*, GRSUPRU) is the appropriate U.S. sales price to use in our calculations.

Importantly, as the Court noted,[17] the material terms of sale shown on the customer's purchase order are exactly the same as the terms on the final invoice for the sale that Toyo Kohan provided.[18]  The Court noted that the billing documentation self-generated by Toyo Kohan at the time of shipping, (*e.g.* the billing statement or revised billing statement) is virtually meaningless, and thus, disagreed with Commerce's use of SALEDATU field as the date of sale. H[19]  While we agree with the Court that the documentation Toyo Kohan issued at the time of shipment is virtually meaningless, we continue to find that Toyo Kohan's U.S. shipment date is the appropriate date of sale based on our reexamination of the record evidence.  Typically, when a seller ships merchandise, documents such as the packing list and/or bill of lading are generated;

---

[15] *See* Memorandum, "Calculation Memorandum for the Draft Results of Redetermination Pursuant to Court Remand," dated January 12, 2026.
[16] *Id.* at 11.
[17] *See Remand Order* at 11.
[18] *See* Toyo Kohan's Letter, "Toyo Kohan's Section A Response," dated September 15, 2023 (Toyo Kohan's AQR), at Exhibit A-10A.
[19] *See Remand Order* at 10.

however, these documents do not normally list the final price of the merchandise. Rather, the

final price is listed on the invoice. Nonetheless, it is Commerce's practice to rely on the earlier

of the shipment or invoice date as the date of sale, given that where shipment date precedes

invoice date, the shipment date better reflects the date when the material terms of sale are

established.[20] In fact, Commerce's questionnaire directs the following regarding the date of sale:

> Because Commerce attempts to compare sales made at the same time, establishing
> the date of sale is an important part of the dumping analysis. Commerce will
> normally use the date of invoice, as recorded in the exporter or producer's records
> kept in the ordinary course of business. However, Commerce may use a date other
> than the date of invoice (e.g., the date of contract in the case of a long-term contract)
> if satisfied that a different date better reflects the date on which the exporter or
> producer establishes the material terms of sale (*e.g.*, price, quantity). (Section
> 351.401(i) of the regulations.) If, for any specific sale, the date selected is after the
> shipment date for that sale, *Commerce will use shipment date as the date of sale
> instead*, but only for the sale in question.[21]

After reexamining Toyo Kohan's sample sales documentation and the pricing formula

information provided in its section A response, we find that nothing on the record supports

deviating from our normal practice of using the earlier of the shipment or invoice date as the

U.S. date of sale.[22] Specifically, the sample sales documentation Toyo Kohan provided on the

record shows that the price indicated on the customer's purchase order matched Toyo Kohan's

pricing formula, as well as the price shown on the final invoice.[23] Additionally, Toyo Kohan's

[                                                    ] for Metal One America, Inc. (Metal One), [

---

[20] *See, e.g., Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical
Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004)
(*Shrimp from Thailand*).
[21] *See* Commerce's Letter, "Request for Information," August 18, 2023, at Appendix I (AD Questionnaire)
(emphasis added); *see also, e.g., Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium: Final
Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part,* 82 FR
16378 (April 4, 2017), and accompanying IDM at Comment 8.
[22] *See* Toyo Kohan's AQR at Exhibit A-10A and Exhibit A13-A, Part 1. We note that the sales documentation in
Toyo Kohan's AQR at Exhibit A-10B is not probative, as it does not reflect a price change at any point and the
pricing formula does not cover the same time period as the documentation for the second sample sale.
[23] *See* Toyo Kohan's AQR at 24 and Exhibit A-10A. We note that we did not contemplate whether it would be
appropriate to use the purchase order date as the U.S. date of sale.

], for the period [                    ] reflects the same price as the purchase order and final invoice, demonstrating that the price did not change between the shipment date and invoice date.[24]  Furthermore, the price reflected in the pricing formula, dated [          ] is the same as the price on the purchase order.  Toyo Kohan reported that Metal One [                                        ] and that such agreed upon pricing formulas were used for all of its U.S. sales during the POR.[25]  Toyo Kohan did not provide any information indicating that there were any U.S. sales during the POR which deviated from these formulas.  For these reasons, we find that it would be inappropriate to consider the date of sale to be after the shipment date when the material terms of sale (*i.e.*, price and quantity) were already finalized at the time of shipment and remained the same until the final invoice date.  Commerce has previously found that, absent "compelling evidence to demonstrate that the material terms of sale change after shipment," it is appropriate for Commerce to follow its "normal practice of using shipment date as the date of sale where shipment date precedes invoice date."[26]  Therefore, we continue to find that it is appropriate to use Toyo Kohan's reported shipment date as the date of sale for its U.S. sales.

