# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Jane A. Restani, Judge**

| | |
|---|---|
| **TOYO KOHAN CO. LTD,** ) | |
| ) | |
| **Plaintiff,** ) | **Court No. 24-00261** |
| ) | |
| **v.** ) | <u>**PUBLIC VERSION**</u> |
| ) | |
| **UNITED STATES,** ) | *Confidential information contained in brackets has been deleted from pages 10, 11, and 14.* |
| ) | |
| **Defendant,** ) | |
| ) | |
| **THOMAS STEEL STRIP CORPORATION,** ) | |
| ) | |
| **Defendant-Intervenor.** ) | |
| ) | |
| ) | |

## PLAINTIFF TOYO KOHAN'S COMMENTS ON THE COMMERCE DEPARTMENT'S REMAND REDETERMINATION

Daniel L. Porter
James P. Durling
Gina M. Colarusso
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co. Ltd.*

**March 20, 2026**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT..................................................... 1

ARGUMENT.................................................................................................................. 7

I.     COMMERCE'S DATE OF SALE ANALYSIS AND CONCLUSION
FAIL TO COMPLY WITH THE COURT'S ORDER AND, IN ANY
EVENT, ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND
ARE OTHERWISE NOT IN ACCORDANCE WITH LAW ................................ 7

     A.     Commerce's Remand Redetermination Fails To Establish,
With Record Evidence, That The Material Terms Of Sale Are
Established On Shipment Date.................................................................... 8

     B.     The Pricing Formula Does Not Establish The Final Price
Prior To The Invoice Date......................................................................... 11

     C.     Commerce's Remand Redetermination Fails to Adequately
Address Record Evidence that Contradicts Commerce's
Conclusion................................................................................................. 14

II.     COMMERCE'S NEW TWO PERCENT DIFFERENCE TEST TO
ANALYZE DIFFERENTIAL PRICING REFLECTS AN IMPROPER
INTERPRETATION OF THE APPLICABLE STATUTORY
PROVISIONS AND IS CONTRARY TO THE FEDERAL CIRCUIT'S
DECISIONS. ...................................................................................................... 16

     A.     Commerce's Two Percent Price Difference Test to Measure
Differential Pricing Adopts an Incorrect Interpretation of the
Applicable Statutory Provision ................................................................. 17

          1.     The statutory text.......................................................................... 18

          2.     Statutory structure ........................................................................ 20

          3.     Legislative history ........................................................................ 22

          4.     Additional context confirming the statutory meaning of
"pattern" — Commerce's own historical approach ........................ 23

          5.     Commerce's continued use of the ratio test does not save the
new test or comply with the statute............................................... 25

B.    Commerce's Decision To Discard Any Statistical Or Analytic Rigor In Its Differential Pricing Analysis Is Contrary To The Federal Circuit's Interpretation Of The Statute And Intent In *Marmen* ...................................................................................... 27

C.    Commerce Failed To Explain How The Two-Percent Price Different Test Has Now Suddenly Become A Reliable Measure Of "Significance" For Purposes Of Section 777A(d)(1)(B)(i)................................................................................ 30

CONCLUSION ................................................................................................. 32

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Allegheny Ludlum Corp. v. United States*,
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ................................................................. 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...................................................................................................... 29

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) ..........................................................................*passim*

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
807 F. Supp. 2d 1361 (Ct. Int'l Trade 2011) ................................................................. 30

*PSC VSMPO-AVISMA Corp. v. United States*,
755 F. Supp. 2d 1330 (Ct. Int'l Trade 2011) ................................................................. 30

*Stupp Corporation v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ................................................................................. 29, 30

Statutes

19 U.S.C. § 1677f-1(d)(1)(B) ...............................................................................*passim*

19 U.S.C. § 1677f-1 (d)(1)(B)(i) ..........................................................................*passim*

Administrative Determinations

*Certain Steel Nails from the People's Republic of China*,
73 Fed. Reg. 33,977 (June 16, 2008) ........................................................... 6, 16, 25, 30

*Coated Free Sheet Paper from Korea,*
72 Fed. Reg. 60,630 (Oct. 25, 2007)
...................................................................................................................... 6, 24, 30

*Welded Line Pipe From the Republic of Korea: Final Determination of Sales at
Less Than Fair Value*, 80 Fed. Reg. 61,366 (Oct. 13, 2015) ....................................... 20

Rules and Regulations

*Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27296 (May 19, 1997) ......... 23

Other Authorities

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994) ................... 22

*Pattern*, Black's Law Dictionary (11th ed. 2019) ............................................................. 18

*Pattern*, Dictionary.cambridge.org,
    https://dictionary.cambridge.org/us/dictionary/english/pattern (last visited Mar.
    20, 2026) ..................................................................................................................... 18

*Pattern*, Dictionary.com, https://www.dictionary.com/browse/pattern (last visited
    Mar. 20, 2026)............................................................................................................. 18

*Pattern*, Dictionary.justia.com, https://dictionary.justia.com/pattern (last visited
    Mar. 20, 2026)............................................................................................................. 19

*Pattern*, Merriam-webster.com, https://www.merriam-
    webster.com/dictionary/pattern (last visited Mar. 20, 2026) ....................................... 19

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This Court's decision remanded the case back to the Department of Commerce ("Commerce") to reconsider its approach and conclusions on two issues: (a) the appropriate date of sale for Tokyo Kohan's U.S. sales and (b) the appropriate differential pricing analysis to determine whether Commerce can permissibly use the alternative average-to-transaction comparison methodology for calculating Toyo Kohan's AD rate. Commerce has now submitted its Remand Redetermination. However, Commerce's Remand Redetermination cannot be sustained with respect to either issue because Commerce's remand conclusions fail to comply with this court's instructions and/or are not supported by substantial evidence and are otherwise not in accordance with law.

**<u>Date of Sale</u>**

In its original determination, Commerce concluded that the shipment date was the appropriate date of sale because the shipment date best represented the date on which the material terms (*e.g.*, price and quantity) were established. In its decision, this Court ruled that Commerce's conclusion was not supported by substantial evidence and asked Commerce to reconsider:

> Commerce's use of the shipment date as the date of sale was unsupported by the record and a reasoned explanation.
>
> ….
>
> The court remands for Commerce to reconsider both the date of sale and the sales price, recognizing that when there is an agreed-to pricing formula, there may be a disconnect in the record data for the two matters. The court makes no determination as to the date of sale or sales price among the various possibilities nor does it direct or prohibit reopening of the record.

