## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| TOYO KOHAN CO. LTD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 24-00261 |
| ) | |
| UNITED STATES, ) | PUBLIC DOCUMENT |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| THOMAS STEEL STRIP CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

### DEFENDANT'S REPLY IN SUPPORT
### OF THE REMAND REDETERMINATION

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

CHARLIE CHUNG
Attorney
Office of the Chief Counsel for Trade
    Enforcement and Compliance
U.S. Department of Commerce

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

April 20, 2026

Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ................................................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................. 5

ARGUMENT ........................................................................................................................ 5

I.  Standard Of Review ................................................................................................... 5

II.  Commerce Reexamined The Record Evidence To Further Explain its Selection Of Shipment Date As The Date of Sale ....................................................................... 6

III.  Commerce's Replaced The Cohen's *d* Test With The Price Difference Test In Compliance With *Marmen* And The Remand Order ................................................. 10

    A.  Statutory Framework ......................................................................................... 10

    B.  Differential Pricing Analysis ............................................................................ 12

    C.  Toyo Kohan's Challenges To Commerce's Differential Pricing Analysis Are Unpersuasive ............................................................................ 15

        1.  The Price Difference Test ............................................................................ 16

        2.  Toyo Kohan's Challenge To The Ratio Test Fails ..................................... 19

            a.  Toyo Kohan Failed to Exhaust Administrative Remedies ...................... 19

            b.  The Federal Circuit Has Sustained the Ratio Test .................................. 20

CONCLUSION .................................................................................................................... 23

## TABLE OF AUTHORITIES

<u>Cases</u>

*Amanda Foods (Vietnam) Ltd. v. United States*,
  774 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ................................................................. 5

*Apex Frozen Foods Priv. Ltd. v. United States*,
  862 F.3d 1337 (Fed. Cir. 2017) .............................................................. 11, 12, 13

*Apex Frozen Foods Priv. Ltd. v. United States*,
  862 F.3d 1322 (Fed. Cir. 2017) ................................................................. 13

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
  102 F.4th 1252 (Fed. Cir. 2024) ........................................................... 20, 21

*Bethlehem Steel Corp. v. United States*,
  223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ................................................. 5

*Ceramark Tech., Inc. v. United States*,
  61 F. Supp. 3d 1371 (Ct. Int'l Trade 2015) ................................................. 19

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ................................................................. 19

*Dillinger France S.A. v. United States*,
  981 F.3d 1318 (Fed. Cir. 2020) ........................................................... 20, 23

*Gerber Food (Yunnan) Co. v. United States*,
  601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) ............................................... 19

*Hussey Copper, Ltd. v. United States*,
  960 F. Supp 315 (Ct. Int'l Trade 1997) ....................................................... 6

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................. 20

*Marmen Inc. v. United States*,
  134 F.4th 1334 (Fed. Cir. 2025) ........................................................... passim

*Outokumpu Copper Strip, B.V. v. United States*,
  15 F. Supp. 2d 806 (Ct. Int'l Trade 1998) .................................................... 6

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................................... 22

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998) .................................................................................... 19

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ....................................................................... 11, 13, 20

*Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013) ............................................................................ 10, 11

*Zhongce Rubber Grp. Co. v. United States*,
  352 F. Supp. 3d 1276 (Ct. Int'l Trade 2018) ............................................................. 19

Statutes

19 U.S.C. § 1673 ........................................................................................................ 10, 11

19 U.S.C. § 1673b ............................................................................................................ 17

19 U.S.C. § 1673d ............................................................................................................ 17

19 U.S.C. § 1677a ............................................................................................................ 11

19 U.S.C. § 1677f-1 ................................................................................................. passim

28 U.S.C. § 2637 .............................................................................................................. 19

Uruguay Round Agreements Act (URAA), Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (1994) ................................................................. 11, 22

Regulations

19 C.F.R. § 351.403 ......................................................................................................... 17

19 C.F.R. § 351.414 ......................................................................................................... 11

Other Authorities

*Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet
  Paper from the Republic of Korea*,
  72 Fed. Reg. 60,630 (Dep't of Commerce Oct. 25, 2007) ....................................... 18

*Xanthan Gum from the People's Republic of China*,
  78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) ......................................... 12

*Xanthan Gum from Austria*,
  78 Fed. Reg. 33,354 (Dep't of Commerce June 4, 2013)......................................... 12

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan*,
  89 Fed. Reg. 95,735 (Dep't of Commerce Dec. 3, 2024)........................................... 1

*Alternatives to the Use of Cohen's d; Request for Comment,*
  90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025)......................................................... 14

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of*
  *Korea:  Final Results of Antidumping Duty Administrative Review; 2022–2023,*
  90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) ............................................................ 14

*Stainless Steel Bar From India: Final Results and Rescission, in Part, of Antidumping*
  *Duty Administrative Review; 2023–2024,*
  91 Fed. Reg. 7,442 (Dep't of Commerce Feb. 18, 2026) ........................................................... 14

*Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the*
  *Antidumping Duty Administrative Review; 2023–2024,*
  91 Fed. Reg. 17,246 (April 6, 2026).......................................................................................... 14

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| TOYO KOHAN CO. LTD, | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 24-00261 |
| UNITED STATES, | ) | PUBLIC DOCUMENT |
| Defendant, | ) | |
| and | ) | |
| THOMAS STEEL STRIP CORPORATION, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S REPLY IN SUPPORT
OF THE REMAND REDETERMINATION**

Defendant, the United States, respectfully files this reply to the comments submitted by plaintiff Toyo Kohan Co. Ltd (Toyo Kohan), ECF No. 68 (Toyo Kohan Comments), concerning the United States Department of Commerce's final results of the redetermination filed in accordance with this Court's decision and remand order in *Toyo Kohan Co. v. United States*, Court No. 24-00261, Slip Op. 25-141 (Ct. Int'l Trade Oct. 23, 2025) (ECF No. 60) (Remand Order), remanding to Commerce the final results in the 2022-2023 administrative review of the antidumping duty order covering diffusion-annealed, nickel-plated flat-rolled steel products from Japan. *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan*, 89 Fed. Reg. 95,735 (Dep't of Commerce Dec. 3, 2024) (Final Results) (P.R. 110), and accompanying

Issues and Decision Memorandum (IDM) (P.R. 108)[1].  As discussed below, Commerce's final

results of the redetermination comply with the Court's remand order, are supported by

substantial evidence, and are in accordance with law.  *See* Final Results of Redetermination

Pursuant to Court Remand, Feb. 18, 2026 (Remand Results), ECF No. 65 (Remand C.R. 18).

Accordingly, the Court should sustain Commerce's remand results and enter judgment for the

United States.

## BACKGROUND

In the final results, Commerce chose the shipment date, which preceded the invoice date

as Toyo Kohan's U.S. date of sales, IDM at 4, and used Cohen's *d* test for its differential pricing

analysis.  Toyo Kohan challenged Commerce's final results, and on October 23, 2025, this Court

remanded Commerce to reevaluate its U.S. date of sale determination.  *See* Remand Order at 11.

Specifically, the Court noted that the record contained conflicting evidence with respect to Toyo

Kohan's date of sales.  The Court also recognized that "there may be a disconnect in the record

data" between the sales price and the date of sale because Toyo Kohan uses a pre-shipment

pricing formula.  *Id.*  Additionally, the Court remanded Commerce to recalculate Toyo Kohan's

margin using a revised differential pricing analysis, consistent with *Marmen Inc. v. United

States*, 134 F.4th 1334, 1345 (Fed. Cir. 2025) , which was issued after the final results and

invalidated Commerce's use of the Cohen's *d* test.  *See* Remand Order at 15.

Complying with the remand order, Commerce reexamined the record evidence regarding

Toyo Kohan's U.S. date of sale and replaced the Cohen's *d* test with the price difference test for

its differential pricing analysis.  *See* Draft Results of Redetermination Pursuant to Court Remand

---

[1]  "P.R. _" is a citation to the public administrative record, "C.R._" is a citation to the
confidential version of that record.  Citations to "Remand P.R._" refer to the public record of the
remand redetermination.

(Jan. 12, 2026) (Remand P.R. 5) (Draft Remand Results).  With respect to the date of sale issue, Commerce reexamined the pre-shipping pricing formula, purchase order, final invoice, and sample sales reported by Toyo Kohan.  Commerce confirmed that sales price was established before the shipping date, and thus, at the time of shipping, all material terms of the sale including price were established.  *See* Draft Remand Results at 5-6.  In the absence of any evidence that the material terms of sale changed after shipment, pursuant to its normal practice, Commerce confirmed that the shipment date precedes the invoice date and that the material terms of sale did not change between the shipment date and invoice date, and thus, the shipment date is Toyo Kohan's U.S. date of sale.  *See id.* at 4-5 ("Toyo Kohan did not provide any information indicating that there were any U.S. sales during the POR which deviated from these {pre-shipping agreed upon pricing} formulas.").

Toyo Kohan and Thomas Steel Strip Corporation filed comments on draft remand results. *See* Re: Comments on Draft Results of Redetermination Pursuant to Court Remand (Jan. 20, 2026) (Remand P.R. 17) (Petitioner Draft Comments); Re: Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Petitioner's Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand (Jan. 20, 2026) (Remand C.R. 16) (Toyo Kohan Draft Comments).  Thomas Strip argued that Commerce's draft remand results "fully explains Commerce's decision to rely on the earlier of shipment date or invoice date as the date of sale" and "complies with the {Remand Order} concerning the Cohen's *d* test."  *See* Petitioner Comments at 2.

