Slip Op. 26-54

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TOYO KOHAN CO., LTD., <br><br>               Plaintiff, <br><br>      v. <br><br> UNITED STATES, <br><br>               Defendant, <br><br> THOMAS STEEL STRIP CORPORATION, <br><br>               Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 24-00261 <br><br> **Public Version** |

## OPINION AND ORDER

Dated: May 22, 2026

[Sustaining the United States Department of Commerce's final remand redetermination in its antidumping duty order review of diffusion-annealed, nickel-plated flat-rolled steel products from Japan.]

Daniel Lewis Porter, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, for the plaintiff, Toyo Kohan Co., Ltd.  Also on the brief were Gina Marie Colarusso, James Philip Durling, John Taishu Pitt, and William Charles Sjoberg.

Tara Kathleen Hogan, Lead Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant, the United States.  Of counsel on the brief were Charlie Chung and William Mitchell Purdy, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

James R. Cannon, Jr., Cassidy Levy Kent (USA) LLP, of Washington, DC, for the defendant-intervenor, Thomas Steel Strip Corporation.  Also on the brief were Nicole Brunda and Ulrika Kristin Skitarelic Swanson.

      Restani, Judge: Before the court is the United States Department of Commerce's ("Commerce") final remand redetermination pursuant to the court's remand order in Toyo Kohan Co. v. United States, 2025 WL 2986385 (CIT Oct. 23, 2025) ("Toyo Kohan I").  See Final Results

Court No. 24-00261                                                        Page 2
**Public Version**

of Redetermination Pursuant to Court Remand, ECF No. 65-1 (Feb. 18, 2026) ("Remand Results").

In Toyo Kohan I, the court considered Commerce's final results of its administrative review of diffusion-annealed, nickel-plated flat-rolled steel products from Japan, covering period of review ("POR") May 1, 2022, through April 30, 2023.  See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan: Final Results of Antidumping Duty Administrative Review, 2022-2023, 89 Fed. Reg. 95,735 (Dep't Commerce Dec. 3, 2024) ("Final Results").  In its Final Results, Commerce used the earlier of the commercial invoice date or the shipment date—which, in this case, was the shipment date—as the date of sale for Toyo Kohan Co., Ltd.'s ("Toyo Kohan") U.S. sales.[1]  See Final Results; Issues and Decision Memorandum for the Final Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan at 4, P.R. 108 (Nov. 25, 2024) ("IDM"); Remand Results at 1 n.3.  Commerce also applied its differential pricing analysis to Toyo Kohan's U.S. sales, the first step of which was the Cohen's d test.[2]  Decision Memorandum for the Preliminary Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan at 5–6, P.R. 85 (May 16, 2024) ("PDM").

---

[1] Commerce's practice is to rely on the earlier of the shipment or invoice date as the date of sale because "where shipment date precedes invoice date, the shipment date better reflects the date when the material terms of sale are established." Remand Results at 5.  Commerce uses its variable "SALEDATU" to refer to the earlier of the shipment or invoice dates.  Id. at 1 n.3.

[2] The Cohen's d test is a statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group.  Decision Memorandum for the Preliminary Results of the 2022-2023 Administrative Review of the Antidumping Duty Order on Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan at 5, P.R. 85 (Dep't Commerce May 16, 2024) ("PDM").

The court remanded the final determination to Commerce to reevaluate its date of sale determination and to reperform its differential pricing analysis.  See Toyo Kohan I at *7.  For the following reasons, the court sustains Commerce's Remand Results.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinion ordering remand to Commerce, see Toyo Kohan I, and recounts only those facts relevant to the court's review of the Remand Results.  On July 12, 2023, Commerce initiated its administrative review of the antidumping ("AD") duty order covering nickel-plated steel products from Japan for POR from May 1, 2022, through April 30, 2023.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 44,262 (Dep't Commerce July 12, 2023).  Commerce selected Toyo Kohan as the sole mandatory respondent in this review.  See Respondent Selection Memorandum at 1–2, P.R. 16 (Aug. 18, 2023); IDM at 1.  On December 3, 2024, Commerce issued its Final Results.  See Final Results.  Commerce calculated a final weighted-average dumping margin of 4.44 percent.  Id. at 95,736.

On October 23, 2025, the court remanded the Final Results to Commerce.  Toyo Kohan I at *7.  First, the court held that Commerce's use of the shipment date as the date of sale was unsupported by substantial evidence because the record evidence suggested that Toyo Kohan's billing documentation at the time of shipping is "virtually meaningless, as it does not necessarily reflect the quantity or price in the purchase order or the final invoice."  Id. at *5.  Accordingly, the court remanded for Commerce "to reconsider both the date of sale and the sales price, recognizing that when there is an agreed-to pricing formula, there may be a disconnect in the record data for the two matters."  Id.