We also reexamined Toyo Kohan's U.S. sales price.  First, we note that Toyo Kohan reported two U.S. gross unit prices in its U.S. sales database:  the first from its billing statement at the time of shipping, GRSUPRU_ORIG, and the second from the final invoice, GRSUPRU;

---

[24] *See* Toyo Kohan's AQR at 24 and Exhibit A13-A, Part 1.
[25] *Id.* at Toyo Kohan's AQR at 15-16.
[26] *See, e.g., Shrimp from Thailand* IDM at Comment 10; *see also Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.  *See also Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Final Determination of Sales at Less Than Fair Value,* 85 FR 44278 (July 22, 2020) (*PET Sheet from Oman*), and accompanying IDM at Comment 4 (where the respondent and its customer established the material terms of sale prior to shipment of the merchandise).

further, Toyo Kohan reported the difference between these two prices as VAL_ADJU.[27]

Nonetheless, Toyo Kohan stated that Commerce should use the field GRSUPRU in its margin

calculations, not GRSUPRU_ORIG,[28] and we used GRSUPRU from the final invoice in the

calculation of the net U.S. price in our margin calculations.  Further, as noted above, the amount

reported in the field GRSUPRU is consistent with Toyo Kohan's pricing formula.  Therefore, we

continue to find that it is appropriate to use the final invoice price in field GRSUPRU as Toyo

Kohan's U.S. sales price in our calculations.

As a result of our analysis, we continue to find that the information on the record fails to

demonstrate that there was a change in the materials terms of Toyo Kohan's U.S. sales after the

date of shipment.  Consequently, we continue to use Toyo Kohan's reported U.S. shipment date

as the date of sale, consistent with our longstanding practice, and Toyo Kohan's reported gross

unit price (*i.e.,* GRSUPRU) as the U.S. sales price in our calculations.

## 2. Commerce's Application of the Cohen's *d* Test

As discussed above, in its *Remand Order*, the Court remanded Commerce to re-perform

its differential pricing analysis consistent with the Federal Circuit's opinion in *Marmen*.[29]  In

*Marmen*, the Federal Circuit held that it is unreasonable for Commerce to use the current

Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do

not satisfy the statistical criteria of normal distribution, equal variability, and sufficiently

numerous data.[30]  In doing so, the Federal Circuit held that "Commerce may re-perform a

differential pricing analysis, and *that analysis may not rely on Cohen's d test* for data sets like

---

[27] As noted above, we are not relying on Toyo Kohan's billing statement to determine the U.S. price; therefore, the amounts reported in VAL_ADJU were not used in our margin calculations.
[28] *See* Toyo Kohan's CQR at 25.
[29] *See Marmen*, 134 F.4th at 1334.
[30] *Id.*; *see also Stupp Corp. v. United States*, No. 23-1663, 2025 WL 1178392 (Fed. Cir. 2025) (*Stupp*) (non-precedential).

those here {*i.e.*, the data underlying the differential pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[31]

     Following the Federal Circuit's decision in *Marmen*,[32] Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[33]  In an effort to comply with the Federal Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[34]  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.  Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to "all relevant law," including the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test to Toyo Kohan's U.S. sales data, and, in the alternative, applied the "price difference test," as detailed below.

---

[31] *See Marmen*, 134 F.4th at 1334 (emphasis added); *see also Stupp*, No. 23-1663, 2025 WL 1178392.

[32] *See Marmen*, 134 F.4th at 1348; *see also Stupp*, No. 23-1663, 2025 WL 1178392.

[33] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).