- 1 -

*See* Slip Op. 25-141 (Oct. 23, 2025) at 10-11 (ECF No. 59) (hereinafter "*Remand Order*").

This Court was explicit that Commerce was expected to step back, consider Toyo Kohan's different sales process, and decide which date truly was the best date that established (with a *bona fide* document) the appropriate "date of sale." But Commerce's Remand Redetermination does not engage in the required careful reconsideration. Rather, Commerce's Remand Redetermination essentially just doubles-down on its conclusion that it was appropriate to apply its preferred practice of using the "earlier of shipment or invoice date" for this AD review. Commerce does not meaningfully attempt to address the specific evidentiary concerns identified by this Court with its reaffirmation that the shipment date is the most appropriate date of sale.

And indeed, this is perhaps best exemplified by how Commerce addressed the possibility of using the purchase order date. As this Court knows, the key possible dates for appropriate date of sale in dumping investigations are invoice date (which sets forth the final price and quantity in the ordinary course of business), shipment date (given Commerce's "earlier-of" practice), and purchase order date (or order confirmation date), which can be the first time (for a specific individual shipment) Toyo Kohan and the customer address price and quantity. Given this range of possibilities, and in light of this Court's direct instruction to Commerce – "{t}he court makes no determination as to the date of sale … among the various possibilities," -- it was expected that Commerce would have addressed purchase order date as a possibility, particularly if it believes the material terms of sale are established prior to invoice date. *Id*. But, representing a significant

- 2 -

change from its Draft Remand, Commerce chose not to do so in its Remand

Redetermination submitted to the Court.  Specifically, in its *Draft* Remand, Commerce

sets forth the following conclusion:

> Nonetheless, because Toyo Kohan stated that there were price changes to
> its purchase order and/or order confirmation for some sales, we find that it
> would be inappropriate to rely on the date of the purchase order as the date
> of sale for Toyo Kohan's U.S. sales.

*See* Draft Results of Redetermination Pursuant to Court Remand (Jan. 12, 2025) at page

5, n.20. (hereafter, "Draft Remand")

But then, in its *final* Remand Redetermination, Commerce removed this

conclusion and instead simply asserted:  "We note that we did not contemplate whether it

would be appropriate to use the purchase order date as the U.S. date of sale."  *See* Final

Results of Redetermination Pursuant to Court Remand (Feb. 18, 2026) at 5, n.23 (ECF

No. 65) (hereafter, "Remand Redetermination")  We respectfully submit that this

statement essentially admits that Commerce did not comply with this Court's direct

instruction.[1]

Moreover, and importantly, as we explain in detail below, Commerce's Remand

Redetermination fails to establish, with record evidence, that the material terms of sale

are established on the shipment date and therefore Commerce's date of sale conclusion is

not supported by substantial evidence.

---

[1] To be clear, given the large number of U.S. sales transactions for which the final invoice price or
quantity are different from the price or quantity on the purchase order, Toyo Kohan believes that purchase
order date is not the appropriate date of sale.  But Toyo Kohan recognizes that purchase order date is
among the common dates to be analyzed for appropriate date of sale and therefore Commerce's refusal to
even "contemplate" this date reflects an unwillingness to fully re-engage, notwithstanding this Court's
instruction.

Suffice to say, Commerce's Remand Redetermination completely fails to explain how this Court's conclusion that "Commerce's use of the shipment date as the date of sale was unsupported by the record and a reasoned explanation" was wrong.

**<u>Differential pricing</u>**

In its Remand Redetermination, Commerce determined to adopt a completely new approach for its "differential pricing" analysis. This new approach is referred to as "the two percent difference test." *See* Remand Redetermination at 16. As we detail below, this new approach to Commerce's differential pricing analysis suffers from several legal and logical flaws.

*First*, and perhaps most importantly, Commerce's two percent price-difference test for measuring differential pricing misinterprets the applicable statutory provisions. The statutory provision -- 19 U.S.C. § 1677f-1(d)(1)(B) -- permits Commerce to depart from the statutory default average-to-average comparison methodology only if it first finds "a pattern of export prices … for comparable merchandise that differ significantly among purchasers, regions, or periods of time." Commerce's two percent price difference test reflects an unlawful interpretation of this statutory language, as demonstrated by the statute's text, structure, and legislative history.

The statute fundamentally requires a "pattern," and Commerce makes no effort to find a pattern either through its two percent price difference test or its ratio test. The ratio test – setting a threshold of at least 33 percent of the transactions – does not find a pattern. The ratio test simply counts the number of transactions, and does so by ignoring the differences in purchasers, regions, or periods of time. A random collection of prices

- 4 -

across purchasers, regions, and periods of time does not constitute a "pattern," and Commerce makes no effort to find one.

*Second*, Commerce's decision to discard any statistical or analytic rigor in its differential pricing analysis is contrary to the Federal Circuit's interpretation of the statute and intent set forth in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) ("*Marmen*"). This Court ordered Commerce "to perform its differential pricing analysis consistent with the Federal Circuit's opinion in *Marmen*." *Remand Order*, at 15. In *Marmen*, the Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *See Marmen* at 1348 (Fed. Cir. 2025). At the same time, the Federal Circuit did not preclude Commerce from "fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences *as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue*." *Id*. (emphasis added).

At the outset, we agree that Commerce's decision to abandon Cohen's *d* here is consistent with *Marmen*, since it reflects Commerce's appreciation of a record in which Toyo Kohan's data is not normally distributed, equally variable, and equally and sufficiently numerous. On the other hand, Commerce's Remand Redetermination completely forgoes any statistical or analytic rigor, contrary to the Federal Circuit's decision in *Marmen* in interpreting 777A(d)(1)(B)(i) of the Act. The Federal Circuit in *Marmen*, consistent with the plain meaning of "pattern" as that term is used in the relevant statutory provision, instructed Commerce to fashion a methodology that is

- 5 -

"sound for gauging differences in the data sets at issue" and that the statistical underpinnings of Cohen's *d* — though not Cohen's d itself — were still relevant to that exercise. *Id.* In other words, there still must be a valid, reasonable, and reliable "statistical analysis" that can identify patterns. *Id.* Commerce's two-percent test – even when combined with the 33 percent ratio test -- is incapable of that exercise and is, therefore, contrary to the statute as interpreted by the Federal Circuit in *Marmen*.