In its comments on the draft remand results, Toyo Kohan argued that the date of sale should be the invoice date.  Toyo Kohan noted that, for some of its U.S. sales, there was a difference between the gross unit price in the final invoice and the gross unit price shown on

3

Toyo Kohan's self-generated shipment billing statements (VAL_ADJU difference). In its view, the material terms were established at the invoice date. Toyo Kohan Draft Comments at 2. Additionally, Toyo Kohan raised an argument with respect to Commerce's post-*Marmen* differential pricing methodology. *See* Toyo Kohan Comments at 3-4. Specifically, Toyo Kohan argued that Commerce's two-percent-difference test fails to detect "a pattern of export prices" as required by 19 U.S.C. § 1677f-1(d)(1)(B)(i), when Commerce's ratio test, as opposed to the two percent difference test, detects the "pattern of export prices." *See id.*; *see* Remand Results at 18.

In the remand results, Commerce made no changes and addressed arguments in Toyo Kohan's comments. With respect to Toyo Kohan's date of sale, Commerce explained that Toyo Kohan's billing documentation at the time of shipping, on which the VAL_ADJ differences are calculated, is "virtually meaningless" as the Court observed, because the billing documentation fails to reflect the purchase order or final invoice quantity and price. Remand Results at 15; Remand Order at 10.

With respect to the differential pricing analysis, Commerce abandoned the Cohen's *d* test, consistent with *Marmen* and in full compliance with the Remand Order. Commerce explained that Toyo Kohan's argument confused Commerce's two percent difference test with the P/2 test, which is a separate test that Commerce never used in this proceeding. *See* Remand Results at 18-20. Furthermore, Commerce explained that Toyo Kohan misunderstood the mechanics of Commerce's post-*Marmen* differential pricing analysis because the two percent difference test has no role in detecting "a pattern of export prices." Remand Results at 21-22 (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)). *See id.*

**SUMMARY OF ARGUMENT**

The Court should sustain the remand results because Commerce complied with the remand order in all respects, and its determination is reasonable, supported by substantial evidence, and otherwise in accordance with law.

In compliance with the remand order, Commerce reexamined all relevant record evidence to further explain the continued use of the earlier of shipment date or invoice. Commerce confirmed and further explained that Toyo Kohan's pricing formula price remained the same until final invoice date. Accordingly, Commerce continued to find that Toyo Kohan's shipment date that preceded the invoice date, is the appropriate date of sale, at which material terms of the sale were already established.

Additionally, Commerce complied with the remand order and *Marmen* by replacing Cohen's *d* test with the price difference test for its differential pricing analysis, which is the methodology that Commerce uses in all antidumping proceedings. Toyo Kohan's arguments misunderstands the mechanics of Commerce's differential pricing analysis, including the function of the price difference test, and its arguments provide no basis for reversal or further remand. Accordingly, the Court should sustain Commerce's remand results.

**ARGUMENT**

**I.    Standard Of Review**

"The same standard of review applies to the review of a remand determination as to the review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." *Amanda Foods*

5

*(Vietnam) Ltd. v. United States*, 774 F. Supp. 2d 1286, 1290 (Ct. Int'l Trade 2011).  Moreover, in redeterminations pursuant to Court remand, "Commerce may only address issues specified in a remand order."  *Hussey Copper, Ltd. v. United States*, 960 F. Supp. 315, 318 (Ct. Int'l Trade 1997).  Accordingly, Commerce may not adopt a change in methodology that was not requested by the parties because Commerce does not consider issues that have not been previously challenged by parties or otherwise remanded.  *See id.*; *see also Outokumpu Copper Strip, B.V. v. United States*, 15 F. Supp. 2d 806, 807 (Ct. Int'l Trade 1998).

**II.      Commerce Reexamined The Record Evidence To Further Explain its Selection Of Shipment Date As The Date of Sale**

Complying with the remand order, Commerce reexamined the record evidence to "reconsider both the date of sale and the sales price" and further explained its date of sale analysis in the final results.  Remand Order at 11; *see also* Remand Results at 4-7.  The Court observed a "disconnect" in the record data between the date of sale and the sales price because Toyo Kohan uses a pre-shipment pricing formula to set the price, but the billing statement generated at the time of shipment does not reflect the same pricing formula price, which is identical to the final invoice price.  Remand Order at 11.  Specifically, the "disconnect" is caused by Toyo Kohan's billing documentation generated at the time of shipping, which the Court held was "virtually meaningless."  Remand Order at 10.

Commerce reexamined Toyo Kohan's sample sales documentation and confirmed that the final price reflected in the pre-shipping pricing formula is the same as price on the purchase order.  *See* Remand Results at 5.  In addition, Commerce confirmed that the same pre-shipping pricing formula was used for all U.S. sales during the period of review.  *See id.* at 5-6.  In short, Commerce reexamined the pre-shipping pricing formula, purchase order, final invoice, and sample sales to confirm that Toyo Kohan finalizes the sales price before shipping based on its

pricing formula, and thus, all material terms of the sale were already established at the time of shipping. *See id*. Accordingly, Commerce continued to find that Toyo Kohan's shipment date that preceded the invoice date, is the appropriate date of sale, at which material terms of the sale were already established. *See* Remand Results at 4-7.