Court No. 24-00261                                                              Page 4
**Public Version**

Second, the court remanded to Commerce to reperform its differential pricing analysis consistent with the Federal Circuit's holding in Marmen Inc. v. United States, 134 F.4th 1334 (Fed. Cir. 2025) ("Marmen") that Commerce may not apply Cohen's d when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous. Toyo Kohan I at *7; see Marmen at 1348. The court noted that, although Toyo Kohan had failed to challenge Commerce's application of Cohen's d in the underlying administrative proceedings, "any such efforts would have been futile" because the Federal Circuit had not yet resolved the issue of how, if at all, Cohen's d could be applied, while Commerce had "adhered to the methodology faithfully . . . after several opportunities to reconsider the matter." Toyo Kohan I at *7. Accordingly, the court remanded to Commerce to reperform its differential pricing analysis consistent with Marmen. Id.

On February 18, 2026, Commerce filed its Remand Results. See Remand Results. First, Commerce continued to find that Toyo Kohan's reported shipment date is the appropriate date of sale for its U.S. sales. Id. at 4. Second, Commerce reconsidered and discontinued its application of the Cohen's d test and, alternatively, applied the "price difference test." Id. at 8. Toyo Kohan's estimated weighted-average dumping margin increased from 4.44 percent to 4.58 percent. Id. at 2. On March 20, 2026, Toyo Kohan filed its comments on the Remand Results. Pl.'s Conf. Comments on Commerce's Remand Results, ECF No. 68 (Mar. 20, 2026) ("Pl. Cmts."). The government and defendant-intervenor Thomas Steel Strip Corporation ("Thomas Steel") filed their reply comments on the Remand Results. Gov't's Reply to Comments on Remand Results, ECF No. 72 (Apr. 20, 2026) ("Gov't Reply"); Thomas Steel Strip Corp.'s Conf. Reply to Comments on Remand Results at 5, ECF No. 74 (Apr. 21, 2026) ("Thomas Steel Reply").

Court No. 24-00261                                                      Page 5
**Public Version**

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and section 516A of the Tariff Act of 1930, codified as amended, 19 U.S.C. § 1516a(2).  The court sustains Commerce's results in an antidumping duty investigation unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); see Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  U.S. Steel Corp. v. United States, 219 F. Supp. 3d 1300, 1307 (CIT 2017) (citation modified) (citation omitted).

## DISCUSSION

### I.  Commerce Reasonably Concluded That the Shipment Date Was the Date of Sale

Toyo Kohan argues that Commerce correctly continued to use the final invoice price as Toyo Kohan's U.S. sales price in its calculation, but that Commerce unreasonably determined that the material terms of the sale were established on the shipment date.  Pl. Cmts. at 7.  Toyo Kohan contends that Commerce unreasonably relied on its practice to use the earlier of the shipment or invoice dates as the date of sale without carefully considering the record evidence.  Id. at 8–9.  Toyo Kohan argues that the quantity and price of its sales are not established upon the shipment date, meaning that the documentation issued at the time of shipment does not always reflect the final quantity and price provided in the invoice.  Id. at 15.  Toyo Kohan explains that this is because the pricing formula that it agrees with its customer "generates only a temporary or tentative price, which is expressly subject to adjustment based on subsequent negotiations, in addition to the exchange rates, and other commercial factors," and that its U.S. database shows that the majority of transactions experienced post-shipment price changes.  Id. at 12–13.  Toyo Kohan adds that the

billing statement, generated at the time of shipment, reflects the price in Toyo Kohan's system at the time of shipment, which can change up to the time of invoicing to the U.S. customer.  Id. at 10–11 (citing Toyo Kohan's Section C Questionnaire Response at 24, P.R. 39, C.R. 48 (Oct. 10, 2023) ("Sec. C Resp."); Toyo Kohan's Section A Questionnaire Response at 36, P.R. 22–23, C.R. 3, 5–9 (Sep. 15, 2024) ("Sec. A Resp.")).  Because there is often a change in the price reflected on the billing statement issued at the time of shipment and the final invoice, Toyo Kohan concludes that the material terms of the sale are established on the invoice date rather than the shipment date and that, accordingly, the invoice date is the date of sale.  See id. at 15–16, 32.

The government responds that, consistent with its normal practice, Commerce began its analysis with the final invoice date and "determined whether the material terms of sale at the invoice date remained the same since the shipping date."  Gov't Reply at 8.  The government clarifies that "if Commerce finds that the material terms of sale were established before the invoice date, and if the shipment date precedes the invoice date, Commerce selects the shipment date as the date of sale."  Id. at 7.  Thomas Steel notes that the court has previously affirmed this practice because "when a party ships its product to a customer, it is reasonable to assume that the material terms of the sale have been established with the customer."  Thomas Steel Reply at 5 (citing Tension Steel Indus. Co. v. United States, 179 F. Supp. 3d 1185, 1194 (CIT 2016)) (citation modified).  The government argues that Toyo Kohan has failed to show that its pricing formula only generates a temporary or tentative initial price, particularly when the sample sales provided by Toyo Kohan reflect no price change between the shipment and invoice dates.[3]  Gov't Reply at