[34] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.

i.    **Comparisons to Normal Value**

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Toyo Kohan's sales of the subject merchandise from Japan to the United States were made at less than normal value (NV), Commerce compared the export price (EP) to the NV as described in the "Export Price" and "Normal Value" sections of the *Preliminary Results*.[35]

1.    **Determination of Comparison Method**

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs (or constructed export prices (CEPs)) (*i.e.*, the average-to-average (A-A) method) unless Commerce determines that another method is appropriate in a particular situation. In a less-than-fair-value investigation or antidumping duty administrative review, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction (A-T) method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act. Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here. Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional

---

[35] *See Preliminary Determination* PDM at 7-10.

experience with addressing the potential masking of dumping that can occur when Commerce

uses the A-A method in calculating a respondent's weighted-average dumping margin.

 The differential pricing analysis used here examines whether there exists a pattern of

prices for comparable merchandise that differ significantly among purchasers, regions, or time

periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine

whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the

differential pricing analysis evaluates whether such differences can be taken into account when

using the A-A method to calculate the weighted-average dumping margin.  The analysis

incorporates default group definitions for purchasers, regions, time periods, and comparable

merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are

defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based

upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the

quarter within the POR based upon the reported date of sale.  For purposes of analyzing sales

transactions by purchaser, region and time period, comparable merchandise is defined using the

product control number and all characteristics of the U.S. sales, other than purchaser, region, and

time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the

individual dumping margins.

 In the first stage of the differential pricing analysis used here, the "price difference test"

is applied to determine whether prices differ significantly.  For comparable merchandise, the

price difference test examines whether the weighted-average net price to a given purchaser,

region, or time period is within two percent of the weighted average net price to all other

purchasers, regions or time periods.  If the weighted-average net price to the given purchaser,

region, or time period falls outside of the plus or minus two percent band around the weighted-

average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-T method and using the alternative A-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-A method can account for such differences. In considering this question, Commerce examines whether using the A-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if:

(1) there is a 25 percent relative change in the weighted-average dumping margins between the A-A method and the A-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-A method and the A-T method move across the *de minimis* threshold.

### 2. Results of the Differential Pricing Analysis

For Toyo Kohan, based on the results of the differential pricing analysis, Commerce preliminarily finds that 100 percent of the value of U.S. sales pass the price difference test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[36]  Further, Commerce preliminarily determines that the A-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-A method and when calculated using the A-T method.  Thus, for these final results of redetermination, Commerce is applying the A-T method to calculate the weighted-average dumping margin for Toyo Kohan.

## IV.    INTERESTED PARTY COMMENTS

On January 12, 2026, Commerce issued its Draft Remand and provided interested parties an opportunity to comment.[37]  Commerce received comments from the petitioner and Toyo Kohan.[38]  The petitioner's and Toyo Kohan's comments on these issues are addressed below. After considering these comments, we have made no changes to our analysis for these final results of redetermination.

---

[36] *See* Memorandum, "Calculation Memorandum for the Draft Results of Remand Redetermination," dated concurrently with these draft results of redetermination.
[37] *See* Draft Remand.
[38] *See* Petitioner Remand Comments; *see also* Toyo Kohan Remand Comments.

**Comment 1:   Toyo Kohan's U.S. Date of Sale**

The following is a verbatim executive summary of argument submitted by the petitioner.  For further details, *see* Petitioner Remand Comments at 3-6 (internal citations omitted).

> The *Draft Remand Redetermination* fully explains Commerce's decision to rely on the earlier of shipment date or invoice date as the date of sale in this review.  In response to the Court's concern that the VAL_ADJU field could represent a change in price after the date of shipment, the *Draft Remand Redetermination* demonstrates that confidential record evidence submitted by Toyo Kohan does not support this conclusion.  The record facts do not include any compelling evidence that the material terms of sale (*i.e.*, the price and/or quantity) changed after the date of shipment.  As such, Commerce appropriately applied its well-established practice to rely on the earlier of invoice date or shipment date as the date of sale.  Commerce also explained why it is appropriate to rely on the price reported in the GRSUPRU in its calculations, as this is the final price established between Toyo Kohan and its U.S. customer.

The following is a verbatim executive summary of argument submitted by Toyo Kohan.  For further details, *see* Toyo Kohan Remand Comments at 5-10 (internal citations omitted).

> Commerce's Draft Remand fails to comply with the Court's *Remand Order* and remains unsupported by substantial evidence.  The Court expressly questioned whether the record demonstrates that the material terms of sale are established at the time of shipping and directed Commerce to reconsider both the date of sale and the sales price, recognizing a potential disconnect where a pricing formula exists.  Instead of engaging with that directive, Commerce reiterates its prior conclusion, grounded in a generalized "normal practice," and again treats shipment date as dispositive as a general policy matter without grappling with the record evidence showing that price in this specific case is frequently tentative at shipment and finalized only at invoicing.