*Third*, Commerce failed to explain how the two-percent price difference test has now suddenly become a reliable measure of "significance" for purposes of section 777a(d)(1)(b)(i). Commerce previously found that the two-percent test applied in its Remand Redetermination was not a "reliable measure for detecting 'obvious' examples of targeted dumping." *See Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 8 (rejecting test from *Coated Free Sheet Paper from Korea*). In other words, Commerce's Remand Redetermination returns to a practice it definitively rejected as unreliable in determining whether prices differ significantly and establishes a pattern for purposes of the analysis called for under Section 777A(d)(1)(B)(i) of the Act. Yet, it makes no serious effort in its Remand Redetermination to justify the reversal despite its clear burden to do so. Far from any reasonable explanation, Commerce does not really grapple with the underlying problems. For these reasons, Commerce's Remand Redetermination regarding differential pricing should not be sustained.

**ARGUMENT**

I.    **COMMERCE'S DATE OF SALE ANALYSIS AND CONCLUSION FAIL TO COMPLY WITH THE COURT'S ORDER AND, IN ANY EVENT, ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ARE OTHERWISE NOT IN ACCORDANCE WITH LAW**

This Court remanded Commerce's date of sale determination because "Commerce's use of the shipment date as the date of sale was unsupported by the record and a reasoned explanation." *See Remand Order*, at 10. In reconsidering this issue, this Court specifically instructed Commerce to reconsider both the date of sale and the sales price, recognizing a potential disconnect between the two where a pricing formula exists. *Id.* at 11.

Commerce's Remand Redetermination is correct to continue to use the final invoice price as Toyo Kohan's U.S. sales price in its calculation. However, Commerce's decision to continue to use the shipment date as the date of sale is, once again, not supported by substantial evidence. Nor does Commerce provide a reasoned explanation for its conclusion. Rather, Commerce simply reiterates its prior rationale to rely on its preferred "practice" of using the shipment date whenever it precedes the invoice date. In doing so, Commerce again failed to address the specific evidentiary concerns presented by this record and identified by this Court.

Specifically, Commerce repeatedly invokes "normal practice," Remand Redetermination at 5-6, but never explains why this particular *shipment date* -- in this AD review for this respondent -- better reflects the point at which the material terms of sale

- 7 -

are established – a conclusion made more confusing by Commerce's view that shipment documentation is "virtually meaningless." *Id*. at 4

> **A.    Commerce's Remand Redetermination Fails To Establish, With Record Evidence, That The Material Terms Of Sale Are Established On Shipment Date**

In its Remand Redetermination, Commerce first recognizes that the final price is typically established upon invoice. *Id*. at 5. Despite quoting its AD questionnaire, which explains the agency's normal practice of using the invoice date as the date of sale, Commerce proceeds to argue that whenever the shipment date precedes the invoice date, it is the agency's practice to use the shipment date. Commerce seems not to understand its own questionnaire, which states that:

> Commerce <u>will normally use the date of invoice</u>, as recorded in the exporter or producer's records kept in the ordinary course of business. Commerce may use a date other than the date of invoice (e.g., the date of contract in the case of a long-term contract) <u>if satisfied that a different date of sale better reflects</u> the date on which the exporter or producer establishes the material terms of sale (*e.g.*, price, quantity). (Section 351.401(i) of the regulations).

*See Id.* (quoting the Department's AD questionnaire) (emphasis added). The questionnaire goes on, explaining that if another date, *i.e.*, a non-invoice date, is selected and *that* date is after the shipment date, Commerce will use the shipment date as the date of sale instead. Commerce points to this explanation as justification for using the shipment date instead of the invoice date here, but that is not what is contemplated by Commerce's own questionnaire. Perhaps, for certain sales, Commerce finds that the material terms of sale are established at another point in time before the invoice date, but that date is after the shipment date, in which case Commerce's questionnaire instructs

- 8 -

using the shipment date.  But the starting point should be the use of the invoice date.

Commerce does not address this aspect of its normal practice.  Instead, it simply repeats a

mantra of "the earlier of the shipment or invoice date."  *Id.*

Commerce then states that "nothing on the record supports deviating from our

normal practice of using the earlier of the shipment or invoice date as the U.S. date of

sale."  *Id*.  To support this conclusion, Commerce explains that "the sample sales

documentation Toyo Kohan provided on the record shows that the price indicated on the

customer's purchase order matched Toyo Kohan's pricing formula, as well as the price

shown on the final invoice."  *Id.* (citing Toyo Kohan's AQR at 24 and Exhibit A-10A).

Commerce does not explain why it views the purchase order of any relevancy to the date

of sale analysis.  Instead, in a footnote, Commerce states that "{it} did not contemplate

whether it would be appropriate to use the purchase order date as the U.S. date of sale."

*Id*. at 5, n.23.  This represents a notable departure from Commerce's statement in its

*Draft* Remand.  There, Commerce set forth the following conclusion:

> Nonetheless, because Toyo Kohan stated that there were price changes to
> its purchase order and/or order confirmation for some sales, we find that it
> would be inappropriate to rely on the date of the purchase order as the date
> of sale for Toyo Kohan's U.S. sales.

*See* Draft Remand at 5, n.20.  Commerce removed this conclusion from its final Remand

Redetermination and instead simply asserted that it did not contemplate using the

purchase order date.  *See* Remand Redetermination at 5, n.23.

Respectfully, this amounts to an admission that Commerce has failed to adhere to

the Court's *Remand Order* to reconsider the appropriate date of sale.  If Commerce

- 9 -

believes that the material terms of sale were consistently established before the invoice date, it should have assessed whether *that date* should be used instead of the invoice date as the date of sale. Commerce failed to do so.