Toyo Kohan block cites Commerce's standard questionnaire and concedes that Commerce explained its "normal practice," but nonetheless argues that Commerce's determination here does not align with the "normal practice." Toyo Kohan Comments at 8-9 (citing *Re: Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel- Plated Flat-Rolled Steel Products from Japan: Request for Inform*, (Aug. 18, 2023) (Initial Questionnaire) (P.R. 17) at I-6). Specifically, Toyo Kohan cites the Initial Questionnaire's explanation that "Commerce will normally use the date of invoice" as the date of sale, and "{i}f, for any specific sale, {the invoice date does not reflect the date when the material terms were established and} the {alternative} date selected {as when material terms of sale were established} is after the shipment date, Commerce will use shipment date as the date of sale instead, but only for the sale in question." *See id;* Toyo Kohan Comments at 8. Accordingly, if Commerce finds that the material terms of sale were established before the invoice date, and if the shipment date precedes the invoice date, Commerce selects the shipment date as the date of sale at which the material terms of sale were established. *See* Remand Results at 5. As the Court recognized, "Commerce's practice is to use the shipment date when the shipment date precedes the invoice date because the shipment date better reflects the date on which the material terms of sale are established." Remand Order at 8 (citation omitted).

Toyo Kohan argues that Commerce should have considered the invoice date as the "starting point." Toyo Kohan Comments at 9. This is exactly what Commerce did. *See* Remand

Results at 5-7.  Commerce reexamined the record evidence and as the "starting point" of its analysis, Commerce confirmed that "it is appropriate to use the final invoice price in field GRSUPRU as Toyo Kohan's U.S. sales price."  Remand Results at 7.  Moreover, Commerce confirmed that the material terms of sale were "already finalized at the time of shipment and *remained the same until the final invoice date.*"  *Id.* at 6 (emphasis added).  Thus, consistent with its normal practice, Commerce examined the final invoice date first and determined whether material terms of sale at the invoice date remained the same since the shipping date.  *See id.*

Toyo Kohan also argues that Commerce "failed to adhere to the {remand order}" because Commerce "did not contemplate using the purchase order date."  Toyo Kohan Comments at 9.  This is incorrect.  Commerce examined the purchase order date and found that "it would be inappropriate to rely on the date of the purchase order as the date of sale" because Toyo Kohan stated that the purchase order prices did not remain the same.  Thus, Commerce found that material terms were not established at the purchase order date.  Draft Remand Results at 5.  This finding was unchanged in the final remand results.

Moreover, as this Court held, Commerce's practice is to examine the shipment date, as opposed to the purchase order date, as the date of sale when the shipment date precedes the invoice date.  *See* Remand Order at 8 (citation omitted).  In the absence of any record evidence demonstrating that the material terms were established at the purchase order date and did not change, there was no basis for Commerce to use the purchase order date as the date of sale.  *See* Remand Results at 5.  Contrary to Toyo Kohan's accusation of "cherry-picking" dates, Toyo Kohan Comments at 14, Commerce simply examined the evidence and followed its normal practice.

8

Next, Toyo Kohan argues that the "price can change up to the date of invoicing" because "the pricing formula does not establish the final price prior to the invoice date." Toyo Kohan Comments at 11. However, Commerce reexamined the purchase order, final invoice, and sample sales reported by Toyo Kohan to confirm that sales price was established in accordance with Toyo Kohan's pre-shipment pricing formula before the shipping date. Thus, material terms of the sale including the price were already established at the time of shipping and did not change. *See* Draft Remand Results at 5-6; Remand Results at 5-7. Thus, Commerce reexamined record evidence to confirm whether Toyo Kohan's pricing formula price remained the same until final invoice date. Remand Results at 4-7. Importantly, Commerce found that Toyo Kohan's price for customer Metal One was set by the pricing formula and "did not change between the shipment date and invoice date." Remand Results at 6 (citing Toyo Kohan Section A Questionnaire Response at 24 (P.R. 22; C.R. 3) and Exhibit A13-1, Part 1 (P.R. 23, C.R. 9)). Commerce also found that Toyo Kohan failed to "provide any information" demonstrating that the final prices deviated from pricing formula prices. Remand Results at 6. Toyo Kohan persists with its argument that the pricing formula generates a "temporary or tentative price," but again fails to provide record support. Toyo Kohan Comments at 12.