---

[3] Toyo Kohan repeatedly takes aim at Commerce's reliance on a "single individual U.S. sales transaction" in its analysis, whereas Toyo Kohan provided evidence that "a substantial majority of transactions experienced post-shipment price changes, recorded in the VAL_ADJU field and confirmed by the billing statement and invoice documentation."  See Pl. Cmts. at 13–14.  Yet, as

**Public Version**

9.  The government adds that, while Toyo Kohan points to the billing documentation issued at the time of shipment as evidence that the material terms of sale were not established at the shipment date, Commerce could not rely on any purported difference between the terms of sale listed on the billing documentation and the final invoice because the court held that the billing documentation is "virtually meaningless."  Id. (citing Toyo Kohan I at *5); see Thomas Steel Reply at 6 (noting that any alleged changes between the shipment and invoice dates "were simply internal changes in Toyo Kohan's accounting system, not actual price changes between Toyo Kohan and its customers").

In an antidumping review, Commerce conducts a "fair comparison" of the prices of a good sold in the respondent's home market (the "normal value") with the prices for the same or similar good sold in the U.S. market (the "export price") to determine the dumping margin.  19 U.S.C. §§ 1677b(a), 1677a, 1675(a)(2).  The normal value must be "the price . . . at a time reasonably corresponding to the time of the sale used to determine the export price."  Id. § 1677b(a)(1)(A). Accordingly, Commerce determines the "date of sale," which is the date "when the material terms of sale are established."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4040, 4153.[4]  The material terms generally include price, quantity, payment, and delivery terms.  Eregli Demir ve Celik Fabrikalari T.A.S v. United States, 308 F. Supp. 3d 1297, 1306 (CIT 2018) (citing Sahaviriya Steel Indus. Pub. Co. v. United States, 34 CIT 709, 727, 714 F. Supp. 2d 1263, 1280 (2010), aff'd,

---

Thomas Steel points out, in its Section A Questionnaire, Commerce asked Toyo Kohan to provide sales trace documentation for a representative "sample" sale in the U.S. market, and Toyo Kohan provided this particular sale.  See Thomas Steel Reply at 7–8; Sec. A Resp. at 23.  Toyo Kohan has not shown that Commerce unreasonably relied on a sample sale that Toyo Kohan itself provided.

[4] Congress designated the SAA as "an authoritative expression by the United States concerning the interpretation of the Uruguay Round Agreements and this Act."  19 U.S.C. § 3512(d).

649 F.3d 1371 (Fed. Cir. 2011)).  Commerce will usually use the invoice date as the date of sale

but may use another date if that date "better reflects the date on which the exporter or producer

establishes the material terms of sale."  19 C.F.R. § 351.401(i).  Commerce has a "well-established

and long-standing practice of looking beyond the invoice date to the parties' actual course of

conduct, as well as the parties' expectations concerning the transaction, to determine whether an

earlier date . . . represents the point at which the parties reached a meeting of the minds on the

material terms of sale."  Nucor Corp. v. United States, 33 CIT 207, 259–60, 612 F. Supp. 2d 1264,

1308 (2009) (citation modified) (citation omitted).

Toyo Kohan's regular sales process is to offer its customer a price based on a temporarily

agreed pricing formula.  Sec. A Resp. at 16.  The customer then sends a purchase order to Toyo

Kohan, and Toyo Kohan generates an electronic order confirmation containing the estimated price,

quantity, product specifications, shipment term, and a sales contract.  Id. at 16–17.  Toyo Kohan

produces the merchandise and ships it to the customer in the United States.  Id. at 17.  Toyo

Kohan's system generates a tentative summary bill based on the shipment date and [[

]].    Id.; Sec. C Resp. at 16.  Toyo Kohan later generates a payment

invoice reflecting the [[

]].    Sec. A Resp. at 17.  Toyo Kohan's U.S. sales database contains a

field marked "VAL_ADJU," which reflects the difference between the price listed on the tentative

summary bill generated on the date of shipment and the final invoice.  Sec. C Resp. at 25.  Toyo

Kohan submitted example sales with its Section A Response.  See Sec. A Resp., Exs. A-10A, A-

10B.  The sale reflected in Exhibit A-10A includes a contract of purchase, dated [[

]],    for [[    ]]    metric tons at a unit price of [[        ]]        per metric ton.  Sec. A Resp.,

Ex. A-10A at 55.  The sales contract, dated [[                ]],    lists a slightly different quantity of

[[   ]]   metric tons at the same price of [[      ]]   per metric ton.  Id. at 58.  The billing statement issued at the time of shipment lists the same quantity as the contract of purchase, [[   ]]   metric tons, but a different price per metric ton than the price listed on the contract of purchase and the final invoice.  See id. at 59; Sec. C Resp. at 24; Sec. A Resp. at 36.  The price listed on the final invoice matches the price listed on the contract of purchase and sales contract.  Id. at 62–63.  The sale reflected in Exhibit A-10B includes a contract of purchase, [[

   ]],   for [[   ]]   metric tons with no unit price listed.  Sec. A Resp., Ex. A-10B at 24.  The order confirmation for the sale, dated shortly after the contract, lists the same quantity and a unit price of [[   ]].     Id. at 26.  The sales contract, dated [[           ]],   lists the same values as the order confirmation.  Id. at 1.  The billing statement lists a different quantity but the same unit price.  Id. at 2.  The final invoice lists the same quantity as the billing statement and the same unit price as the order confirmation, the sales contract, and the billing statement.  Id. at 4–5.