> Commerce concedes that shipment date billing documents are "not meaningful," yet paradoxically continues to select shipment date as the date of sale.  This directly conflicts with the regulation's requirement that the date of sale reflect when the material terms are established.  Commerce also mischaracterizes the pricing formula as fixing price prior to invoice, despite record evidence demonstrating that the formula yields only a tentative price subject to change and that, in the majority of transactions, the final invoiced price differs from the shipment date price.

> Critically, Commerce again ignores the most probative evidence on the record: the Section C sales database and narrative explaining post-shipment price changes, including the VAL_ADJU field and supporting documentation.  Those data demonstrate that more than half of Toyo Kohan's U.S. sales experienced price changes after shipment, confirming that the material term of price was not finally established until invoice.  {Commerce's} reliance on the purchase order in isolated

sample documentation, rather than actually analyzing the terms at shipment date, and its refusal to analyze the entire universe of transactions at issue cannot constitute substantial evidence.

By again elevating a generalized practice over the actual record-specific facts, Commerce fails to adhere to the Court's directive as stated in its *Remand Order*. The Draft Remand fails to assess the material terms of sale *at shipment* compared to the final invoice and fails to provide any reasoned explanation, grounded in actual record evidence, for why Commerce believes the shipment date is the appropriate date of sale when the record demonstrates that the material terms of sale are not set at the shipment date. Accordingly, Commerce has not complied with the *Remand Order*.

**Commerce's Position:**  We continue to use the earlier of the shipment date or the invoice date as the date of sale for Toyo Kohan's U.S. sales.

We disagree with Toyo Kohan that Commerce failed to establish that the material terms of sale were established by the time of the shipment date.[39]  In Toyo Kohan's AQR, it stated that the "'price formula mechanism' is a shorthand reference for establishing the final sales prices with DANP customers"[40] and the [                    ] between Toyo Kohan and its customer demonstrates the application of the price formula mechanism.[41]  The price shown on the [                    ] (*i.e.*, the final selling price) matches the price shown on Toyo Kohan's invoice.[42]  Therefore, the information on the record shows that the final price was calculated and established before the date of shipment based on the pricing formula that remained the same after the date of shipment until the final invoice date.[43]  Further, as the petitioner correctly noted, we also find that the final quantity of the sale was set on the date of shipment because there was [

---

[39] *See* Toyo Kohan Remand Comments at 6.
[40] *See* Toyo Kohan's AQR at 24.
[41] *Id.* at 18.
[42] *Id.* at Exhibit A-10A.
[43] Use of the date of purchase order is not one of the options at issue regardless of the statement that we made in footnote 20 of the Draft Remand.  Instead, we have discussed whether to use the earlier of shipment of invoice date or the invoice date.

].  Thus, the final quantity cannot logically have changed after the shipment."

Thus, while Toyo Kohan reported a [          ] value in the field VAL_ADJU for certain sales, we do not find these amounts meaningful to our analysis.  As we described above, the amounts reported in VAL_ADJU are simply the difference between the two gross unit prices Toyo Kohan reported:  (1) the first from its billing statement at the time of shipment,[44] GRSUPRU_ORIG; and (2) the second from the final invoice, GRSUPRU.[45]  We did not rely on the amounts reported in VAL_ADJU in our margin calculations; rather, we relied on the final reported gross unit price (GRSUPRU), which, as noted above, the record demonstrates was calculated before the date of shipment and did not change after the date of shipment.

Toyo Kohan argues that Commerce fails to recognize that VAL_ADJU field is the evidence demonstrating that there were price changes subsequent to the purchase order for some sales.[46]  However, as the Court correctly noted, billing documentation at the time of shipping, on which GRSUPRU_ORIG and VAL_ADJU are generated, are "virtually meaningless"[47] because it fails to reflect the purchase order or final invoice quantity or price.  Therefore, we agree with the petitioner that the VAL_ADJU field is a "red herring–not relevant to the determination of the final price."[48]

As a result, we continue to find that, based on our reexamination of the information on the record, Toyo Kohan's shipment date is the appropriate date of sale for its U.S. sales.