Instead, Commerce tries to rely on a perplexing rationale that the price did not change between the customer's purchase order and the final invoice (for one particular sales transaction) to justify using the *shipment* date. *Id*. at 5-6 ("Toyo Kohan's [

] . . . reflects the same price as the purchase order and final invoice, demonstrating that the price did not change between the **shipment date** and invoice date.") (citing Toyo Kohan's AQR at 24 and Exhibit A-13A, Part 1) (emphasis added). Commerce goes on to say that the price reflected in the pricing formula is the same as the price on the purchase order, and "Toyo Kohan did not provide any information indicating that there were any U.S. sales during the POR which deviated from the formulas." *Id*. Commerce then concludes "{f}or these reasons, we find that it would be inappropriate to consider the date of sale to be after the shipment date when the material terms of sale {} were already finalized at the time of shipment and remained the same until the final invoice date." *Id*.

Commerce's focus on dates and documentation issued *prior to* shipment date does not amount to a reasonable explanation nor substantial evidence for its selection of shipment date as the date of sale. The record makes clear that the billing statement is the relevant documentation issued at shipment date — not the customer's purchase order. *See e.g.*, Toyo Kohan Section C Response (Oct. 10, 2023) ("Toyo Kohan's CQR") at 24, P.R. 39, C.R. 48, ("Specifically, Toyo Kohan's sales system requires it to generate upon

- 10 -

shipment from Kudamatsu a summary billing document.  This date has been used to report the field SHIPDATU1.  This billing document reflects the price in Toyo Kohan's system at the time of shipment.  However, this price can change up to the date of invoicing to the U.S. customer as noted in Toyo Kohan's Section A and C Responses. *See* Toyo Kohan's Section A Response (Sept. 15, 2023) ("Toyo Kohan's AQR") at 36, P.R. 22, C.R. 3 (**[**

**]** When this occurs … Toyo Kohan's system will generate a new invoice."). *See also* Toyo Kohan's CQR at 24 ("This billing document is issued at the price in Toyo Kohan's system at the time of shipment.  However, this price can change up to the date of invoicing to the U.S. customer as noted in Toyo Kohan's Section A response (*i.e.*, the date of the invoice to the U.S. customer has been reported in field SALINDTU3)").  Commerce does not adequately address this key piece of evidence, nor does it support its conclusion to use shipment date with any documentation *issued on the shipment date*.

## B.    The Pricing Formula Does Not Establish The Final Price Prior To The Invoice Date

Pursuant to this Court's instruction, Commerce's Remand Redetermination provides additional discussion about the significance of the fact that the prices of Toyo Kohan's U.S. sales are established, <u>in part</u>, by the use of a pricing formula.  Some of Commerce's discussion is correct, some is flatly wrong, and some is nonsensical.

The key parts of Commerce's discussion is as follows:

Toyo Kohan reported that Metal One **[**
**]** and that such agreed upon pricing formulas were used for

- 11 -

> all of its U.S. sales during the POR.  Toyo Kohan did not provide any
> information indicating that there were any U.S. sales during the POR which
> deviated from these formulas.  For these reasons, we find that it would be
> inappropriate to consider the date of sale to be after the shipment date when
> the material terms of sale (*i.e.*, price and quantity) were already finalized at
> the time of shipment and remained the same until the final invoice date.
>
> .  .  .
>
> Further, as noted above, the amount reported in the field GRSUPRU is
> consistent with Toyo Kohan's pricing formula.  Therefore, we continue to
> find that it is appropriate to use the final invoice price in field GRSUPRU
> as Toyo Kohan's U.S. sales price in our calculations.

*See* Remand Redetermination at 6-7.

We start by noting that Commerce is correct to reaffirm its decision "to use the

final invoice price in field GRSUPRU as Toyo Kohan's U.S. sales price in our

calculations."  However, and importantly, the use of a pricing formula has nothing to do

with the correctness of this decision.  Use of <u>the final invoice price</u> as Toyo Kohan's U.S.

sales price for the AD margin calculation is required because this is the price that the

unaffiliated customer pays and U.S. AD law and practice required use of the price that

the unaffiliated customer paid.  How the final invoice price is derived (use of a pricing

formula or straightforward negotiation) is not relevant to the legal requirement to use the

actual price paid by the unaffiliated customer in the AD margin calculation.

We next note that Commerce's assertion that "Toyo Kohan did not provide any

information indicating that there were any U.S. sales during the POR which deviated

from these formulas" is just flat wrong.  *See* Remand Redetermination at 6.  Toyo

Kohan's Section A and Section C responses consistently explain that the pricing formula

generates only a temporary or tentative price, which is expressly subject to adjustment

based on subsequent negotiations, in addition to the exchange rates, and other

- 12 -

commercial factors (*e.g.*, freight cost or fuel price increases not captured by the indices). *See* Toyo Kohan's AQR at 15-18 and 34-35. The formula functions effectively as a starting point for pricing, not as the mechanism by which a final price is set for all sales. The fact that Commerce happened to find one individual sales transaction in which the final invoice price reflected straightforward application of the pricing formula does not invalidate Toyo Kohan's description of its process of how sales prices are established. *See Remand Order*, at 10-11 ("Toyo Kohan clearly laid out its sales process in its Section A response . . . Nothing in the record contradicts Toyo Kohan's explanation of its sales process.")

Nor does reference to this single individual U.S. sales transaction invalidate the numerous other U.S. sales transactions for which Toyo Kohan proved that the final invoice price is different from the simple application of the pricing formula. As addressed repeatedly by Toyo Kohan in earlier arguments, the U.S. sales database shows that a substantial majority of transactions experienced post-shipment price changes, recorded in the VAL_ADJU field and confirmed by the billing statement and invoice documentation. The very existence of these changes belies the conclusion that the pricing formula had already produced a final, binding price by date of shipment. *See* Exhibit SC-1 to Toyo Kohan's Supplemental Section C Response (Apr. 24, 2024), P.R. 73-74, and C.R. 132-33, 138. *See also* Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (May 2, 2025), at 11-12 and 27-28 (ECF No. 28).

Finally, Commerce's core conclusion that the use of a pricing formula and the identification of a single U.S. sales transaction in which the final invoice price reflected

- 13 -

straightforward application of the pricing formula proves the correctness of using shipment date as the date of sale is just nonsensical. We start by noting this Court's apt observation that "this {only} suggests that there were no changes to the inputs of the pricing formula, not that the material terms of the sale were only set at the shipment date." *See Remand Order*, at 11.