Lastly, Toyo Kohan continues to rely on the billing documentation at the time of shipping to contend that the material terms of sale were not established at the shipping date. The Court already held that the billing documentation is "virtually meaningless." Remand Order at 10. Toyo Kohan argues that the existence of such "virtually meaningless" documentation is the reason why Commerce's date of sale analysis is not supported by substantial evidence. Toyo Kohan Comments at 15. Specifically, Toyo Kohan argued that the difference between the gross unit price in the final invoice and the gross unit price shown on Toyo Kohan's self-generated

shipment billing statements (VAL_ADJU difference) demonstrates that the material terms of sale were not finalized at the time of shipping. *See id.* However, Commerce could not rely on the VAL_ADJU difference, which Toyo Kohan self-generated based on the billing statements that the Court found to be "virtually meaningless." Remand Results at 7.

Thus, upon its reexamination of Toyo Kohan's pre-shipping pricing formula, purchase order, final invoice, and sample sales Commerce selected the shipping date as the date of sale because it found that "the material terms of sale … were *already* finalized at the time of shipping and remained the same until the final invoice date." Remand Results at 6 (emphasis added). In the absence of any probative counterevidence, the Court should sustain Commerce's continued use of the shipment date as Toyo Kohan's U.S. date of sale.

**III.    Commerce's Replaced The Cohen's *d* Test With The Price Difference Test In Compliance With *Marmen* And The Remand Order**

Consistent with *Marmen*, which held that "Commerce may re-perform a differential pricing analysis, and … may not rely on Cohen's *d* test", Commerce discontinued the use of the Cohen's *d* test and replaced it with the price difference test for its differential pricing analysis. *Marmen*, 134 F.4th at 1348; *see* Remand Results at 8. Toyo Kohan contends that Commerce "created a simplistic test that does not meet the statutory standard." Toyo Kohan Comments at 16. As we demonstrate below, Toyo Kohan's contentions lack merit.

**A.    Statutory Framework**

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. The antidumping provisions of the Act provide relief for domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value. 19 U.S.C. § 1673. By statute, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices. 19 U.S.C. § 1673; *see also Union Steel v.*

10

*United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013). If Commerce concludes that the U.S. sales are "at less than fair value" – meaning that the products are dumped into the U.S. market, it will direct U.S. Customs and Border Protection to assess an "antidumping duty." *Id.* A sale is at "less than fair value" when, in general, the price charged in the U.S. market – the "U.S. price" – is less than the price charged in the home market – the "normal value." 19 U.S.C. § 1677b(a)(l)(B)(i); 19 U.S.C. §§ 1677a(a), (b). The antidumping duty is equal to the "amount by which the normal value exceeds the {U.S. price} for the merchandise." 19 U.S.C. § 1673.

In determining whether subject merchandise is being sold at less than fair value, Commerce normally compares "the weighted average of the normal values to the weighted average of the export (and constructed export prices) for comparable merchandise" unless it determines another method is appropriate. 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1). Under this average-to-average ("A-to-A") method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period. *See* 19 C.F.R. § 351.414(b)(1).

One downside of the A-to-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which occurs when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex II*)). When Commerce uses the A-to-A method, higher-priced U.S. sales can mask these lower-priced targeted U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices. *See* Uruguay Round Agreements Act (URAA), Statement

11

of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (SAA) at 842 (1994) ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").  In an investigation, for example, if the full extent of dumping is masked, the domestic industry may not receive the relief that the statute affords when the calculated weighted-average dumping margin based on the A-to-A method falls below the two percent *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B).  *See Apex II*, 862 F.3d at 1342.  Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-to-A method or transaction-to-transaction method}."  Congress did not specify how Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time.  Nor did Congress mandate any particular statistical test or technique for Commerce to use in determining if the conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist.

B.    **Differential Pricing Analysis**

To determine whether there is a pattern of prices that differs significantly, Commerce devised the differential pricing analysis which it first used in 2013.  *See Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351, 33,352 (Dep't of Commerce June 4, 2013), and accompanying IDM at Comment 3; *Xanthan Gum from Austria*, 78 Fed. Reg. 33,354, 33,355

12

(Dep't of Commerce June 4, 2013).[2]  The differential pricing analysis consisted of three tests: Cohen's *d* test, ratio test and meaningful difference test.  The Federal Circuit has sustained the ratio and meaningful difference tests, but recently invalidated Commerce's use of the Cohen's *d* test as the tool to determine whether prices differed significantly.  *See Stupp*, 5 F.4th at 1354-56 (sustaining ratio and meaningful difference tests); *Marmen*, 134 F.4th at 1348.  In *Marmen*, the Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions.  *Marmen*, 134 F.4th at 1348.  The Federal Circuit further held that on remand "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here."  *Id*.

The Federal Circuit's decision in *Marmen* had a profound effect on Commerce's practice, affecting hundreds of antidumping proceedings.  Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method is appropriate.[3]  Because the statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be present in exporters' pricing data, as a practical matter, the Federal Circuit's decision to condition the use Cohen's *d* test, a component of differential pricing analysis, on such assumptions rendered Cohen's *d* test unusable in antidumping proceedings.