In its original determination, Commerce concluded that the material terms of the documented sample sales, such as price and quantity, between Toyo Kohan and its U.S. customer were established at the time of the shipment date, meaning the shipment date was the date of sale.  IDM at 4.  The court remanded to Commerce to reconsider its date of sale analysis.  See Toyo Kohan I at *5.  The court noted that Toyo Kohan's billing documentation at the time of shipping is "virtually meaningless," and that "[w]hile the price reflected in the record at the shipment date may have no substance, the sales actually may or may not be considered to have been made on the date."  Id.  In its remand results, Commerce continued to find that the material terms of the sale for Toyo Kohan's U.S. sales did not change between the shipment date and the invoice date and that, accordingly, Toyo Kohan's shipment date is the appropriate date of sale.  Remand Results at 4.  Commerce noted that the sample sale documentation provided by Toyo Kohan shows that "the

price indicated on the customer's purchase order matched Toyo Kohan's pricing formula, as well

as the price shown on the final invoice." Id. at 5.  Commerce clarified that it used the price reflected

on Toyo Kohan's final invoice to calculate the net U.S. price in its margin calculations.  Id. at 7.

Commerce reasonably selected the shipment date as the date of sale for Toyo Kohan's U.S.

sales.  The parties agree that the only two choices for the date of sale are the shipment date and the

invoice date.[5]  See Pl. Cmts. at 23 n.1; Thomas Steel Reply at 9; Gov't Reply at 8.  Toyo Kohan's

argument that the material terms of sale were not established until the invoice date relies on the

purported difference between the price listed on the billing documents issued at the time of

shipment and the final invoice, denoted in Toyo Kohan's system as the "VAL_ADJU" value.  Pl.

Cmts. at 13.  Yet, as the court noted, and Toyo Kohan and the government agree, the price and

quantity listed on the documentation issued at the time of shipment are "virtually meaningless, as

[they] do[] not necessarily reflect the quantity or price in the purchase order or the final invoice."

Toyo Kohan I at *5; see Pl. Cmts. at 15; Gov't Reply at 9–10.  Accordingly, any purported

---

[5] Toyo Kohan also contends that Commerce failed to comply with the court's remand order to consider the purchase order date as a possible date of sale, although Toyo Kohan specifically notes that it does not actually contend that the purchase order is the appropriate date of sale because of the "large number of U.S. sales transactions for which the final invoice price or quantity are different from the price or quantity on the purchase order."  Pl. Cmts. at 2, 3 n.1.  Toyo Kohan notes that, in its draft remand redetermination, Commerce considered and rejected the purchase order as the date of sale but then removed this analysis from the Remand Results.  Id. at 9.  Toyo Kohan argues that, accordingly, Commerce failed to adhere to the court's Remand Order.  Id.  The government responds that Commerce did in fact consider the purchase order date but dismissed it because "Toyo Kohan stated that the purchase order prices did not remain the same."  Gov't Reply at 8.  Thomas Steel argues that the purchase order date is not the appropriate date of sale because, even though the price was set before the shipment date, the final quantity [[
                                ]].          Thomas Steel Reply at 9.  Because no party has actually argued on remand that the purchase order date is the date of sale, the court does not consider whether Commerce sufficiently considered the issue.

difference between the price listed at the time of shipment and the price listed on the invoice does

not bear on the question of whether the material terms were established at the shipment date.[6]

The record evidence reasonably supports the conclusion that the price and quantity were

actually established by the time of shipment, and that these terms did not change between the

shipment and invoice dates.[7]  The sales reflected in Exhibits A-10A and A-10B demonstrate that

the prices on both invoices match the prices reflected in documentation dated prior to the shipment

date, such as the contracts and order confirmations.  See Sec. A. Resp., Ex. A-10A at 55, 59, 62–

63; Sec. A. Resp., Ex. A-10B at 24, 26,  The only remaining variable, then, is the quantity, and

Toyo Kohan has not suggested that the quantity ever changes after shipment.  Accordingly,

Commerce reasonably concluded that the material terms of the sale were established on the

shipment date, and thus that the shipment date is the date of sale.