---

[44] *See Remand Order* at 10.
[45] *See* Toyo Kohan's CQR at 25.
[46] *See* Toyo Kohan Remand Comments at 8-10.
[47] *Remand Order* at 10.
[48] *See* Petitioner Remand Comments at 5.

**Comment 2:   Commerce's Application of the Cohen's *d* Test**

The following is a verbatim executive summary of argument submitted by the petitioner.  For further details, *see* Petitioner Remand Comments at 6-9 (internal citations omitted).

> The Draft Remand Redetermination also complies with the Court's order concerning the Cohen's *d* test.  Rather than the Cohen's *d* test, Commerce relies on its newly adopted "price difference test," developed based on public comment, to determine whether Toyo Kohan's prices differed significantly between purchasers, regions, or time periods.  Commerce's revised differential pricing analysis—which no longer relies on Cohen's *d*—is fully consistent with the *Remand Order* and the underlying antidumping statute.

The following is a verbatim executive summary of argument submitted by Toyo Kohan.  For further details, *see* Toyo Kohan Remand Comments at 10-20 (internal citations omitted).

> In its Draft Remand, Commerce adopted a completely new approach for its "differential pricing" analysis, referred to as "the two percent difference test."  This new approach to Commerce's differential pricing analysis suffers from a number of legal and logical flaws.
>
> First, Commerce's new two percent difference test adopts an incorrect interpretation of the applicable statutory provisions.  The statute permits Commerce to depart from the statutory default A-A comparison methodology only if it first finds "a **pattern** of export prices … for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  Commerce's two percent price difference test reflects an unlawful interpretation of this statutory language, as demonstrated by the statute's text, structure, and legislative history.
>
> The ordinary meaning of the statutory text "pattern" is clear.  Dictionaries consistently define a "pattern" as involving repetition, regularity, and a discernible structure – *i.e.*, an intelligible and persistent sequence of conduct, not isolated or random variation.  Under all of these definitions, random or isolated fluctuations do not constitute a "pattern."  Consequently, under the ordinary meaning of the key statutory term "pattern," it is insufficient merely to identify price differences among purchasers, regions, or time periods.  Instead, Commerce must also demonstrate, based on the evidence, that any observed price differences are not the result of random processes or variations.
>
> The statutory structure of § 777A(d)(1)(B) also reinforces the conclusion that "pattern" is an independent substantive requirement, not a mechanical trigger satisfied by numeric thresholds.  The statute establishes a two-step inquiry, which are separate and cumulative conditions.  They are linked by the conjunctive "and."  If "pattern" were established whenever prices differ by more than a specified percentage, the first step would collapse into the second, and Congress's decision to require a threshold "pattern" finding would be meaningless.  Similarly, the need

to find prices that differ "significantly" reinforced the need to give the term "pattern" some substantive meaning beyond a numerical difference. Interpreting "pattern" to mean nothing more than price dispersion, as Commerce's approach does, unlawfully collapses the statute's two-step framework into a single mechanical inquiry.

The legislative history confirms that Congress authorized the use of alternative comparison methodologies to address deliberate pricing practices that mask dumping, not ordinary or random price variation. The SAA does not reference numerical thresholds or specific percentages, nor does it suggest that Commerce may dispense with identifying a pricing practice or strategy in favor of a purely mechanical test.

Finally, even if the statute were ambiguous—which it is not—Commerce's two percent price difference test would still fail because it produces illogical results inconsistent with the concept of a "pattern."

**Commerce's Position:** We made no changes to the differential pricing analysis for the final results of redetermination and we continue to conduct our analysis consistent with the Federal Circuit's opinion in *Marmen*.[49] While Toyo Kohan agrees that Commerce's decision to abandon the Cohen's *d* test is consistent with *Marmen*, it claims that Commerce's use of the two percent test is contrary to the Federal Circuit's intent in *Marmen* and contrary to the Act.[50]

As explained in detail below, Toyo Kohan's claims with respect to the price difference test largely revolve around arguing that the price difference test does not adequately identify whether there is a pattern of export prices (or constructed export prices) that differ significantly among purchasers, regions, or periods of time, as required by section 777A(d)(1)(B) of the Act.[51] In doing so, Toyo Kohan erroneously conflates Commerce's previously discarded P/2 test and the price difference test.[52] Furthermore, Toyo Kohan fails to recognize that the price difference test, as explained in the Draft Remand,[53] determines whether prices differ significantly via the