Moreover, even if the existence of a pricing formula somehow established the final material terms of sale for all of Toyo Kohan's U.S. sales, Commerce's Remand Redetermination does not explain how *the shipment date* reflects the use of the pricing formula and is therefore the appropriate date of sale. Rather, with respect to a single example, Commerce states that "the price reflected in the pricing formula, dated **[**

 **]** is the same as the price on the <u>purchase order</u>." Remand Redetermination at 6 (emphasis added). But, as noted above, Commerce admits that they did not even bother to contemplate whether it would be appropriate to use the purchase order date as the date of sale. Commerce should not be allowed to engage in cherry-picking dates that fit its intention of increasing Toyo Kohan's AD margin.

C.     **Commerce's Remand Redetermination Fails to Adequately Address Record Evidence that Contradicts Commerce's Conclusion**

In its comments on the Draft Remand, Toyo Kohan specifically identified transaction-level evidence demonstrating that the price reflected in the billing statement at shipment frequently differs from the final invoice price and explained how those changes are reflected in the sales database through the VAL_ADJU field. *See* Toyo Kohan's Comments on Draft Results of Redetermination Pursuant to Court Remand (Jan.

- 14 -

20, 2026) ("TK Comments on Draft Remand") at 8-10.  Those data confirm that the price recorded at shipment is frequently provisional and subject to revision prior to invoicing, and thus, the shipment date should not be used as the date of sale.

Rather than engaging with this record evidence, Commerce dismisses the VAL_ADJU data as not meaningful to its analysis because the agency did not rely on the values reported in VAL_ADJU in its margin calculations.  *See* Remand Redetermination at 15.  But this observation is completely beside the point – neither the Court nor Toyo Kohan is suggesting that Commerce use the values in VAL_ADJU as part of the margin calculation.  Rather, as Toyo Kohan has repeatedly explained, VAL_ADJU is simply factual information that demonstrates every instance/sale when the price at shipment differed from the final invoice price.  Commerce retorts that the "billing documentation at the time of shipping, on which GRSUPRU_ORIG and VAL_ADJU are generated, are 'virtually meaningless' because it fails to reflect the purchase order or final invoice quantity or price."  *Id*.  But that is precisely the point:  the quantity and price are <u>not</u> <u>established upon shipment date, which is why the material terms of sale (quantity and/or</u> <u>price) on the billing documentation (issued on shipment date) do not always reflect the</u> <u>final terms provided on the invoice.</u>  That the terms differ does not make the documentation issued at shipment meaningless; rather, it is the very evidence of why Commerce's conclusion that the date of shipment is the appropriate date of sale is not supported by substantial evidence.

In sum, Commerce has failed to provide a reasonable explanation, based on the record evidence, for its selection of shipment date as the date of sale.  Because substantial

evidence does not support Commerce's choice, the Remand Redetermination's conclusion regarding the date of sale cannot be sustained.

## II.    COMMERCE'S NEW TWO PERCENT DIFFERENCE TEST TO ANALYZE DIFFERENTIAL PRICING REFLECTS AN IMPROPER INTERPRETATION OF THE APPLICABLE STATUTORY PROVISIONS AND IS CONTRARY TO THE FEDERAL CIRCUIT'S DECISIONS.

In its Remand Determination, Commerce adopted a new approach for its "differential pricing" analysis.  Notwithstanding the Federal Circuit decisions raising fundamental doubts about the foundation of prior differential pricing test, Commerce decided to ignore any effort to address the statutory standard seriously, and instead created a simplistic test that does not meet the statutory standard.  This new approach is referred to as "the two percent price difference test."  Commerce simply tests whether prices differ by more than plus/minus 2 percent, continues to apply the so-called ratio test, and then deems that random collection of prices to be a "pattern."

As we detail below, this new approach to Commerce's differential pricing analysis suffers from a number of fundamental flaws.  The new approach continues to ignore the statutory test to find a "pattern" of prices.  The Department previously abandoned this simplistic 2 percent price difference test after using it just one time, concluding that the test was not reliable.  *See Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 8 (rejecting test from *Coated Paper from Korea*).  In returning to this test, the Department makes no serious effort in its Remand Redetermination to justify this reversal in Department position despite its burden to do so.  In particular, the 33 percent ratio test

- 16 -

also does not find a "pattern" that takes into account price variations specific to the product ("comparable merchandise") or market ("purchasers, regions, periods of time") at issue – the very reason given by Commerce for rejecting the prior test.  Drawing these distinctions at the initial stage as part of the 2 percent price difference test does not help if the distinctions are then ignored in the 33 percent ratio test.

A.      **Commerce's Two Percent Price Difference Test to Measure Differential Pricing Adopts an Incorrect Interpretation of the Applicable Statutory Provision**

The statutory provision at issue here is 19 U.S.C. § 1677f-1(d)(1)(B), which creates an exception to the normal rule of comparing prices based on averages to averages.  The language of this exception provides as follows:

**(B) Exception**

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

(i)      there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii)     the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

This provision permits Commerce to depart from the statutory default average-to-average comparison methodology only if it first finds "a pattern of export prices … for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  *Id*.  Commerce's two percent price difference test reflects an unlawful

- 17 -

interpretation of this statutory provision, as demonstrated by the statute's text, structure, and legislative history.

### 1.    The statutory text

The statutory text reveals several important points about this requirement.  First, this language is part of its own subsection, which sets forth a unified test that begins with the requirement to find a "pattern."  The provision opens with the key term "pattern" and then goes on to qualify some other requirements for the "pattern" to meet the statutory test – that the prices be of "comparable merchandise," that the prices be evaluated within the groups of "purchasers, regions, or periods of time," and that the prices "differ significantly" among those defined groups.  *Id*.  But tying all these elements together is the overarching need for the significant price different among the appropriate comparison groups together constitute a "pattern."