---

[2] Prior to 2013, Commerce applied several other tests such as the *Nails* test.  *See e.g., Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1328 (Fed. Cir. 2017) (*Apex I*) ("Applying a court-sanctioned methodology knows as the *Nails* test, Commerce identified for Apex a pattern of targeted sales that differed significantly from prices of non-targeted sales." (internal citations omitted)).

[3] The statute, 19 U.S.C. § 1677f-1(d)(1)(B)(i), directs Commerce to determine whether prices differ significantly among purchasers, regions, or time periods.

Following the Federal Circuit's decision in *Marmen*, Commerce changed its practice. Commerce first sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods. *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). To comply with the holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings[4] and adopted the "price difference" test as the test for determining whether price differences among purchasers, regions, or time periods are significant. *See, e.g.*, *Steel Concrete Reinforcing Bar From the Republic of Türkiye: Final Results of the Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 17,246 (April 6, 2026), and accompanying IDM at 3-7; *Stainless Steel Bar From India: Final Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 7,442 (Dep't of Commerce Feb. 18, 2026), and accompanying IDM at 13-14; *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025), and accompanying IDM at 2-5.

Under Commerce's current practice, the differential pricing analysis operates as follows. In the first stage, Commerce applies the price difference test to determine whether prices for comparable merchandise differ significantly. Remand Results at 10-11. Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period

---

[4] Concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings, aligning its practice more closely with the statutory language in 19 U.S.C. § 1677f-1(d)(1)(B). This change has no material effect on this case, because all Toyo Kohan's sales passed the price difference test. Thus, the mixed method would not have been applicable in any event.

14

falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." *Id.*

Next, the ratio test assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. *See id.* at 11. Commerce calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of investigation or review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the relevant period. *Id.*

Finally, if both price difference test and ratio test demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method may be considered, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method. *Id.* at 11-12. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. *Id.*

C. **Toyo Kohan's Challenges To Commerce's Differential Pricing Analysis Are Unpersuasive**

Toyo Kohan acknowledges, as it must, that Commerce's decision to abandon Cohen's *d* test in favor of the price difference test is consistent with *Marmen*. Toyo Kohan Comments at

15

28.  Despite this acknowledgment, Toyo Kohan nonetheless contends that Commerce's differential pricing methodology is unlawful, advancing several arguments against the price difference and ratio tests.  As we demonstrate below, Commerce's differential pricing analysis is consistent with the statute and binding Federal Circuit precedent, and thereforeshould be sustained.

### 1.  The Price Difference Test

The central theme of Toyo Kohan's arguments is that the price difference test "does not satisfy the statutory requirement of identifying a 'pattern' of prices within the meaning of § 1677f-1(d)(1)(B)" and "fails to give effect to the statutory term 'pattern.'"  Toyo Kohan Comments at 25.  This argument misunderstands the basic mechanics of Commerce's differential pricing methodology, including the role of the price difference test.  The "price difference test determines whether prices differ significantly" and the "ratio test determines whether there is a pattern."  Remand Results at 21.  Toyo Kohan's criticism is therefore misplaced considering the purpose of the price difference test.  *Id*.  By focusing its arguments on the suitability of the price difference test for determining a "pattern" rather than on whether the test is suitable for determining whether prices "differ significantly," which is the purpose for the test, Toyo Kohan has failed to provide a sufficient basis for not sustaining the remand redetermination.

The statute requires Commerce to determine if there is a pattern of prices that "differ significantly" among purchasers, regions or time periods.  19 U.S.C. § 1677f-1(d)(1)(B).  The price difference test, which is the first step in Commerce's analysis, determines if the prices for comparable merchandise differ significantly among purchasers, regions or time periods.  Remand Results at 10-11.  Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the

16

prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." *Id*. Commerce's two percent threshold is expressly used in other provisions of the statute that consider the significance of price differences, 19 U.S.C. §§ 1673b(3) and 1673d(a)(4) (defining *de minimis* thresholds), and in Commerce's practice for determining whether prices to affiliates are made in the ordinary course of trade[5] under 19 C.F.R. § 351.403(c).

Given that the two percent difference between U.S. price and normal value (typically a price in the comparison market) is sufficient to make an affirmative finding of sales at less than fair value (and impose antidumping duties if material injury is found by the International Trade Commission), then it is also reasonable to conclude that a two-percent price difference is significant in the context of 19 U.S.C. § 1677f-1(d)(1)(B). *Marmen*, 134 F.4th at 1338 (applying "reasonableness" standard to Commerce's differential pricing analysis). Similarly, the two percent difference in average prices to an affiliated customer and average prices to unaffiliated customers (*i.e.*, market price) is significant, and, thus, provides a sufficient basis to conclude that prices to an affiliated customer were not in the ordinary course of trade, and, thus, should be excluded from calculations.