## II.    Commerce Reasonably Conducted its Differential Pricing Analysis

Toyo Kohan also challenges the price difference test[8] that Commerce has adopted in the

wake of the Federal Circuit's decision in Marmen invalidating Commerce's application of the

Cohen's d test when the underlying data is not normally distributed, equally variable, and equally

---

[6] Toyo Kohan agrees that Commerce reasonably used the final invoice price as Toyo Kohan's U.S. sales price in its calculation.  See Pl. Cmts. at 7.  This, however, does not in turn mean that the date of sale must also be the date of invoice.  As the court noted in Toyo Kohan I, "when there is an agreed-to pricing formula, there may be a disconnect in the record data for [the price and the date of sale]."  Toyo Kohan I at *5.

[7] While Toyo Kohan argues that its pricing formula leads to price changes between the shipment and invoice dates, Pl. Cmts. at 12–13, the only record evidence it has presented to demonstrate this proposition is the "VAL_ADJU" documentation, see id. at 13, which, as the court has already noted, is based on meaningless documentation issued at the time of shipment.  Toyo Kohan I at *5.

[8] As the court describes in more detail below, the "price difference test" is the first step in Commerce's new differential pricing analysis to determine whether the subject merchandise is being, or is likely to be, sold at less than fair value.  See Remand Results at 10–11; 19 U.S.C. § 1677b(a).

Court No. 24-00261                                                      Page 12
**Public Version**

and sufficiently numerous.  See Pl. Cmts. at 16–32; Marmen at 1348.  Toyo Kohan argues that 19

U.S.C. § 1677f-1(d)(1)(B) permits Commerce to depart from the statutory default average-to-

average comparison methodology only if Commerce finds a "pattern of export prices . . . for

comparable merchandise that differ significantly among purchasers, regions, or periods of time,"

and that Commerce's price difference test does not actually test for a "pattern" as required by the

statute.  Pl. Cmts. at 16–17 (citing 19 U.S.C. § 1677f-1(d)(1)(B)).  Toyo Kohan contends that

Congress intended "pattern" in section 1677f-1 to encompass structured relationships between

prices and purchasers, regions, and period of time, whereas Commerce's price difference test

establishes only whether an arbitrary number of transactions differ among purchasers, regions, or

time periods.  Id. at 18–22.  Toyo Kohan adds that the legislative history of the statute evidences

that Congress authorized the use of alternative comparison methodologies to address "deliberate

pricing practices that mask dumping, not ordinary or random variation."[9]  Id. at 22 (citing SAA at

4177 ("In part, the reluctance to use an average-to-average methodology has been based on a

concern that such a methodology could conceal 'targeted dumping.'")).  Toyo Kohan also argues

that Commerce's continued use of the ratio test is unlawful because it only tests for a limited

number of transactions instead of the statutorily mandated "pattern."  Id. at 26.  Toyo Kohan adds

---

[9] Toyo Kohan argues that in 2008, Commerce even explicitly rejected the adoption of the two percent price difference test for purposes of implementing section 1677f-1(d)(1)(B).  Pl. Cmts. at 24 (citing Certain Steel Nails from the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008)).  The government and Thomas Steel assert that Toyo Kohan confuses the two percent price difference test with the "P/2 test," which Commerce used in the determinations cited by Toyo Kohan but has not resurrected.  Gov't Reply at 17–18; Thomas Steel Reply at 13.  The government adds that, specifically, the P/2 test is different from the two percent price difference test because it covered more steps in the analysis than the price difference test now before the court.  Gov't Reply at 18.  Whether Commerce previously used and rejected the two percent price difference test does not influence the court's reasoning on the reasonableness of the test.  See Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014) (Each administrative review is a "separate exercise of Commerce's authority." (citation omitted)).

that Commerce's Remand Results "completely forego any statistical or analytical rigor, contrary

to the Federal Circuit's intent in Marmen in interpreting [section 1677f-1(d)(1)(B)(i)]." Id. at 28.

The government responds that Commerce had only employed the Cohen's d test in the first

step in Commerce's differential pricing analysis, and that the Federal Circuit has already sustained

the next two steps in the analysis: the ratio and meaningful difference tests. Gov't Reply at 13

(citing Stupp Corp. v. United States, 5 F.4th 1341, 1354–56 (Fed. Cir. 2021) ("Stupp I")). The

government and Thomas Steel argue that, contrary to Toyo Kohan's position, the price difference

test alone does not aim to identify a pattern. Id. at 16; Thomas Steel Reply at 11–12. Rather,

Commerce's overall differential pricing methodology—which replaces Cohen's d with the price

difference test and maintains the previously upheld ratio and meaningful difference tests—as a

whole identifies a "pattern" of prices within the meaning of section 1677f-1(d)(1)(B) because the

"price difference test determines whether prices differ significantly, and the ratio test determines

whether there is a pattern." Gov't Reply at 16 (citing Remand Results at 21); Thomas Steel Reply

at 11–12. The government adds that the two percent cutoff in the price difference test is reasonable

because Commerce uses a two percent threshold in other provisions of the statute that consider

price differences—19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4)—and in Commerce's practice for

determining whether prices to affiliates are made in the ordinary course of trade under 19 C.F.R.