---

[49] *See Marmen*, 134 F.4th at 1343-1348.
[50] *See* Toyo Kohan Remand Comments at 19.
[51] *Id.* at 10-20.
[52] *Id.* at 15.
[53] *See* Draft Remand at 10.

two percent test.  In the second step of Commerce's differential pricing analysis, the ratio test determines if there is a pattern to these price differences.  Toyo Kohan's comments with respect to the price difference test are without merit because it erroneously conflates the P/2 test with the price difference test and fails to recognize that it is the ratio test, instead of the price difference test, that identifies the "pattern" as required by section 777A(d)(1)(B) of the Act.

A. *Toyo Kohan Erroneously Conflates the P/2 test with the Price Different Test*

The P/2 test was the methodology used by Commerce in *Coated Paper from Korea* to measure the amount of targeted dumping in that investigation.  The P/2 test examined the weighted-average prices of allegedly "targeted" sales that were two percent lower than weight-averaged priced of "non-targeted" sales.  When a preponderance of the allegedly "targeted" sales "passed," Commerce determined that "targeted dumping" existed.[54]

We disagree with Toyo Kohan that Commerce's decision not to adopt the P/2 test used in *Coated Paper from Korea* is instructive regarding the validity of the price difference test.[55] First, the P/2 test only examined the weighted-average prices of "targeted" sales that were two percent lower than the weighted-average prices of non-targeted sales with the stated aim of identifying "targeted dumping" even though there was no comparison with normal value.  The price difference test only examines whether prices differ significantly among purchasers, regions and time periods.  Specifically, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods.  Thus, the price difference test

---

[54] *See Notice of Final Determination of Sales at Less Than Fair Value:  Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) (*Coated Paper from Korea*), and accompanying IDM; *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008) (*Nails from China*), and accompanying IDM.
[55] *See* Toyo Kohan Remand Comments at 15, 20.

is simply a different test than the P/2 test. Furthermore, Commerce rejected the P/2 test for two reasons.[56] First, the P/2 test did not account for price variations specific to the market in question (*e.g.* it did not account for information such as the customer, region or time of the transaction).[57] The price difference test on the other hand measures relative differences on a case-by-case basis by a comparison to case-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration. Second, the P/2 test collapsed the pattern and significant difference tests into a single test.[58] Our new methodology, by contrast, does not utilize the price difference test in isolation but rather, in conjunction with the ratio test and meaningful difference test as one step in a three-step differential pricing analysis, uses the ratio test to determine whether a pattern exists and the meaningful difference test to determine whether the A-to-A method could account for the differences. Thus, Commerce's previous statements regarding the P/2 test are not applicable to the price difference test.

Additionally, the premise of Toyo Kohan's claim that Commerce did not explain the *return* to a practice previously rejected is incorrect.[59] As described extensively above, the two-percent test used in the Draft Remand is a fundamentally different test than the P/2 test used in *Coated Paper from Korea*. Thus, claiming that Commerce must explain why it is *returning* to an alleged practice that is previously disavowed it is simply inapposite.

However, to the extent that Toyo Kohan is claiming that Commerce has failed to explain its rationale for the price difference test, we disagree. In the Draft Remand, we explained how each step of the revised differential pricing analysis addresses the criteria set forth in section

---

[56] *See Nails from China* IDM at Comment 8.
[57] *Id*.
[58] *Id*.
[59] *See* Toyo Kohan's Remand Comments at 20.

777A(d)(1)(B) of the Act.[60]  The explanation provided is nearly identical to the explanation provided in the prior differential pricing analysis (first used in 2013),[61] but explicitly notes two changes:  we now identify price differences according to a two-percent test and we are discontinuing the use of a "mixed method" as a potential alternative comparison methodology. In particular, we stated:

> Following the Federal Circuit's decision in *Marmen*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.  In an effort to comply with the Federal Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.  Accordingly, for these draft results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to "all relevant law," including the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test to Toyo Kohan's U.S. sales data, and, in the alternative, applied the "price difference test," as detailed below.[62]

Additionally, Commerce released complete calculations for the Draft Remand results detailing the implementation of the revised analysis.  Thus, we find no basis to the claim that we have not explained the price difference test.