Second, the "pattern" seeks to define something other than a collection of price transactions.   Dictionaries consistently define a "pattern" as involving repetition, regularity, and a discernible structure — "any regularly repeated arrangement, especially a design made from repeated lines, shapes, or colors on a surface" (*See Pattern*, Dictionary.cambridge.org, https://dictionary.cambridge.org/us/dictionary/english/pattern (last visited Mar. 20, 2026)), "a combination of qualities, acts, tendencies, etc., forming a consistent or characteristic arrangement" (*See Pattern*, Dictionary.com, https://www.dictionary.com/browse/pattern (last visited Mar. 20, 2026)).  In a legal context, "pattern" means "{a} mode of behavior or series of acts that are recognizably consistent." *See Pattern*, Black's Law Dictionary (11th ed. 2019).  Another similar

definition is a "series of actions that are consistent and are easily recognized due to their similarity." *See Pattern*, Dictionary.justia.com, https://dictionary.justia.com/pattern (last visited Mar. 20, 2026). Under all of these definitions, random or isolated fluctuations do not constitute a "pattern." The key parts of the textual meaning are prices that show a discernable structure or are recognizably consistent.

Commerce focuses on secondary meanings, and not the primary meaning of "pattern." In its Remand Determination, Commerce cites to *Merriam-Webster* that "pattern" means "frequent or widespread occurrence." *See* Remand Determination at 21. But Commerce has turned to the 11th definition offered by Merriam-Webster, and ignored all of the earlier and more probative definitions – "form or model proposed for imitation," "configuration," "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution" -- that focus on finding a discernable structure or recognizable consistency in something. *See Pattern*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/pattern (last visited Mar. 20, 2026).

Importantly, Congress did not define this requirement with language indicating a sufficient number of transactions. There is no quantitation test for the number of transactions. Nor is there any language suggesting that a sufficient number of transactions – without more – could be a "pattern." A "pattern" requires more than isolated transactions, but a collection of prices that are more than isolated do not become a "pattern" without more.

- 19 -

Consequently, under the ordinary meaning of the key statutory term "pattern," it is not sufficient for Commerce merely to identify price differences among purchasers, regions, or time periods, even if there are a number of such transactions. Instead, Commerce must also demonstrate, based on the evidence, that any observed price differences are not the result of random processes or variations.

Commerce itself previously acknowledged that the statutory term "pattern" requires more than random price variation. In a 2015 AD determination, Commerce stated:

> a 'pattern of prices that differ significantly among purchasers, regions or time periods' means that the Department is examining the extent to which the prices, when ordered by purchaser, region or time period, exhibit differences *which have meaning*, which have or may have influence or effect, which are noticeably or measurably large, and *which may be beyond something that occurs by chance*.

*See Welded Line Pipe From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 61,366 (Oct. 13, 2015), accompanying Issues and Decision Memorandum (Oct. 5, 2015) at 20 (emphasis added).

Note the key ideas of prices "which have meaning" and "beyond something that occurs by chance" – fundamental aspects of the core idea of a "pattern" that the Department now has simply ignored.

### 2.    Statutory structure

The structure of § 777A(d)(1)(B) also reinforces the conclusion that "pattern" is an independent substantive requirement, not a mechanical trigger satisfied by numeric thresholds. As detailed above, the statute establishes a two-step inquiry:

1. Commerce must first determine whether there exists a pattern of prices that differ significantly among purchasers, regions, or periods of time; and

2. Commerce must then explain why such differences cannot be taken into account using the average-to-average method.

These are separate and cumulative conditions. They are linked by the conjunctive "and." If "pattern" were established whenever prices differ by more than a specified percentage, or whenever there are a number of such transactions, the first step would collapse into the second, and Congress's decision to require a threshold "pattern" finding would be meaningless.

The statutory term "significantly" reinforces this need for the term "pattern" to have substantive meaning. Congress emphatically did not itself impose a simplistic numerical test that was devoid of any context. Rather, Congress chose the term "pattern," to signal something more than just counting the number of price differences. Moreover, Congress reinforced this need for something more than just a lot of price differences by specifically requiring that the "pattern" be of prices that "differ significantly." In other words, a pattern of differences alone is not sufficient. The differences must be "significant," relative to other purchasers, regions, or periods of time. "Significant" means more than large — it captures the sense of something that is important and meaningful and thus reinforces that similar meaning in the term "pattern."

Courts applying traditional tools of statutory interpretation reject constructions that render statutory terms superfluous. Interpreting "pattern" to mean nothing more than price dispersion would deprive that term of independent meaning and collapse the statute's two-step framework into a single mechanical inquiry.

- 21 -

Moreover, Congress expressly tied the concept of a "pattern" to specific dimensions—purchasers, regions, and periods of time. This framing indicates that Commerce must examine whether pricing differences are systematically associated with those dimensions (*e.g.*, whether certain purchasers are consistently charged different prices, or whether pricing differs persistently over time). Commerce's new two-percent test and other aspects of its differential pricing test does not make any effort to perform that inquiry. It compares averages, not pricing behavior, and it does not identify any structured relationship between prices and the statutory categories Congress specified.

### 3.     Legislative history

The legislative history of § 777A(d)(1)(B), as set forth in the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 843–44 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, confirms that Congress authorized the use of alternative comparison methodologies to address deliberate pricing practices that mask dumping, not ordinary or random price variation. The SAA explains that the provision is intended to address situations where exporters engage in pricing behavior — such as charging different prices to different purchasers, regions, or time periods — in a manner that prevents dumping margins from being fully revealed under the average-to-average method. *See* SAA, at 4177. ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'"). The SAA does not reference numerical tolerances, percentage bands, or value thresholds, nor does it suggest that Commerce may dispense with

- 22 -

identifying a pricing practice or strategy in favor of a purely mechanical test. *See generally*, SAA.

Congress's focus on masking reinforces that a "pattern" must reflect systematic pricing behavior, not the mere fact that prices are not uniform. Commerce's two-percent difference test, which treats all deviations beyond an arbitrary tolerance as equally probative and requires no showing of repetition or regularity, is inconsistent with that legislative intent.

### 4.    Additional context confirming the statutory meaning of "pattern" — Commerce's own historical approach

The provisions permitting Commerce to depart from the normal average-to-average price comparison when it finds a "pattern" of significant price differences in a respondent's U.S. sales were added to the statute as part of implementing the Uruguay Round Agreements. To give effect to this new provision, Commerce announced an intention to "employ common statistical methods in its targeted dumping determinations in order to ensure that the test is applied on a consistent basis and in a manner that ensures transparency and predictability to all parties concerned." *See Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27296, 27374 (May 19, 1997).