Additionally, Toyo Kohan conflates Commerce's new price difference test with the P/2 test, contending that Commerce "return{ed} to a practice it definitively rejected as unreliable" by using the two-percent test. Toyo Kohan Comments at 30; *see also* Toyo Kohan Draft Comments at 20 ("{Commerce} previously found that the two-percent test applied in its Draft Remand was not a 'reliable measure for detecting 'obvious' examples of targeted dumping{}' … in

---

[5] Under the arm's-length test, the average prices to an affiliated party customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices, are outside of the ordinary course of trade, and, thus, would be excluded from calculations.

determining whether prices differ significantly for purposes of the analysis called for under Section 777A(d)(1)(B)(i) of the Act.").

First, the "two-percent test" that Toyo Kohan refers to is the P/2 test. Commerce no longer uses the P/2 test, which is different from the price difference test that Commerce now uses under the current practice. Remand Results at 18. Toyo Kohan correctly notes that the P/2 test was used in the *Coated Free Sheet Paper* investigation. Toyo Kohan Comments at 23-24 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,630 (Dep't of Commerce Oct. 25, 2007)). Commerce never returned to the P/2 test; thus, any challenge to the P/2 test is irrelevant. *See* Remand Results at 18-20.

The price difference test examines whether the weighted-average net price to a given purchaser, region, or time period for comparable merchandise is within two percent of the weighted average net price to all other purchasers, regions or time periods, whereas the P/2 test only examined the weighted-average prices of targeted sales that were two percent lower than the weighted-average prices of non-targeted sales with the stated aim of identifying targeted dumping even though there was no comparison with normal value. *Id.* In contrast, the price difference test does not purport to identify targeted dumping and "only examines whether prices differ significantly among purchasers, regions and time periods." Remand Results at 18. Additionally, Commerce explained its reasons for abandoning P/2 test; namely that the P/2 test "did not account for information such as the customer, region or time of the transaction" and "collapsed the pattern and significant difference tests into a single test," and that such concerns are not present in the price difference test. *Id*. at 19.

18

### 2. Toyo Kohan's Challenge To The Ratio Test Fails

#### a. Toyo Kohan Failed to Exhaust Administrative Remedies

During the remand proceedings, Toyo Kohan did not challenge Commerce's use of the ratio test. Toyo Kohan's comments on the draft remand do not contain a single reference to the "ratio test." *See* Toyo Kohan Draft Comments at 10-20; *see also* Remand Results at 21 ("{W}ithout any discussion of the ratio test, Toyo Kohan makes meritless arguments … when the price difference test is not at all about identifying a pattern."). Toyo Kohan now asks the Court for the first time to consider the lawfulness of the ratio test and references the "ratio test" at least 16 times in its comments to the Court. By failing to raise an argument with respect to the ratio test before this Court and Commerce in the remand proceeding, *see* Complaint, ECF No. 6; Pl. Br., ECF No. 28; Case Brief (P.R. 92), Toyo Kohan waived any argument that Commerce should have modified its differential pricing methodology regarding the ratio test on remand and, in any event failed to exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d); *see also Sandvik Steel Co. v. United States*, 164 F.3d 596, 599-600 (Fed. Cir. 1998); *Ceramark Tech., Inc. v. United States*, 61 F. Supp. 3d 1371, 1376-77 (Ct. Int'l Trade 2015) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) and dismissing the plaintiff's argument for failing to exhaust administrative remedies by not raising the argument during remand proceeding).

None of the narrow exceptions to the exhaustion doctrine apply in this case. *See Zhongce Rubber Grp. Co. v. United States*, 352 F. Supp. 3d 1276, 1279 (Ct. Int'l Trade 2018); *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1380 (Ct. Int'l Trade 2009) . First, it would not have been futile for Toyo Kohan to advocate for an alternative to the ratio test. *See Zhongce Rubber*, 352 F. Supp. 3d at 1279 (explaining the futility exception). The pure question of law exception does not apply because methodological choices, including consideration of an

alternative to the ratio test, necessarily involve agency discretion and expertise. *See id.* (explaining that the pure law exception applies in cases where no further agency involvement is needed). Lastly, the intervening judicial decision exception does not apply either because *Marmen* was issued before Toyo Kohan submitted its Draft Remand Comments and, in any event, Marmen set aside the use of the Cohen's *d* test, not the ratio test. *See Gerber Food*, 601 F. Supp. 2d at 1380 (explaining that the intervening judicial decision exception applies when the intervening decision was issued after the decision pending appeal). Accordingly, Toyo Kohan's challenge to Commerce's use of the ratio test, Toyo Kohan Comments at 25-27, should be dismissed because Toyo Kohan failed to exhaust administrative remedies.