§ 351.403(c).[10] Gov't Reply at 17; see Thomas Steel Reply at 14–15. Thomas Steel adds that in

Marmen, the Federal Circuit did not question the validity of Commerce applying its ratio test to

determine whether a pattern existed. Thomas Steel Reply at 12. Finally, the government argues

---

[10] The government also argues that in the administrative proceedings, Toyo Kohan only challenged
the price difference test and failed to challenge Commerce's use of the ratio test and therefore
failed to exhaust its administrative remedies. Gov't Reply at 19–20. Because the court holds that
Commerce's overall methodology is reasonable, the government's argument is moot.

that the statute does not specify how Commerce may determine whether a pattern exists and whether prices differ significantly.  Gov. Reply at 22.

As already discussed, in an antidumping duty review, Commerce conducts a "fair comparison" of the normal value and the export price to determine whether the subject merchandise is being, or is likely to be, sold at less than fair value.  19 U.S.C. § 1677b(a).  Commerce may use an average-to-average (comparing the weighted-average normal values to weighted-average export prices), transaction-to-transaction (comparing the normal values of individual transactions with the export prices of individual transactions), or average-to-transaction method (comparing the weighted-average normal values with the export prices of individual transactions).  19 C.F.R. § 351.414(b).  Commerce will use the average-to-average method unless it determines that another method is appropriate in a particular case.  Id. § 351.414(c).  Commerce may use the average-to-transaction method if "there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce "explains why such differences cannot be taken into account using [the average-to-average or transaction-to-transaction methods]."  19 U.S.C. § 1677f-1(d)(1)(B).  The rationale informing the average-to-transaction method "is that targeted dumping is more likely to be occurring when export prices fit a pricing model that differs significantly among different periods of time, different purchasers, or different regions of the United States."  Stupp I at 1345 (citing Apex Frozen Foods Private Limited v. United States, 862 F.3d 1337, 1347 (Fed. Cir. 2017)).

Congress has not delineated exactly how Commerce shall assess whether there is a "pattern of export prices . . . differ[ing] significantly among purchasers, regions, or periods of time."  Id. (citation omitted); see 19 U.S.C. § 1677f-1(d)(1)(B).  In 2013, Commerce began applying its "differential pricing analysis."  See Differential Pricing Analysis; Request for Comments, 79 Fed.

Court No. 24-00261                                                                    Page 15
**Public Version**

Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014); Xanthan Gum from the People's Republic

of China, 78 Fed. Reg. 33,351 (Dep't Commerce June 4, 2013).  Commerce conducted the

differential pricing analysis in three steps: First, Commerce applied the Cohen's d test to determine

whether sales prices in the test group are significantly different from the sales prices in the

comparison group.  Stupp I at 1346–7 (citation omitted).  Second, Commerce applied the ratio test

to sales that "passed" the Cohen's d test (i.e., sales with significantly different sales prices from

those in the comparison group).  Id. at 1347.  If the total percentage of transactions that passed the

Cohen's d test was 33% or less, Commerce used the average-to-average method to calculate the

weighted average dumping margin.  Id.  If the total percentage was 66% or more, Commerce

tentatively used the average-to-transaction method.  Id.  If the total percentage was between 33%

and 66%, Commerce tentatively applied the average-to-transaction method to those transactions

passing the Cohen's d test and the average-to-average method to the remainder of the transactions.

Id. (citation omitted).  Third, Commerce conducted the "meaningful difference test" in which it

assessed whether using the average-to-average or the other tentative calculation method led to

meaningfully different results.[11]  Id. (citation omitted).  If the comparison led Commerce to

conclude that there was no meaningful difference, Commerce applied the average-to-average

---

[11] The first step of the meaningful difference test was to calculate the weighted average dumping
margin using the average-to-average method.  Stupp I at 1347.  The second step was to calculate
the weighted average dumping margin with the tentatively selected method.  Id.  The third step
was to compare the results.  Id.  If the margin for the average-to-average method was below the de
minimis threshold—which is 2 percent in less-than-fair-value investigations, see 19 U.S.C.
§ 1673d(a)(4)—and the margin for the tentatively selected method was above that threshold, or if
both were above the threshold and the margin for the tentatively selected method was 25 percent
greater than the average-to-average margin, then Commerce considered there to be a meaningful
difference, and selected the alternative approach.  See id.  If Commerce concluded there was no
meaningful difference, Commerce applied the average-to-average method across the board.  Id.

method to all sales.  Id.  Otherwise, Commerce selected the alternative comparison method.  Id.

(citation omitted).

The Federal Circuit held that Commerce's ratio test, step two of the analysis described

above, "reasonably implements the statutory requirement that Commerce determine whether there

is a 'pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of

time' before selecting the average-to-transaction method."[12]  Id. at 1355 (quoting 19 U.S.C.