---

[60] *See* Draft Remand at 10-11.
[61] *See, e.g., 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from India:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012; and Intent to Revoke Order (in Part)*, 78 FR 25699 (May 2, 2013), and accompanying PDM at 4-6; *Non-Oriented Electrical Steel from the Republic of Korea:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 29426 (May 22, 2014), and accompanying PDM at 6-8; *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea:  Preliminary Results and Rescission in Part of Antidumping Duty Administrative Review; 2023- 2024*, 90 FR 21891 (May 22, 2025), and accompanying PDM at 4-7; and *Hard Empty Capsules from the Socialist Republic of Vietnam:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 FR 22708 (May 29, 2025), and accompanying PDM at 16-18.
[62] *See* Draft Remand at 8.

*B. Toyo Kohan Misunderstands the Mechanics of Commerce's Differential Pricing Analysis*

Toyo Kohan's claim that the price difference test is an illogical means of detecting a pattern displays a misunderstanding of the mechanics of Commerce's differential pricing analysis.[63] The price difference test determines whether prices differ significantly. The ratio test determines whether there is a pattern. The ratio test is consistent with the ordinary meaning of the word "pattern," which is "a frequent or widespread incidence."[64] The Federal Circuit has upheld Commerce's ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has held that Commerce "has discretion to determine a reasonable methodology to implement the statutory directive."[65] Therefore, at least 33 percent of Toyo Kohan's U.S. sales must pass the ratio test before Commerce determines there is a pattern. As such, if there are U.S. sales that pass the price difference test, there will not be a pattern until it reaches thirty three percent. Moreover, the Federal Circuit has also rejected the argument that the Act requires Commerce "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}"[66] Nevertheless, without any discussion of Commerce's ratio test, Toyo Kohan makes meritless argument that the price difference test produces illogical results inconsistent with the concept of a "pattern," when the price difference test is not at all about identifying a pattern.[67]

---

[63] *See* Toyo Kohan Remand Comments at 16-18.
[64] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/pattern (last visited December 2, 2025).
[65] *See Stupp II*, 5 F.4ᵗʰ at 1354. *See also* Dillinger France S.A. v. United States, 981 F.3d 1318 (Fed. Cir. 2020).
[66] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (CIT 2015).
[67] *See* Toyo Kohan Remand Comments at 16.

Similarly, Toyo Kohan's argument that Commerce's price difference test makes the "family-wise" error relies on a flawed premise and is meritless.[68]  Toyo Kohan argues that a family-wise error exists because the price difference test "systematically converts random variation into affirmative findings."[69]  However, Commerce's price difference test does not convert random variations, as it does not look for statistical correlations.  Instead, the price difference test determines whether the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods.  As such, Toyo Kohan's argument about the family-wise error stemming from converting random variations is not applicable here. Moreover, as noted above, the price difference test measures significant differences in pricing;  it is the *ratio test* that identifies the statutorily required pattern and Toyo Kohan's comments are silent with respect to the ratio test.

Thus, Toyo Kohan misunderstands Commerce's price difference test when arguing that this test "completely forgo{es} any statistical or analytic rigor, contrary to the Federal Circuit's intent in *Marmen* in interpreting 777A(d)(1)(B)(i) of the Act."[70]  Accordingly, we find that there is no basis to Toyo Kohan's claim that Commerce lacks "'statistical analysis' that can identify patterns," as required by the Act and in compliance with *Marmen*, when Toyo Kohan fails to discuss the ratio test.[71]

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have:  (1) provided further explanation regarding our continued use of the earlier of shipment or invoice date as the date of sale for Toyo

---

[68] *Id.* at 18.
[69] *Id.* at 18.
[70] *Id.* at 19.
[71] *Id.*

Kohan's U.S. sales; and (2) discontinued the use of the Cohen's *d* test and adopted the "price difference test" to determine whether prices differ significantly.  As a result of the changes to Commerce's differential pricing analysis, Toyo Kohan's estimated weighted-average dumping margin increases from 4.44 percent to 4.58 percent.  Because Toyo Kohan's weighted-average dumping margin is different from that calculated in the *Final Results*, we intend to issue a *Timken*[72] notice with the amended final results should the Court sustain these final results of redetermination.

2/18/2026

X _Chris / Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

---

[72] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).