What's more, Commerce itself explicitly rejected adoption of this very two percent difference test for purposes of implementing 19 U.S.C. § 1677f-1(d)(1)(B). Specifically, Commerce applied a two-percent significance test once before, in a single investigation involving *Coated Free Sheet Paper*. But Commerce made clear in that case that the two-percent test was a short-term gap measure applied only while

- 23 -

Commerce took the time to develop a more robust methodology to replace a previous test known as the "*Pasta* Test."

In *Coated Free Sheet Paper,* Commerce clarified that it had applied the two-percent test proposed by petitioner in that case "{i}n view of the Department's uncertainty regarding the general applicability of the *Pasta* Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, ... *without endorsing the petitioner's test standards and procedures as a general practice.*" *See Coated Free Sheet Paper from Korea,* 72 Fed. Reg. 60,630 (Oct. 25, 2007), and accompanying Issues & Decision Memorandum at General Comment 2 (hereafter, *Coated Free Sheet Paper*).

The test applied in *Coated Free Sheet Paper* was summarily — and correctly — jettisoned less than a year later.  In the investigation of *Steel Nails from China,* Commerce held that the two-percent test was not a "reliable measure for detecting 'obvious' examples of targeted dumping."[24]  As Commerce explained:

> ... {T}he two-percent price difference threshold does not adequately account for price variations specific to the market in question. In so doing, the P/2 test may find targeted dumping in many cases when arguably no such dumping is occurring. Thus, we do not find the results of this test to be a reliable indicator that "obvious" targeted dumping has occurred.

*See Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 8.

In light of these flaws in the two-percent test, Commerce discarded that methodology and instead adopted a different test (known subsequently as the *Nails* test), which it applied consistently until the adoption of the Differential Pricing Analysis.  This

- 24 -

history confirms that Commerce itself previously understood that a two-percent

dispersion test does not satisfy the statutory requirement of identifying a "pattern" of

prices within the meaning of § 1677f-1(d)(1)(B).

In short, by redefining "pattern" to mean nothing more than price differences

beyond a two percent band, Commerce effectively rewrites § 777A(d)(1)(B) of the Act.

The statute does not authorize Commerce to replace a qualitative, behavior-focused

inquiry with a rigid numerical rule divorced from pricing structure.  Nor does it delegate

to Commerce the authority to define "pattern" in a manner that eliminates the distinction

between patterned pricing and ordinary variation.

Because Commerce's two-percent price difference test fails to give effect to the

statutory term "pattern," conflicts with the structure of § 777A(d)(1)(B), and is

inconsistent with the provision's legislative history, it is contrary to law and cannot

support the application of the average-to-transaction comparison method in this Remand

Redetermination.

> **5.  Commerce's continued use of the ratio test does not save the new test or comply with the statute**

In its Remand Determination, Commerce defends its new approach largely by

shifting focus to the ratio test – the part of the differential pricing test that asks whether

the prices that differ significantly together are more than 33 percent of the prices.

Remand Determination at 17-18.  This effort, however, does not succeed in squaring

Commerce's new differential pricing test with the statutory requirements.

- 25 -

The statutory requirement is to find a "pattern."  Commerce argues it uses two tests – the 2 percent price different test, and the 33 percent ratio test – to meet the statutory test and that Toyo Kohan conflates the two.  On the contrary, Toyo Kohan's argument is that the Commerce differential pricing test – neither the newly created 2 percent price difference test, nor the still being applied 33 percent ratio test – meet the statutory test of "patten."

Commerce seems to think the 33 percent ratio test correctly establishes a "pattern." But Commerce has not made any serious effort to parse the statutory text, its structure, or its history.  Commerce basically asserts that 33 percent is enough to establish a "pattern."  But this argument fails for several reasons.

First, as noted above, finding a "pattern" requires more than just a sufficient number of transactions.  The key parts of the textual meaning of "pattern" are prices that show a discernable structure or are recognizably consistent.  A set of prices can be 33 percent, 66 percent, or even 100 percent of the total and still not be a "pattern."  Prices could be totally random.  That randomness is not eliminated by simply adding more price transaction to the set being evaluated.

Second, Commerce's ratio test compounds this problem by applying the 33 percent test to the total, and not by the different purchasers, regions, or time periods, and not by the different categories of comparable merchandise.  Rather than respect the statutory framework to find some order and possible "pattern" among these groups, Commerce blurs them all together.

Third, Commerce's efforts to break "pattern" into different parts ignores the statutory structure. The requirement is to find a "pattern." That obligation is found a single subsection, separate from others. That key term opens the provision – there must a "pattern" – and then moves on to other limitations on when that pattern is sufficient. Addressing those other limitation does not establish the "pattern." Commerce seems to think that addressing the limitations it has somehow established the "pattern" – as long as there are enough transactions. But nothing the process of identifying a number of transactions that different by more than some arbitrary threshold establishes a "pattern."

Basically, the problem is that Commerce wants to play a shell game. Faced with a statutory obligation to find a "pattern," Commerce explicitly defends the 2 percent price difference test by pointing to the 33 percent ratio test, and then implicitly defends the 33 percent ratio test by pointing to the 2 percent price different test. But in neither test does the Commerce actually look for the statutorily mandated "pattern."

**B.** **Commerce's Decision To Discard Any Statistical Or Analytic Rigor In Its Differential Pricing Analysis Is Contrary To The Federal Circuit's Interpretation Of The Statute And Intent In *Marmen***

The Court ordered Commerce "to perform its differential pricing analysis consistent with the Federal Circuit's opinion in *Marmen*." *See Remand Order*, at 15. In *Marmen*, the Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Marmen Inc. v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025). At the same time, the Federal

- 27 -

Circuit did not preclude Commerce from "fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences *as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue.*" *Id.* (emphasis added).