### b.  The Federal Circuit Has Sustained the Ratio Test

Even if Toyo Kohan had preserved this argument by exhausting its administrative remedies, its arguments lack merit. The Federal Circuit has sustained the use of the "ratio test." *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020); *see also Stupp*, 5 F.4th at 1355-56. Toyo Kohan invites this Court to disregard *Stupp* because, in its view, the Federal Circuit was not reviewing the statute in light of the "instructions in *Loper Bright* not to deference to agency interpretations of statutory limits on agency power." Toyo Kohan Comments at 29 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024)). This argument provides no basis to ignore the Federal Circuit authority. First, this Court is bound to follow *Stupp*, which is "still subject to statutory *stare decisis.*" *Loper Bright*, 603 U.S. at 412. Second, in sustaining the ratio test, the *Stupp* court did not rely upon *Chevron* deference to interpret statutory language; rather, the court recognized that the ratio test was within Commerce's "discretion to determine a reasonable methodology to implement the statutory directive." *Stupp*, 5 F.4th at 1354. This is the type of delegation, undisturbed by the Supreme Court, that provides agencies discretion to regulate. *Loper Bright*, 603 U.S. at 394-95; *see, e.g.,*

20

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1260 (Fed. Cir. 2024).

Even if Commerce's use of the ratio test were seriously subject to reexamination, Toyo Kohan's arguments are unpersuasive.  Toyo Kohan argues that the ratio test fails to detect a pattern because "prices could be totally random {and} that randomness is not eliminated by simply adding more price transactions to the set being evaluated."  Toyo Kohan Comments at 26.[6]  Toyo Kohan made a similar argument in its comments on draft remand results, asserting that the "two-percent price test" erroneously "converts random variations into affirmative findings."  Toyo Kohan Draft Comments at 18.  As explained in the remand results, there is no concern about random variations because Commerce's differential pricing analysis "does not convert random variations, as it does not look for statistical correlations."  Remand Results at 22.  As such, Toyo Kohan's arguments with respect to random variations are inapposite, regardless of whether it blames the "two-percent price test" or the ratio test.  *Id.*

Next, Toyo Kohan argues that the remand determination "reveals a decision to completely forgo any statistical or analytic rigor, contrary to the Federal Circuit's intent in *Marmen* in interpreting 777A(d)(1)(B)(i) of the Act."  Toyo Kohan Comments at 28.  Toyo Kohan argues that the Federal Circuit's statement – that its holding in *Marmen* "does not prevent Commerce from fashioning and justifying statistical analysis that uses some of ideas underlying Cohen's {d} analysis" – somehow limited Commerce to using statistical tests only, and because the ratio test is not a statistical test, it is beyond the scope of remand.  *Id*.  Toyo Kohan misconstrues *Marmen*.  The language is permissive in stating that it "does not prevent"

---

[6] Toyo Kohan's characterization of exporters' prices as "random" runs counter to common sense.  Exporters do not randomly set prices.  Rather, prices are set by deliberate business decisions.

21

Commerce from "fashioning and justifying" a statistical analysis; it does not require Commerce to do so.  More fundamentally, the antidumping statute does not specify how Commerce may determine whether a pattern exists and whether prices differ significantly, let alone require the use of statistical techniques.  19 U.S.C. § 1677f-1(d)(1)(B).  Had Congress intended to restrict Commerce to a statistical analysis in 19 U.S.C. § 1677f-1(d)(1)(B), it would have done so expressly, as it has done elsewhere in the Tariff Act.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("{W}here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *compare* 19 U.S.C. § 1677f-1(d)(1)(B), *with* 19 U.S.C. §§ 1677f-1(a)&(b).  It would be unreasonable to interpret the permissive language in *Marmen* as mandating the use of a "statistical" analysis that the statute does not require.

Toyo Kohan also disagrees with the dictionary definition of the term "pattern" relied upon by Commerce: "a frequent and widespread incidence."  See Remand Results at 21 & n. 64. Instead, it offers several alternative definitions, which it claims are "primary" definitions. Toyo Kohan Comments at 19.   However, Congress did not adopt these alternative definitions in the text of the statute, and it is unnecessary to engage in the debate about primary and secondary definitions.  The definition of pattern as "a frequent and widespread incidence" is commonly used in the ordinary English language and, more importantly, is consistent with congressional intent of addressing masked dumping through 19 U.S.C. § 1677f-1(d)(1)(B).  *See* SAA at 842 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").

22

Lastly, Toyo Kohan argues that the ratio test "blurs" differences in prices by purchasers, regions, or time periods, instead of analyzing them separately. Toyo Kohan Comments at 26. The Federal Circuit has, however, already held that "aggregation" of sales across purchases, regions, or time periods categories in comparing sales "is not inconsistent with the statute." *Dillinger France*, 981 F.3d at 1325.

Accordingly, not only Toyo Kohan failed to exhaust administrative remedies by failing to raise any argument with respect to the ratio test, Toyo Kohan's arguments with respect to the ratio test lack merit and are contrary to binding Federal Circuit precedent.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:

CHARLIE CHUNG
Attorney
Office of the Chief Counsel for Trade
    Enforcement and Compliance
U.S. Department of Commerce

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

April 20, 2026

Attorneys for Defendant

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this document contains **6,885** words, and therefore complies with the word limitation set forth in ¶ 2(B)(1)(b).


/s/Tara K. Hogan