§ 1677f-1(d)(1)(B)(i)).  The Federal Circuit reasoned that the ratio test "is [] a conventional method

for quantifying comparisons across discrete groups: counting the number of divergent sales prices,

as identified by an effect-size test, and calculating the population percentage of those divergent

sales prices."  Id. at 1354.  The Federal Circuit further held that Commerce's selection of the 33%

and the 66% cutoffs in the ratio test is reasonable.  Id. at 1354–55.  The Federal Circuit also held

---

[12] Toyo Kohan also argues that, while the Federal Circuit accepted the ratio test as part of the differential pricing test in Stupp I at 1353, the Federal Circuit's reasoning rested on Commerce's discretion to determine a reasonable methodology.  Pl. Cmts. at 29.  Toyo Kohan concludes that the decision is therefore no longer applicable in the wake of Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024) ("Loper Bright").  Id. at 29.  In Loper Bright, the Supreme Court overruled Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), holding that courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.  Loper Bright at 412.  Courts exercise their independent judgment in deciding statutory meaning, id. at 394, and may conclude that Congress explicitly delegated authority to the agency to give meaning to the terms so long as it is consistent with the Constitution.  Id. at 413.  Congress afforded flexibility to Commerce in section 1677f-1(d)(1)(B) by including the phrase "differ significantly," which is an open-ended qualifier.  Garg Tube Export LLP v. United States, 740 F. Supp. 3d 1355, 1366–67 (CIT 2024) ("Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." (citing Loper Bright at 395)); see 19 U.S.C. § 1677f-1(d)(1)(B).  The SAA confirms Congress' delegation: "[T]he Administration intends that in determining whether a pattern of significant price differences exist[,] Commerce will proceed on a case-by-case-basis . . . ."  SAA at 4178.  Because the text and legislative history of this subsection of the statute confirm that Congress intended that Commerce have discretion in making the relevant determination, the Federal Circuit's holding in Stupp I is undisturbed by the Supreme Court's holding in Loper Bright.

that Commerce's use of the "meaningful difference test," step three in the analysis described above, is reasonable.  Id. at 1356 (citing Apex Frozen Foods, 862 F.3d at 1348–49).

In Marmen, the Federal Circuit held that Commerce unreasonably used the Cohen's d test, the first step of its differential pricing analysis, "to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous."  Marmen at 1348.  The Federal Circuit remanded, directing that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on the Cohen's d test for data sets like those here."  Id.  The Federal Circuit "[did] not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying [the Cohen's d] analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue."  Id.  Following the Federal Circuit's decision, Commerce sought information and public comment on alternatives to the Cohen's d test.  See Alternatives to the Use of the Cohen's d; Request for Comment, 90 Fed. Reg. 21,277 (Dep't Commerce May 19, 2025).

In its remand redetermination, Commerce discontinued its application of the Cohen's d test to Toyo Kohan's U.S. sales data and instead applied the "price difference test" as the first step in its differential pricing analysis.  Remand Results at 8.  Commerce outlined that "[f]or comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods."  Id. at 10 (citation modified).  If the weighted-average net price to the given purchaser, region, or time period falls outside of the two percent band, then those prices "pass" the price difference test.  Id. at 10–11.  Commerce then proceeds to steps two

and three: the ratio[13] and meaningful difference[14] tests.  Id. at 11–12.  Using its new differential

pricing analysis, Commerce preliminarily found that 100 percent of the value of Toyo Kohan's

U.S. sales passed the price difference test, and "confirm[ed] [with the ratio test] the existence of a

pattern of prices that differ significantly among purchasers, regions, or time periods."  Id. at 12.

Commerce also preliminarily applied the meaningful difference test and accordingly applied the

average-to-transaction method to calculate the weighted-average dumping margin for Toyo

Kohan.  Id.

When reviewing Commerce's choice of methodology, the court considers whether the

methodology "reasonably implements a given statutory directive," Stupp I at 1351 (quoting Stupp

Corp. v. United States, 365 F. Supp. 3d 1373, 1378 (CIT 2019)).  Commerce's two percent price

difference test reasonably implements section 1677f-1(d)(1)(B)'s directive.  As discussed above,

Congress has not specified how Commerce shall assess whether there is a "pattern of export prices

. . . differ[ing] significantly among purchasers, regions, or periods of time."  19 U.S.C. § 1677f-

---

[13] Commerce's ratio test now differs from that described above because Commerce has discontinued the use of the "mixed method" in administrative proceedings.  Remand Results at 8. Now, "[i]f 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the [average-to-transaction] method.  If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR."  Id. at 11.  Toyo Kohan, however, does not argue that this difference in the ratio test renders it unreasonable now.  See Pl. Cmts. at 27–29.  Rather, Toyo Kohan argues that the ratio test does not identify a pattern of sales.  Id.  As the court will discuss, this argument fails.