At the outset, we agree that Commerce's decision to abandon Cohen's *d* here is consistent with *Marmen*, since it reflects Commerce's appreciation of a record in which Toyo Kohan's data is <u>not</u> normally distributed, equally variable, and equally and sufficiently numerous. On the other hand, Commerce's Remand Determination reveals a decision to completely forgo any statistical or analytic rigor, contrary to the Federal Circuit's intent in *Marmen* in interpreting 777A(d)(1)(B)(i) of the Act. The Federal Circuit in *Marmen*, consistent with the plain meaning of "pattern" as that term is used in the relevant statutory provision, intended Commerce to fashion a methodology that is "sound for gauging differences in the data sets at issue" and that the statistical underpinnings of Cohen's *d* — though not Cohen's d itself — were still relevant to that exercise. In other words, there still must be valid, reasonable, and reliable "statistical analysis" that can identify patterns. As discussed above, Commerce's two-percent test is incapable of that exercise and is therefore contrary to the statute as interpreted by the Federal Circuit in *Marmen*.

Contrary to Commerce's argument, the Federal Circuit has not blessed the new differential price version of finding a pattern. Commerce points to language where the Federal Circuit accepted the old ratio test as part of the prior differential pricing test. Remand Determination, 21 (citing, incorrectly, *Stupp Corporation v. United States,* 5

F.4th 1341, 1353 (Fed. Cir. 2021) ("*Stupp I*")).  But this decision does not resolve the issue.

In *Stupp I*, the Federal Circuit (in 2021) was addressing an argument that the 33 percent ratio test was not supported by substantial evidence in the case and that the specific thresholds were not justified.  *See Stupp I*, 5 F.4th at 1353.  The Federal Circuit was not addressing the broader question of the statutory requirements of a "pattern," and the interrelationships of the different parts of 19 U.S.C. § 1677f-1(d)(1)(B)(i).  The Federal Circuit was addressing only the issue posed in that specific case, whether there was anything inherently wrong with using the 33 percent ratio test as part of the analysis, not as "the ultimate determinant of masked dumping" and rather as only a "preliminary step" in aggregating results.  *Id.* at 1354.  Moreover, the Federal Circuit was not conducting its review of the statute in light of the instructions in *Loper Bright* not to deference to agency interpretations of statutory limits on agency power.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.")

The Federal Circuit stressed its reliance on discretion, noting that in the absence of specific statutory language, "Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive."  Accordingly, *Stupp I* does not resolve the issue now before this Court – not a substantial evidence challenge to how Commerce applied the statute here, but rather a direct argument about the statutory limits imposed on Commerce as a matter of law by the key term "pattern."

- 29 -

**C.    Commerce Failed To Explain How The Two-Percent Price Different Test Has Now Suddenly Become A Reliable Measure Of "Significance" For Purposes Of Section 777A(d)(1)(B)(i)**

As discussed above, Commerce previously found that the two-percent test applied in its Remand Redetermination was not a "reliable measure for detecting 'obvious' examples of targeted dumping." *See Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33977 (June 16, 2008), and accompanying Issues & Decision Memorandum at Comment 8 (rejecting the 2 percent *Nails* test from *Coated Free Sheet Paper from Korea*).  In other words, Commerce's Remand Redetermination returns to a practice it definitively rejected as unreliable in determining whether prices differ significantly and establish a pattern for purposes of the analysis called for under Section 777A(d)(1)(B)(i) of the Act.  Yet, it makes no serious effort in its Remand Redetermination to justify the reversal despite its clear burden to do so.  *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 807 F. Supp. 2d 1361, 1367–68 (Ct. Int'l Trade 2011) ("{I}f the Department chooses to depart from {its} practice it is required to provide a reasonable explanation for doing so." (*citing Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1148 (Ct. Int'l Trade 2000)); *PSC VSMPO-AVISMA Corp. v. United States*, 755 F. Supp. 2d 1330, 1339 (Ct. Int'l Trade 2011).  Far from any reasonable explanation, Commerce does not really grapple with the underlying problems.

Commerce argues only that the prior 2 percent *Nails* test was never part of showing a "pattern."  Remand Determination at 19, 21.  But that comment does not really address the intrinsic unreliability and problems of the new simplistic 2 percent test.

Moreover, Commerce makes a telling admission, that its old test "did not account for price variations specific to the market in question (*e.g.* it did not account for information such as the customer, region or time of the transaction)" and "collapsed the pattern and significant difference tests into a single test." *Id.* at 19. In other words, Commerce acknowledges the interconnection among the different parts of the single statutory provision requiring a "pattern," and that the rejected 2 percent *Nails* test was in part an effort to determine the existence of a "pattern." But in unpacking a single numerical test into a two-part numerical test, Commerce does not really solve the problem. As discussed above in Section A.5, the 33 percent ratio test does not meet the statutory test to find a "pattern." In particular, the 33 percent ratio test also does not find a "pattern" that takes into account price variations specific to the product ("comparable merchandise") or market ("purchasers, regions, periods of time") at issue. Drawing these distinctions at the initial stage as part of the 2 percent price difference test does not help if the distinctions are then <u>ignored</u> in the 33 percent ratio test.

Moreover, putting aside the requirements to find a pattern, Commerce's argument is also illogical when applied to the significant price difference part of the test. The test still does not account for "price variations specific to the market in question" (it is a one size fits all test), and still does not explain why 2 percent is in fact a "significant" price difference in this context without any consideration of the underlying data (magnitude of prices, range of differences, frequency of differences). As noted in *Marmen*, the statutory obligation is to find some analysis that "is itself justified as sound for gauging differences in the data sets at issue." *See Marmen*, 134 F.4th at 1348. There is nothing about the

new mechanical and arbitrary 2 percent price difference test that is a sound gauge for judging price differences.

## CONCLUSION

For all of the above reasons, this Court should find that Commerce's Remand Redetermination cannot be sustained because (a) substantial evidence demonstrates that the invoice date is the appropriate date of sale as it best reflects the date on which the material terms of sale were established for the majority of Toyo Kohan's U.S. sales, and (b) Commerce has not sufficiently justified its new approach for analyzing alleged differential pricing in order to apply the average-to-transaction comparison methodology.

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Gina M. Colarusso
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*

March 20, 2026

- 32 -

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 8,557 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Gina M. Colarusso
John Taishu Pitt

**Pillsbury Winthrop Shaw Pittman LLP**
1200 17th St, N.W.
Washington, D.C. 20036
202-663-8140

*Counsel for Toyo Kohan Co., Ltd.*