[14] Commerce's meaningful difference test described in the Remand Results matches the pre-Marmen meaningful difference test described in note 11, supra; see Stupp I at 1347.  Specifically, Commerce considers whether using the average-to-transaction method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the average-to-average method.  Remand Results at 11.  Commerce considers a difference to be meaningful if "(1) there is a 25 percent relative change in the weighted-average dumping margins between the [average-to-average] method and the [average-to-transaction] method where both rates are above the de minimis threshold; or (2) the resulting weighted-average dumping margins between the [average-to-average] method and the [average-to-transaction] method move across the de minimis threshold."  Id. at 11–12.

1(d)(1)(B); see Stupp I at 1346. Toyo Kohan shoots arrows at Commerce's price difference test but does not explain how the test may be improved or propose a meaningful alterative. See Pl. Cmts. at 16–32. Toyo Kohan dedicates much of its brief to its argument that Commerce's "new approach continues to ignore the statutory test to find a 'pattern' of prices." Id. at 16. Yet, as Commerce pointed out in its Remand Results, the price difference test—which has replaced the Cohen's d test and is just the first step of Commerce's differential pricing analysis—aims to determine whether prices differ significantly, not whether a pattern exists. See Remand Results at 17–18. Instead, Commerce uses the ratio test, the second step in the differential pricing analysis, to determine whether there is a pattern to the price differences identified by the two percent price difference test. Id. at 18. While Toyo Kohan also takes aim at the ratio test, see Pl. Cmts. at 25–27, as discussed, the Federal Circuit has already affirmed Commerce's use of the ratio test as a reasonable approach to detect a pattern of sales in the light of the broad language in section 1677f-1(d)(1)(B).[15] See Stupp I at 1354.

---

[15] Toyo Kohan also challenges the ratio test because Commerce "appl[ies] the 33 percent test to the total, and not by the different purchasers, regions, or time periods, and not by the different categories of comparable merchandise." Pl. Cmts. at 26. The government responds that the Federal Circuit has already held that the aggregation of sales across purchases, regions, or time periods categories in comparing sales "is not inconsistent with the statute." Gov. Reply at 23 (citing Dillinger France S.A. v. United States, 981 F.3d 1318, 1325 (Fed. Cir. 2020)). Thomas Steel responds that the ratio test "necessarily considers such distinctions [between purchasers, regions, and time periods] because the output from the first step of the differential pricing analysis—which measures whether there are significant price differences between purchasers, regions, or time periods—is used as an input in the second step of the differential pricing analysis, the ratio test." Thomas Steel Reply at 13 (citing Marmen at 1346). In Stupp I, the Federal Circuit explained that before Commerce applied the Cohen's d test as the first step of its differential pricing analysis, Commerce segmented the respondent's exports sales into product groups and then segmented each product group into subsets based on the purchasers, regions, and time periods. Stupp I at 1346. Once Commerce conducted the first step, which at the time of Stupp I was the Cohen's d test, Commerce applied the ratio test to the observations in each product group that passed the Cohen's d test. Id. at 1347. The Federal Circuit held that this use of the ratio test "reasonably implements the statutory requirement that Commerce determine whether there is 'a

Accordingly, the court considers only whether the two percent price difference test reasonably determines whether prices differ significantly as directed by section 1677f-1(d)(1)(B)(i). The language of the statute affords Commerce discretion to fashion its methodology. See Garg Tube Export, 740 F. Supp. 3d at 1367 ("Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."). The Federal Circuit's holding in Marmen also leaves Commerce discretion to amend its differential pricing analysis: The court "[did] not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying [the Cohen's d] analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." Marmen at 1348. The court left Commerce the option to "re-perform a differential pricing analysis" that does not rely on Cohen's d for data sets that were not normally distributed, equally variable, and equally and sufficiently numerous. Id. Commerce took the latter route: Rather than apply the ideas underlying Cohen's d, Commerce constructed a new price difference test. As already discussed, the language of the statute affords Commerce discretion to fashion its methodology. See Garg Tube Export, 740 F. Supp. 3d at 1367 ("Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."); see supra note 12. Accordingly, Toyo Kohan's argument that the price difference test

---

pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of time' before selecting the average-to-transaction method." Id. at 1355 (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)). Just as before, Commerce's new differential pricing analysis evaluates all U.S. sales by purchaser, region, and time period. See Remand Results at 10. Commerce's application of the ratio test to the total value of sales by the respondent in the United States during the period of review, therefore, does not render the test unreasonable. See Remand Results at 11; Stupp I at 1355.

**Public Version**

foregoes any statistical or analytical rigor, <u>see</u> Pl. Cmts. at 28, does not succeed. The task Congress

has set in section 1677f-1(d)(1)(B) has no obvious solution. Toyo Kohan has not suggested what

route Commerce should take and has not shown that Commerce has unreasonably implemented

the statutory directive of section 1677f-1(d)(1)(B). The court therefore sustains Commerce's

differential pricing analysis.

## CONCLUSION

For the foregoing reasons, Commerce's remand redetermination, ECF No. 65-1, is

sustained. Judgment will be entered accordingly.


                                                                     /s/ Jane A. Restani
                                                                    Jane A. Restani, Judge


Dated: May 22, 2026
        New York, New York